UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| MARSHALL FREIDUS and EDWARD P. ZEMPRELLI, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:09-cv-01049-LAP (**Consolidated**) |
| | : | |
| Plaintiffs, | : | CLASS ACTION |
| | : | |
| vs. | : : | |
| | : | |
| ING GROEP N.V., et al., | : : | |
| | : | |
| Defendants. | : : | |
| | x | |

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who acquired the 6.375% ING Perpetual Hybrid Capital Securities, 7.375% ING Perpetual Hybrid Capital Securities and the 8.50% ING Perpetual Hybrid Capital Securities of ING Groep N.V. ("ING" or the "Company") pursuant or traceable to a false registration statement and three separate prospectuses issued in connection with the Company's June 2007, September 2007 and June 2008 Offerings.[1]  Specifically, ING sold 41,800,000 6.375% Securities at $25 per share for proceeds of over $1 billion in June 2007, 58 million 7.375% Securities at $25 per share for proceeds of over $1.45 billion in September 2007 and 80 million 8.50% Securities at $25 per share for proceeds of approximately $2 billion in June 2008. This action asserts strict liability and negligence claims under the Securities Act of 1933 ("1933 Act") against ING, its senior insiders and the investment banks that underwrote the Offerings (collectively, "defendants").

2.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired the Securities pursuant or traceable to the Company's false and misleading Registration Statement and Prospectus, in connection with the Company's Offerings, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all

---

[1]     The 6.375% ING Perpetual Hybrid Capital Securities ("6.375% Securities" or "June 2007 Offering"), 7.375% ING Perpetual Hybrid Capital Securities ("7.375% Securities" or "September 2007 Offering") and the 8.50% ING Perpetual Hybrid Capital Securities ("8.50% Securities" or "June 2008 Offering") (collectively, the "Securities" or the "Offerings") were conducted between June 2007 and June 2008 (the "Offering Period") pursuant to ING's Form F-3ASR Registration Statement filed December 1, 2005, (the "2005 Shelf Registration Statement") and the numerous prospectuses and filings with the U.S. Securities and Exchange Commission ("SEC"), as set forth in ¶59 (individually, the "June 2007 Offering Materials," the "September 2007 Offering Materials" and the "June 2008 Offering Materials," collectively, the "Offering Materials").

relevant times, members of their immediate families and their legal representatives, heirs, successors

or assigns and any entity in which defendants have or had a controlling interest.

### INTRODUCTION

3.      Between June 2007 and June 2008, ING used the Offering Materials to sell more than

$4.4 billion in preferred securities pursuant to plaintiffs and the Class.  The Offering Materials

omitted and/or misrepresented material facts concerning the Company's exposure to tens of billions

of dollars of mortgage related assets, the decrease in value of those assets, and/or the resulting

deterioration of the Company's capital position and liquidity.

4.      Prior to June 2007, ING and the Individual Defendants had caused the Company to

acquire tens of billions of dollars in unhedged, highly risky securities backed by non-prime Untied

States residential mortgages.  These portfolios, consisting of subprime and "Alt-A" U.S. residential

mortgage-backed securities ("RMBS"), represented more than €31 billion ($45.2 billion) –

*approximately 75% of the Company's total equity* – by the third quarter of 2007.[2]

5.      Alt-A and subprime RMBS are securities backed by mortgages extended to borrowers

who do not qualify for standard loans, and therefore are inherently more risky.  ING's portfolio of

Alt-A and subprime RMBS was made riskier still by the fact that more than 60% of the Company's

Alt-A and subprime RMBS were comprised "option ARM" and negative amortization ("NegAm")

loans – loans that allowed borrowers to pay low monthly payments for a period of time before

increasing dramatically, often forcing borrowers to default.

---

[2]      For purposes of comparing euros to dollars throughout the complaint, plaintiffs use an
exchange rate of 1.46 dollars to the euro, which was the average exchange rate during the Offering
Period.

6.    The value of ING's Alt-A and subprime RMBS portfolios was directly tied to the strength of the U.S. housing market, which by the second quarter of 2007 was in the midst of a total collapse. As property values dropped and the mortgages underlying mortgaged-backed securities defaulted, the market for those securities became illiquid. As a result, the value of ING's Alt-A and subprime RMBS portfolios plummeted.

7.    The Offering Materials were false and misleading, as they misrepresented and omitted material facts regarding the Company's RMBS portfolios. For example, in the Offering Materials used in connection with the June 2007 Offering, defendants failed to disclose ***any mention whatsoever*** of ING's massive position in these high-risk securities, as well as the financial and liquidity risk that those securities posed to the Company. On August 8, 2007, less than four weeks after that June 2007 Offering, ING disclosed for the first time that it was holding €3.2 billion ($4.6 billion) in subprime RMBS and a dramatic €28.7 billion ($41.9 billion) in its Alt-A RMBS portfolio. This compared with reported shareholder equity of €40 billion and "Capital and Reserves" of €40 billion.

8.    The September 2007 Offering Materials were also false and misleading. While the September 2007 Prospectus included some small amount of information concerning ING's RMBS portfolio, it did so in a very limited and misleading way. For example, while defendants provided the total amount of exposure to Alt-A and subprime RMBS in the September 2007 Offering Materials, they provided virtually no details about the risk associated with those assets. Instead, defendants misleadingly told Lead Plaintiff and the Class that any such risk was "limited":

> ***To date this market disruption has had a limited impact on ING. Overall, ING considers its subprime, ALT-A and CDO/CLO exposure to be of limited size and relatively high quality***.

9.    Instead, defendants touted that more than 99.9% of its Alt-A RMBS were "AAA" and "AA" rated, suggesting that ING's portfolio was comprised of safe investments and distinguishing

ING from other banks that were writing down these assets on a massive scale. Defendants failed to disclose, however, that these ratings were based on outdated models and faulty data or the fact that Alt-A and subprime loans underlying these "AAA" rated securities, and specifically "option ARM" and negative amortization loans, were defaulting at an unprecedented rate and were located in states like California and Florida where the housing collapse was at its worst.

10.     Similarly, defendants reported seemingly high "FICO" scores and Loan to Value ("LTV") ratios of the underlying mortgages to support their conclusion that the risk was "limited" and the mortgages were "relatively high quality." But these numbers were hopelessly outdated, as they were based on an analysis done *at the time the mortgages were issued*. In the rapidly declining housing market and economy of 2007-2008, those historic LTV ratios and FICO scores from earlier years were not just meaningless, they were misleading.

11.     By the time of the last Offering in June 2008, ING had failed to properly writedown its RMBS portfolios and other debt securities, and increase its loan loss reserves – thus it was substantially overstating its net income, shareholder equity and capital adequacy. Other participants in the Alt-A and subprime markets had either gone bankrupt or taken huge writedowns by this time. For instance, over a year earlier in February 2007, HSBC Securities (USA) Inc. ("HSBC") announced it would take $10.56 billion in impairments on its subprime loan portfolio. In October 2007, Merrill Lynch Pierce, Fenner & Smith Incorporated ("Merrill Lynch") wrote down its ABS Collateralized Debt Obligations ("CDOs") by $12.4 billion and UBS Securities LLC ("UBS") wrote down $4.4 billion in subprime RMBS and CDOs. This was followed by another $10 billion writedown by UBS in December 2007.

12.     While ING admittedly had exposure of €30 billion ($43.8 billion), defendants adjusted ING's losses in the June 2008 Offering Materials by only taking a €26 million ($37.9

million) impairment on its subprime RMBS (**less than 1%** of the €2.8 billion portfolio) and a miniscule €17 million ($24.8 million) impairment on its Alt-A RMBS portfolio (**only 0.06%** of the €27.1 billion portfolio) from the prior quarter.  In truth, ING should have taken an additional €1.2 billion in charges in the form of increased impairments and loan loss reserves.

13.     These misstatements and omissions allowed ING to raise over $4.4 billion of precious "Tier 1" capital by selling securities in three separate Offerings to Lead Plaintiff and the Class in 2007 and 2008.  Defendants' false statements and omissions were material because the exposures noted above posed a significant threat to the Company's capital adequacy and liquidity.  Indeed, throughout 2007 and 2008 ING was suffering massive losses on its subprime and Alt-A RMBS assets.

14.     Maintaining its liquidity and well-capitalized status was critical to ING in 2007 and 2008.  ING's 2006 Annual Report on Form 20-F emphasized that "[t]he main objective of ING's liquidity strategy is to maintain sufficient liquidity in order to ensure safe and sound operations."  Accordingly, in the SEC filings incorporated by reference in the Offerings Materials, ING repeatedly represented that it was "well capitalized."

15.     In fact, by the second quarter of 2007, ING was not "well capitalized" at all.  Rather, it was operating with a very high degree of leverage, holding a small amount of capital against a massive asset base.  Because ING had a razor-thin margin for error, losses in even a small portion of its risk-adjusted assets could destroy much of its capital base and liquidity, rendering the Company under-capitalized and subjecting it to regulatory action or, worse, causing investor flight.  Thus, as the U.S. housing market collapsed, it was critical for defendants to disclose to investors in the Offerings the risks of its mortgage-related exposures, and accurately account for losses in those assets and their impact on ING's liquidity and capital adequacy.  Defendants failed to do so.

16.     In fact, ING's RMBS portfolio was so toxic to the Company's balance sheet that on October 20, 2008 (less than four months after the June 2008 Offering), it was forced to seek a *€10 billion ($14.6 billion) bailout* from the Dutch government.  This bailout was due to the declines in the value of ING's RMBS assets during 2007 and 2008.  Yet because of the dramatic declines in the value of these assets, even the nearly $15 billion bailout was insufficient.

17.     Less than three months later, ING admitted that its RMBS portfolio threatened the bank's liquidity.  ***To avert a total collapse, the Dutch government intervened and on January 26, 2009 took ownership of over 80% of the €27.7 billion ($40.4 billion) Alt-A portfolio on ING's books at 90% of par (way above prevailing market prices), in what was called the Illiquid Assets Back-up Facility***.  The Company finally admitted that the market prices for its Alt-A portfolio had collapsed, severely impacting the Company's results and equity.  ING's Chief Executive Officer ("CEO") was immediately fired.

### JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  In connection with the acts complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 22 of the 1933 Act.

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the Underwriter Defendants (defined below) conduct business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

**Plaintiffs**

21.     Lead Plaintiff Marshall Freidus acquired the 6.375% Securities issued pursuant or traceable to the false and misleading Registration Statement and Prospectus as set forth in the Certification filed with the Court on April 6, 2009.  He was appointed Lead Plaintiff by Order on May 19, 2009.

22.     Plaintiff Ray Ragan acquired the 7.35% Securities pursuant or traceable to the false and misleading Registration Statement and Prospectus and has been damaged thereby.  His Certification is attached hereto.

23.     Lead Plaintiff Belmont Holdings Corp. ("Belmont") acquired the 8.50% Securities issued pursuant or traceable to the false and misleading Registration Statement and Prospectus as set forth in the Certification filed with the Court on April 6, 2009.  Belmont was appointed Lead Plaintiff by Order on May 19, 2009.

**Defendants**

        **(a)     ING Groep**

24.     Defendant ING is a bank holding company and a major global financial services provider operating in Europe, the United States, Canada, Latin America, Australia and Asia.  ING is headquartered in Amsterdam, The Netherlands.  Its common shares trade on the Euronext exchange, while the Securities at issue in this case trade on the New York Stock Exchange ("NYSE").  ING is the Registrant of the false and misleading Registration Statement and Prospectuses, and the issuer of all of the securities.

25.     Defendant ING Financial Holdings Corporation ("ING Holdings") is a wholly owned subsidiary of ING located in New York.  It is a global financial services company which provides

banking, insurance and asset management services in over 50 countries. ING Holdings signed the false and misleading 2005 Shelf Registration Statement.

26.    Defendant Stichting ING Aandelen ("Stichting ING") is a wholly owned subsidiary of ING, and is organized as an administrative trust that holds approximately 99% of the outstanding ordinary shares of ING and that issues bearer depositary receipts for such shares and for ING's preference shares. Stichting ING governs the rights of the holders of bearer depositary receipts relative to Stichting ING. Stichting ING signed the false and misleading 2005 Shelf Registration Statement.

**(b)    Individual Defendants**

27.    Defendant Michel J. Tilmant ("Tilmant") was a member of the Executive Board of ING from 1998 to May 2000, Vice-Chairman from May 2000 to April 2004 and Chairman of the Executive Board and CEO of the Company from April 2004 to January 2009. Defendant Tilmant signed the false and misleading 2005 Shelf Registration Statement.

28.    Defendant John C.R. Hele ("Hele") was Chief Financial Officer ("CFO") of the Company and has served as a member of the Executive Board of ING since 2007. Hele left the Company effective March 31, 2009. Defendant Hele signed the false and misleading September 24, 2007 Form 6-K and the 2007 Form 20-F.

29.    Defendant Cees Maas ("Maas") was CFO of ING from July 1996 until his retirement from the Company in 2007, and Vice-Chairman of the Executive Board from April 2004 to 2007. Defendant Maas signed the false and misleading 2005 Shelf Registration Statement and 2006 Form 20-F.

30.    Defendant J. Hans van Barneveld ("Barneveld") was Principal Accounting Officer of ING. Defendant Barneveld signed the false and misleading 2005 Shelf Registration Statement, May

22, 2007 Form 6-K, June 4, 2007 Form 6-K, September 24, 2007 Form 6-K, May 15, 2008 Form 6-K and the May 19, 2008 Form 6-K.

31.    Defendant Eric F. Boyer de la Giroday ("de la Giroday") is, and at all relevant times was, a member of the Executive Board of ING since April 2004.  Defendant de la Giroday signed the false and misleading 2005 Shelf Registration Statement.

32.    Defendant Fred S. Hubbell ("Hubbell") was a member of the Executive Board of ING until April 2006.  Defendant Hubbell signed the false and misleading 2005 Shelf Registration Statement.

33.    Defendant Eli P. Leenaars ("Leenaars") is, and at all relevant times was, a member of the Executive Board of ING.  Leenaars signed the false and misleading 2005 Shelf Registration Statement.

34.    Defendant Alexander H.G. Rinnooy Kan ("Rinnooy Kan") was a member of the Executive Board of ING until April 2006.  Rinnooy Kan signed the false and misleading 2005 Shelf Registration Statement.

35.    Defendant Hans K. Verkoren ("Verkoren") was a member of the Executive Board of ING until April 2006.  Verkoren signed the false and misleading 2005 Shelf Registration Statement.

36.    Defendant John K. Egan ("Egan") is, and at all relevant times was, CFO and Managing Director of ING Holdings.  Egan signed the false and misleading 2005 Shelf Registration Statement on behalf of ING Holdings.

37.    Defendant A.H.J. Risseeuw ("Risseeuw") was Chairman of the Executive Board of Stichting ING until December 2006.  Risseeuw signed the false and misleading 2005 Shelf Registration Statement.

38.    Defendant H.J. Blaisse ("Blaisse") is, and at all relevant times was, a member of the Executive Board of Stichting ING since December 1999. Defendant Blaisse signed the false and misleading 2005 Shelf Registration Statement.

39.    Defendant P.M.L. Frentrop ("Frentrop") is, and at all relevant times was, a member of the Executive Board of Stichting ING since July 2004. Defendant Frentrop signed the false and misleading 2005 Shelf Registration Statement.

40.    Defendant T. Regtuijt ("Regtuijt") is, and at all relevant times was, a member of the Executive Board of Stichting ING since May 1996. Defendant Regtuijt signed the false and misleading 2005 Shelf Registration Statement.

41.    Defendant J.J.M. Veraart ("Veraart") is, and at all relevant times was, a member of the Executive Board of Stichting ING from August 2001, and Chairman of the Executive Board since December 2006. Defendant Veraart signed the false and misleading 2005 Shelf Registration Statement.

42.    The defendants referenced above in ¶¶27-41 are referred to herein as the "Individual Defendants."

### (c)    Underwriter Defendants

43.    Defendant UBS is the U.S. investment banking and securities arm of UBS Investment Bank. UBS Investment Bank provides a range of financial products and services worldwide. UBS acted as an underwriter in connection with each of the Offerings.

44.    Defendant Citigroup Global Markets Inc. ("Citigroup") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Citigroup acted as an underwriter in connection with each of the Offerings.

45.    Defendant Merrill Lynch provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking and related products and services on a global basis.  Merrill Lynch acted as an underwriter in connection with each of the Offerings.

46.    Defendant Wachovia Capital Markets, LLC ("Wachovia Capital") is the corporate and investment banking side of brokerage firm Wachovia Securities (both companies are subsidiaries of banking giant Wachovia).  Wachovia Capital provides financial and corporate advisory services, private capital, debt private placement, mergers and acquisitions advice, underwriting, and equity investing.  It also offers real estate financing, risk management services, and structured products such as asset-backed and mortgage-backed securities.  Wachovia Capital acted as an underwriter in connection with each of the Offerings.

47.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals.  Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions.  Morgan Stanley acted as an underwriter in connection with each of the Offerings.

48.    Defendant Banc of America Securities LLC ("Banc of America") is the investment banking arm of Bank of America.  Banc of America offers trading and brokerage services; debt and securities underwriting; debt and equity research; and advice on public offerings, leveraged buyouts, and mergers and acquisitions.  Banc of America acted as an underwriter in connection with each of the Offerings.

49.     Defendant RBC Capital Markets Corporation ("RBC") is the corporate and investment banking division of Royal Bank of Canada.  RBC acted as an underwriter in connection with each of the Offerings.

50.     Defendant J.P. Morgan Securities Inc. ("JP Morgan") is one of the oldest operating financial services firms in the world and is a leader in investment banking, financial services, asset and wealth management and private equity.  JP Morgan acted as an underwriter in connection with each of the Offerings.

51.     Defendant ING Financial Markets LLC ("ING Financial") offers investment banking and corporate financial services. ING Financial acted as an underwriter in connection with each of the Offerings.

52.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") operates as an investment bank in the United States. Its businesses include securities underwriting, sales and trading, investment banking, private equity, alternative assets, financial advisory services, investment research, and asset management.  Credit Suisse acted as an underwriter in connection with the June 2008 Offering only.

53.     Defendant HSBC is a registered broker dealer of securities and a Futures Commission Merchant.  HSBC is also engaged in investment banking underwriting, dealing and brokering of debt and equity securities and futures contracts and is a primary dealer in U.S. Government and federal agency securities.  HSBC acted as an underwriter in connection with the June 2008 Offering only .

54.     Defendant ABN Amro Inc. ("ABN Amro") is a leading banking and fixed-income capital markets firm.  ABN Amro acted as an underwriter in connection with the June and September 2007 Offerings.

55.     Defendant A.G. Edwards & Sons, Inc. ("A.G. Edwards") is a full service broker-dealer providing securities and commodities brokerage, investment banking, trust services, asset management, financial and retirement planning, private client services, investment management and other related financial services to individual, governmental and institutional clients.  A.G. Edwards is a subsidiary of defendant Wachovia Capital.  A.G. Edwards acted as an underwriter in connection with the June 2007 and September 2007 Offerings.

56.     Pursuant to the 1933 Act, the defendants referenced in ¶¶43-55 above are referred to herein as the "Underwriter Defendants."

57.     The Underwriter Defendants are strictly liable for the false and misleading statements in the Registration Statement and Prospectuses.  In connection with the Offerings, the Underwriter Defendants drafted and disseminated the Registration Statement and Prospectuses and were paid substantial fees in connection therewith.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

58.     On or about December 1, 2005, ING filed the 2005 Shelf Registration Statement with the SEC.  The 2005 Shelf Registration Statement incorporated by reference subsequently filed prospectuses:

### The Securities We Are Offering

We may offer any of the following securities from time to time:

- debt securities;
- preference shares; and
- American depositary shares.

*       *       *

- 13 -

The SEC allows us to "incorporate by reference" the information we file with them, which means:

- incorporated documents are considered part of this prospectus;
- we can disclose important information to you by referring you to those documents; and
- information that we file with the SEC in the future and incorporate by reference herein will automatically update and supersede information in this prospectus and information previously incorporated by reference herein.

59.     Pursuant to the 2005 Shelf Registration Statement, defendants completed three Securities Offerings by filing Prospectuses during the period June 2007 through June 2008, as follows:

| Offering | Date Filed | Total Proceeds (Including Over Allotment) | SEC Filings Incorporated by Reference |
|---|---|---|---|
| 6.375% ING Perpetual Hybrid Capital Securities | June 6, 2007 | $1 Billion | 6/4/07 6-K; 5/22/07 6-K; 2006 Annual Report |
| 7.35% ING Perpetual Hybrid Capital Securities | September 27, 2007 | $1.5 Billion | 9/24/07 6-K; 6/4/07 6-K; 5/22/07 6-K; 2006 Annual Report |
| June 2008 8.50% ING Perpetual Hybrid Capital Securities | June 10, 2008 | $2.0 Billion | 5/27/08 6-K; 5/19/08 6-K; 5/15/08 6-K; 2007 Annual Report |

**The Public Offering Materials Misstated and Omitted**
**Material Facts Regarding ING's Exposure to RMBS**

60.     In the years leading up to 2006, the U.S. housing market boomed as a massive volume of mortgage loans were given to higher credit risk consumers.  Mortgage brokers and lenders began to relax their lending standards and issue mortgages on increasingly risky terms to the lender in order to compete for business and capitalize on the expanding market.  Demand for homes amid lower interest rates and easy credit terms fueled a rise in home prices. Rising home prices fueled a

- 14 -

building boom in new homes.  Inevitably, as lenders attempted to expand to ever more potential homebuyers, aggressive and oftentimes predatory lending practices by U.S. lenders spurred ever increasing loans to U.S. borrowers whose ability to repay their loans became questionable and particularly sensitive to interest rate changes.  The end result was that millions of home buyers were able to borrow much more money than they could practically afford to repay.

61.    Lenders were willing to extend loans to riskier borrowers because there were mortgage purchasers in the secondary market willing to relieve the lender of the risk associated with these loans.  Investment banks would bundle mortgages into various security and debt obligations, or mortgage-backed securities ("MBS"), which were sold to institutional investors.  RMBS were a common type of MBS which were created by originating and purchasing thousands of residential mortgages, pooling them together, and then issuing securities that entitled the purchaser to a specified payout of the cash generated when borrowers made payments on the underlying mortgages.

62.    The RMBS underwriters evaluated the underlying mortgage assets and calculated the risk of default, called an "expected loss."  Based on the expected loss calculation, the underwriters then structured the securitization into a set of discrete tranches, each of which bore a discrete degree of remove from that expected loss sufficient to merit a given credit rating.  The farther removed from the predicted loss, the higher the credit rating; the more proximate to the loss, the lower credit rating.  The average RMBS consisted of approximately 2,500 to 4,000 mortgages.

63.    In order for the cash flows of the underlying mortgages to flow through to the RMBS security holder, each RMBS identified at least one mortgage processing agent (usually an institution) that was responsible for servicing each of the mortgages in the RMBS pool.  When the RMBS was then marketed and sold, the purchaser was able to view all the information relevant and necessary to justify the price charged for that asset.  In the instance of RMBS, that included the detailed

underwriting analysis of each mortgage in the pool and its subsequent payment history.  To the extent any information was lacking, the RMBS holder could obtain that information from the identified servicing agent.  In this way, ING had access to any and all information necessary to evaluate the risk of each of the RMBS it held.

       1.       **ING's Residential Mortgage Backed Securities**

       a.       **"Alt-A" RMBS**

64.     The term "Alt-A" is shorthand for "Alternative to Agency," which historically meant loans not meeting the published standards of Freddie Mac or Fannie Mae.  An Alt-A loan falls just above subprime status, but still below that of a "prime" loan because of deficiencies in the borrower's credit profile.  For example, a borrower typically does not provide complete documentation of his assets or the amount or source of his income.  Other characteristics of Alt-A loans include: (i) LTV in excess of 80%, but that lacks primary mortgage insurance; (ii) a borrower who is a temporary resident alien; (iii) the loan is secured by non-owner occupied property; or (iv) a debt-to-income ratio above traditional limits.

65.     ING stated in its 2007 Annual Report that it did not have a "single standard definition" of Alt-A RMBS, but that it generally classified Alt-A loans as all mortgages that fell below prime status, but above subprime status, because they were deficient in one or more of the following categories: LTV ratio, loan documentation, or FICO score.  Generally, ING represented it classified RMBS backed by loans made to borrowers with a FICO score of 640-730, an LTV of 70-100%, or less than 50% of required documentation as "Alt-A."  During the Offering Period, ING held more than €27 billion ($39.4 billion) (par) worth of Alt-A RMBS.

       b.       **Subprime RMBS**

66.     "Subprime RMBS," are residential mortgage-backed securities in which the underlying collateral consists of subprime mortgages.  Subprime mortgages carry a significantly

higher default risk than prime mortgages or even Alt-A mortgages due to the creditworthiness of the borrowers who take out these loans. Essentially, an investment in subprime RMBS is an investment in a pool of subprime home mortgage loans. During the Offering Period, ING held more than €3.2 billion ($4.6 billion) (par) worth of sub-prime RMBS.

> **2.    ING's Alt-A and Subprime Portfolios Contained High-Risk Assets that Were Vulnerable to the Collapsing United States Housing Market**

67.    One of the most important factors influencing RMBS performance is the "vintage" of the underlying mortgages (the year the mortgages in the RMBS pool were issued). As credit and underwriting standards loosened beginning in 2002, more and more borrowers who should not have been receiving mortgages were approved for larger and larger loans. Moreover, the types of loans being issued became riskier, such as "option ARM" loans which allowed borrowers to have introductory low "teaser" payments that would reset to a much higher payment within 1, 3 or 5 years. As a result, newer vintages of RMBS become exponentially more risky.

68.    ING's Alt-A and subprime RMBS portfolios were primarily (more than 65%) made up of vintages from 2006 and 2007. These vintages were the very riskiest, and were being heavily marked down by other banks in late 2007 due to the high rates of defaults. According to a 2008 report by Standard & Poors, at the end of 2007, 8.5% of all Alt-A mortgages in the 2006 vintage were delinquent, and both the 2006 and 2007 vintages had deteriorated significantly faster than the 2005 vintage. After 18 months, Alt-A loans that were originated in 2006 had a delinquency rate of 4.71%, versus 1.97% for such loans from 2005 and 1.07% for 2004.

69.    By May 2008, the total delinquencies of Alt-A RMBS were 13.10%, 17.34% and 10.88% of the aggregate pool balances for the 2005, 2006 and 2007 vintages, respectively, up 7.03% for the 2005 vintage, 6.32% for 2006 and 6.77% for 2007 since March 2008. Serious delinquencies (defined as 90-day plus and foreclosures) were approximately 8.47%, 11.48% and 6.64% of the

aggregate pool balances, respectively, up 10% for the 2005 vintage, 8.61% for 2006 and 10.85% for 2007.

70.     And the numbers were worse for subprime mortgages originated in 2006 and 2007. As of April 2008, total delinquencies for subprime RMBS transactions were 36.79%, 37.11% and 25.87% of the current aggregate pool balances for the 2005, 2006 and 2007 vintages, respectively. This was an increase of approximately 2% for the 2005 vintage, 4% for 2006 and 6% for 2007 when compared with the prior month!

71.     Adding to the risk, one third of ING's underlying Alt-A mortgages were variable rate mortgages or "Hybrid ARMs" which meant that they had adjustable interest rates which would reset at different periods.  Adjustable rate mortgages have a much higher delinquency and default rate than fixed rate mortgages.  The vast majority of ING's adjustable rate mortgages were two to five year ARMs.  Prior to 2005, borrowers had been able to simply refinance these mortgages when it came time for the ARMs to adjust.  As the housing market collapsed, however, these mortgages were underwater and unable to refinance.  Specifically, by the end of 2007, the 2006 vintage delinquency rate was 9.6% for variable rate mortgages, compared to 6.2% for fixed rate mortgages.

72.     ING's Alt-A portfolio also contained more than €7.4 billion in "negative-amortization" loans, which allows a borrower to skip an interest payment and have it added on to the principle, up to a defined level (usually up to 115% of the initial loan).  This means the LTV could continue to increase even if the housing market stopped falling (it did not).  A negative-amortization mortgage is much riskier than even an interest-only mortgage because the initial payments do not cover all of the interest, so the interest deficiencies are added to the loan's principal, which increases over time along with the borrower's indebtedness.  Once the flexible payment period ends, the

monthly payments are even larger because the loan amount has increased and the amortization period is shorter.

73.    Compounding the risk, a significant percentage of the mortgages in ING's Alt-A and subprime portfolios originated from California and Florida – including up to 65% of the "negative amortization" loans.  This was especially risky because by the end of 2007 those two markets were being devastated.  As the housing collapse gained momentum throughout 2007, foreclosures skyrocketed, loan originators began going bankrupt and the financial media publicly described the fallout from the lax mortgage requirements and salacious lending practices.  According to a report by RealtyTrac, Inc., foreclosures in August 2007 had more than doubled from the prior year.  Moreover, in that month alone, California led the nation with more than 41,000 Notices of Default, while Florida was second with more than 26,000.

### 3.    Collapse of the Residential Mortgage-Backed Securities Market

74.    When housing prices began to stall and interest rates began to rise in mid-2005, homeowners who over-extended themselves and those with poor credit and unstable income, began to default on their loans.  These default rates began to rise dramatically in 2006, leading to a cascading effect on the credit markets due to the correlation of the rising rate of default for subprime and Alt-A mortgages with the decline in value of the securities backed by these mortgages.

75.    By early 2006, investors were increasingly concerned about financial institutions' exposure to mortgage-backed securities.  In a February 13, 2006 article titled, "Coming Home to Roost," *Barron's* reported that the market was experiencing increased "anxiety" over "mortgage-backed securities" given the "easy lending practices" that prevailed in recent years.  Specifically, the article reported that "[v]arious doomsday scenarios are being posited" regarding "Hybrid ARMs" loans, "Stated Income" or "No Doc" loans, and "Option ARMs" mortgages, and warned that a

"looming 'reset problem'" would lead to a "deadly feedback loop . . . in which forced home sales

will diminish collateral values, which, in turn, will foster yet more delinquencies and forced sales.

Before the crisis runs its course, the deflationary contagion will infect all manner of homes, from

high-end to starters . . . ." The article also noted that because of the packaging of mortgages "all or

most of the credit risk on the loans is shifted to the investors in securitizations . . . [but] [s]hould this

funding dry up, the sector's financing structure could seize up. And that would spell big trouble not

only for sub-prime borrowers, but for the entire U.S. housing market . . . and economy."

76. These problems grew worse in 2006, as borrowers continued to default in record

numbers. As a result, the market for Alt-A and sub-prime RMBSs and related CDO/Collaterized

Loan Obligations ("CLOs") began to show substantial distress. This distress resulted from three

primary indicators used by industry experts to assess the current state of, and future prospects for,

the U.S. mortgage market, which had turned negative: (1) rising interest rates; (2) the declining U.S.

Housing Price Index, which measures changes in U.S. home prices; and (3) delinquency rates, which

monitor the percentage of mortgagees who default on their mortgage obligations.

77. As illustrated in the chart below, by late-2006, and accelerating into 2007, the

domestic housing market collapsed. For a financial institution like ING, with substantial exposure to

troubled geographic housing markets and exotic mortgages, this collapse immediately resulted in

rising delinquency rates in its RMBS and impaired loans.



78.     The combination of higher interest rates and the dramatic slowing of U.S. property appreciation (and decline in some areas) was devastating to Alt-A and subprime borrowers who over-extended themselves by purchasing homes that they could not afford.  Faced with new, higher mortgage payments, little refinancing options and declining home values that wiped out what little equity they had in their homes, millions of U.S. mortgagees, particularly Alt-A and sub-prime mortgagees, defaulted on their mortgages:





**Alt-A Default Rates Accelerating**

**Annualized Monthly Defaults as % of Outstanding Balance**

Source: Fitch, Loan Performance



79. By late 2006, periodicals that focused on banking and real estate had begun documenting the collapse. For example, on November 13, 2006, *American Banker* reported:

UBS Securities issued a report last week that found that ***subprime loans made this year are "going bad" at a rate that is 50% faster than the rate for those made last year***.

- 22 -

About 2.4% of subprime loans originated this year were more than 60 days delinquent by the sixth month, compared with 1.6% for 2005 loans and 0.9% for 2004 loans, the report said.

80.     On November 27, 2006, *National Mortgage News* reported:

"How bad is 2006 subprime collateral is a question I think most of you have an opinion on already," said Mr. Zimmerman [the Executive Director of UBS Securities]. "*We were a bit surprised at the magnitude and speed at which this vintage year deteriorated*."

Mr. Liu [a Director at UBS Securities] pointed out at the conference that the industry is seeing "a steady increase of delinquencies and that rate has been accelerating over the past two to three months." Not only have there been higher delinquencies but also the delinquency numbers have been showing up earlier in 2006 than they had been in 2005. "2006 is tapped to be the worst vintage ever," he said.

*Foreclosures have also risen.  And the foreclosures, like the delinquency rates, are also happening at earlier dates*.

81.     On December 14, 2006, the Mortgage Bankers Association ("MBA") reported in its quarterly National Delinquency Survey that late payments and new foreclosures on U.S. homes rose in the third quarter and were likely to grow as a massive wave of ARMs reset at higher interest rates. MBA also reported that delinquencies rose for all home loans, but most notably for adjustable loans to nonprime borrowers who were already stretched before mortgage rates climbed. MBA estimated that between $1.1 trillion and $1.5 trillion of mortgages faced resets in 2007.

82.     On December 19, 2006, *Bloomberg* reported:

S&P Cuts Alt-A Mortgage Bonds; Analysts Warn on Prime

*Standard & Poor's reduced its ratings on about $7 billion of Alt-A mortgage securities, citing a sustained surge in delinquencies during the past five months* on loans considered a step above subprime.

The lowered bonds represent about 1 percent of the $694 billion of securities backed by Alt-A mortgages created in 2005 and 2006, the largest ratings company said today in a statement. Countrywide Financial Corp., Bear Stearns Cos., and Lehman Brothers Holdings Inc. issued the most debt downgraded, S&P said.

"*These actions reflect a persistent rise in the level of delinquencies among the Alt-A mortgage loans supporting these transactions,*" along with S&P's expectations for further home price declines, the New York-based unit of McGraw-Hill Cos. said.

The downgrades underscore how loosened lending standards across the mortgage market and borrower fraud are mixing with the first nationwide declines in home prices since the Great Depression and a tightening of credit to sour a wider range of home loans, not just subprime mortgages to borrowers with poor credit. Alt-A loans are sometimes called "near-prime."

Prime "jumbo" mortgages from recent years packaged into securities also have rising delinquencies that may create losses among some bonds with investment-grade ratings, according to reports yesterday by New York-based securities analysts at Credit Suisse Group and UBS AG. *UBS called increases in late payments on adjustable-rate mortgages, or ARMs, from this year "alarming*."

"*It's not just a subprime problem," Joshua Rosner, managing director at New York-based research firm Graham Fisher & Co., said* in a telephone interview today.

*       *       *

Total Delinquencies

*Since July, late payments on Alt-A loans in bonds issued in 2005 have increased 37.3 percent to 8.62 percent, while delinquencies for such mortgages in 2006 securities rose 62.1 percent to 11.64 percent, S&P said.* Moody's Investors Service late last month completed a review of certain Alt-A bonds, downgrading or placing under review a total of $11.7 billion.

83.     On December 22, 2006, the Center for Responsible Lending ("CRL") issued a study that revealed that 2.2 million American households are likely to lose their homes, resulting in as much as $164 billion in foreclosures. CRL's research reported that risky lending practices had triggered the worst foreclosure crisis in the modern mortgage market, projecting that one out of five (19.4%) nonprime loans issued during 2005-2006 would fail.

84.     In the first quarter of 2007, Moody's noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."

85.     By early 2007, this collapse of the housing and mortgage market was affecting all of the financial institutions that had invested or participated in these markets.  Some of the top mortgage lenders with Alt-A and sub-prime U.S. mortgage exposure started to reveal enormous losses and warned of future losses.  For example, on February 7, 2007, citing trouble with the U.S. sub-prime lending market, HSBC Holdings announced that provisions for bad loans would be 20% higher than analysts expected.  On that the same day, New Century Financial, the second largest sub-prime mortgage originator in the U.S., reported significant problems with loan defaults – causing it to later file for Chapter 11 bankruptcy in April 2007.

86.     The collapse of the housing market had spread beyond subprime mortgages as defaults rose dramatically in Alt-A and even in "prime" loans.  For instance, in a February 18, 2007 article titled "Will Other Mortgage Dominoes Fall?," *The New York Times* reported:

> It is becoming clear . . . that subprime mortgages are not the only part of this market experiencing strain.  Even paper that is in the midrange of credit quality – one step up from the bottom of the barrel – is encountering problems.  That sector of the market is known as Alt-A, for alternative A-rated paper, and it is where a huge amount of growth and innovation in the mortgage world has occurred.
>
> The Alt-A segment of the market used to consist of mortgages issued to professionals – like doctors – with unpredictable incomes.  Now Alt-A is dominated by so-called affordability mortgages – adjustable-rate interest-only loans, 40-year loans and silent-second loans.  You, dear risk-taking homeowner, know all about these loans that allowed people to buy a house that might have been beyond their means but looked attractive because they didn't need to make payments on the principal in the early years.

87.     And on April 24, 2008, *Housingwire.com* reported:

> Moody's Begins Downgrading AAA-Rated Alt-A RMBS to Junk
>
> Moody's Investors Service issued more Alt-A downgrades on Thursday morning, this time taking a heavy hand to 32 different Aaa-rated tranches from 10 different Alt-A deals.  Many of the downgrades even pushed former Aaa's into non-investment grade categories – a stunning descent for top-rated Alt-A mortgage bonds that underscores two key points.

*First, defaults are obviously accelerating*. Second, many Alt-A deals were issued with less in the way of overcollateralization – which, in plain English, means that these deals *will start to see downgrades sooner, compared to the relative stress that a typical subprime RMBS* deal can withstand before the hits start coming at the Aaa level.

88.    The decline in the value of mortgage-backed securities was also reflected in specialized indices, the ABX.HE ("ABX") and the TABX.HE ("TABX"). The ABX index, developed in 2006, was designed to track the value of RMBS tranches at each rating level (AAA, AA, A, BBB and BBB-). Similarly, the TABX index, launched in 2007 by a consortium of banks attempts to replicate the market value of a basket of RMBS and CDOs. The TABX index accounts for high levels of subordination and therefore provides a benchmark for the value of senior MBS.

89.    Market experts, analysts *and even ING itself* relied upon the ABX and TABX indices to monitor the value of RMBS and CDO tranches. Beginning in October 2006, the ABX BBB and BBB- indices began suffering substantial declines, after MBS risks began to materialize via monthly tracking reports showing that 2006 vintage mortgages were experiencing record levels of nonpayment.

90.    By February and March 2007, the ABX index for BBB and BBB- RMBS tranches had suffered serious declines – some BBB dropped as much as 60% of par. During that time, market participants anticipated that the values of junior tranche RMBSs such as these *were going to zero*.

91.    RMBS continued to hemorrhage value throughout the summer of 2007. By September 30, 2007, the ABX triple-B indices had fallen to 30% of par, while the TABX indices for all junior mezzanine tranches showed such tranches to be effectively worthless. The TABX index for mezzanine super seniors had fallen to 33% of par. In addition, ABX indexes for higher RMBS tranches also showed substantial declines: single-A ABX indices were at 50% of par, while double-A ABX indices were at 80%.

92.    During the fourth quarter of 2006 and most of 2007, the value of the ABX Indices plummeted, evidencing the market's expectation of a measurable decrease in the estimated future cash flows on Alt-A and subprime RMBS and CDO/CLO.  In fact, as illustrated in the charts below, even ABX indices tied to purportedly higher quality mortgage bonds – those rated AAA and AA – also declined significantly:





93.     By October 2007, banks continued to reveal losses as a consequence of the mortgage crisis. Merrill Lynch announced that it would write-down its ABS CDOs by $12.4 billion. Also in October 2007, Swiss banking giant UBS wrote-down $4.4 billion in subprime related RMBS and CDOs.

94.     In November 2007, Morgan Stanley announced a $3.7 billion hit, Bank of America took a $3 billion write-off and Citigroup was forced to sell a $7.5 billion stake to Abu Dhabi in a desperate effort to raise capital. The Federal Reserve also injected $41 billion into the money supply for the banks to borrow, the largest single expansion since September 11, 2001.

95.     In December 2007, UBS reported an additional $10 billion write-down in subprime related RMBS and CDOs and Bank of America liquidated a $12 billion cash fund. During the same time frame, Merrill Lynch received a $6.2 billion cash infusion from outside investors.

96.     By the end of 2007, more rating agencies were downgrading non-prime AAA rated RMBSs at a rapid pace. For example, between December 31, 2007 and February 25, 2008, the credit ratings associated with *more than $16 billion* of Freddie Mac's AAA RMBS securities were downgraded below AAA by at least one nationally recognized rating agency.

97.     And the rating agencies themselves were being politically and publically attacked at the time for failing to timely downgrade subprime and Alt-A RMBS much sooner and much faster. On September 26, 2007, *National Public Radio* reported:

> Lawmakers will grill executives from credit-rating agencies for their role in the subprime mortgage crisis at today's Senate committee hearing. ***Critics say firms like Moody's and Standard & Poor's failed to see the risk. They say rating agencies should have downgraded the bonds backed by risky home loans much earlier***.

> The firms made their first downgrade last July, at least two months after defaults on subprime loans started rising. Still, there's probably not much Congress can do to overhaul the rating system – beyond finger pointing, that is. There's even

less it can do to restore confidence in the debt products that have exploded on Wall Street in recent years.

98.     The year 2008 saw the housing and credit crisis continue unabated.  On January 30, 2008, UBS announced that it had written-down an additional $4 billion on its mortgage-related assets as of December 31, 2007.  Then in February 2008, UBS announced that its write downs for fiscal year 2007 totaled $18.7 billion, primarily due to its exposure to U.S. mortgages.  This total included a $2 billion write down for the fourth quarter of 2007 on the bank's $26.6 billion Alt-A portfolio.

99.     By March 2008, the collapsing real estate and credit markets led to the destruction of one of this country's oldest investment banks.  On March 16, 2008, Bear Stearns announced it would be acquired for $2 a share by J.P. Morgan (later increased to $10 per share) in a fire sale to avoid bankruptcy.  The deal had to be brokered by the Federal Reserve, which provided up to $30 billion to cover potential Bear Stearns losses – mostly resulting from mortgage-backed securities.

100.    During the three months ended March 31, 2008, American International Group, Inc. ("AIG") recorded an impairment charge of $5.6 billion that was "primarily related to the significant disruption in the residential mortgage and credit markets."

101.    In April 2008, the International Monetary Fund, which oversees the global economy, warned that potential losses from the credit crisis could reach $1 trillion.  Shortly after this announcement, UBS doubled its subprime write downs, writing down another $19 billion.

### 4.    ING Collapses

102.    Throughout 2007 and 2008, defendants repeatedly tried to distance ING from the crisis being felt by other large financial institutions.  In the Offering Materials defendants reassured investors of "limited direct impact," from the collapsing market, and reiterated that ING's RMBS portfolio was "high quality."  Moreover, unlike other large banks, ING took miniscule writedowns.

103.    But in the second half of 2008, analysts started to become skeptical of ING's capital position.  For example, a June 23, 2008 Landsbanki Kepler analyst report stated:

> We believe ING Bank could manage a period of low capitalisation, although our stress-test scenario (Table 2) shows a EUR3.0bn P&L impairment would decrease the core Tier 1 ratio to 5.14% and the Tier 1 ration below 7%.  ***At such a level, we believe ING would be required to issue new capital to maintain its current rating***.

104.    As reported in an August 13, 2008 *Dow Jones International News* article, entitled "THE SKEPTIC: ING Steady For Now":

> At a time when financial institutions are reducing their leverage as fast as possible, ING is moving the other way, with second-quarter excess cash, after meeting its capital adequacy targets, falling to EUR3.9 billion from EUR6.2 billion a year ago.
>
> The reason is that ING's share buybacks, dividend payouts and the capital consumption at its banking division have outpaced profit growth.  ***But if markets remain volatile for rest of the year, leading to more write-downs, it's unlikely ING will meet its capital-ratio targets***.

105.    Two months after the last Offering, on August 13, 2008, the Company announced its financial results for the second quarter of 2008, in which ING disclosed that it had downgraded its €2.2 billion subprime RMBS portfolio by €415 million in the second quarter of 2008, brining the total cumulative downgrades to €927 million, and that as of June 30, 2008, the Company's subprime RMBS was 79.7% of par value verses 81.4% at the end of the first quarter of 2008.  The Company also stated that it had taken a €400 million impairment on its €22 billion Alt-A RMBS portfolio, and that as of June 30, 2008 the market value had declined to 82.7%, compared to 84.7% at the end of the first quarter of 2008.

106.    Less than two months later, on October 17, 2008, ING surprised the market by pre-releasing earnings and announcing that deepening market turmoil in the third quarter of 2008 generated impairments and negative fair-value changes that would cause the Company to book a net loss of around €500 million for the period, including a negative revaluation of its ABS portfolio of

€333 million of impairments reducing shareholder equity to €23.9 billion. The Company announcement was intended to calm market worries that ING might need to seek support from the Dutch State. ING also stated that its banking operations were within target capital ratios, with its Tier 1 ratio above its targeted 8.5%, and Core Tier 1 at 6.5% as of the end of September. The Company also reaffirmed its own credit rating.

107.    Despite these assurances, three days later on October 20, 2008, ING shocked the market when it announced that *ING would need to strengthen their core capital position with a €10 billion ($14.6 billion) bailout from the Dutch government due to increasing exposures in their "pressurized asset classes*." The Company also announced that they sold ING Life Taiwan in a fire sale for €447 million to raise additional capital.

108.    Three weeks later, on November 11, 2008 the Company announced its final third quarter of 2008 earnings, and disclosed major further deterioration of its Alt-A RMBS portfolio. *ING's Alt-A RMBS was now marked down to the same value as its subprime RMBS* (75% of par value) with the €5 billion of 2006 vintage Alt-A RMBS at 75.2% and the 9.8 billion of 2007 vintage Alt-A RMBS at 64% of notional value. The NegAm RMBS had further collapsed to 52% of par value, down from 63% at June 30, 2008. In total, during the third quarter of 2008, shareholder equity fell another €3.4 billion.

109.    By November 2008, ING also began to concede what had become obvious – that its risk management and stress testing procedures were not as defendants had originally stated – and so defendants began "de-risking" the Company's asset portfolio. In a November 12, 2008 conference call, CEO Tilmant admitted:

> I think it's obvious that we are going to look to our portfolio of business and assess our portfolio and look at the risk embedded in those portfolios of activities, with the intention to see how much we can de-risk our business and our portfolio or de-risk our businesses.

110.    By the end of the third quarter of 2008, ING had taken a total pre-tax negative revaluation of €6.1 billion on its Alt-A RMBS portfolio.

111.    On January 23, 2009 the Company announced its earnings for the fourth quarter of 2008 and stated that it would have to take an additional €3 billion impairment and loss on pressurized assets, with €1.8 billion in the Alt-A RMBS portfolio. ***The Company also announced that, in an unprecedented bailout, the Dutch State agreed to bear the risk on 80% for each security in ING's €28 billion Alt-A portfolio***. As a result, ING would write back revaluation of reserves of €5 billion in the shareholder's equity, but ING would lose some €400 million a year in interest income. The transaction released €5 billion of International Financial Reporting Standards ("IFRS") equity, as it led to a write-back of negative revaluation reserves and a €15 billion reduction in risk-weighted assets. And the Tier 1 Capital ratio of the bank increased to 9.5% from 8.5% at end of September. Before the bailout, ING's Alt-A portfolio was valued at $0.60-$0.65 on the euro. In this bailout the Dutch government effectively guaranteed 80% of ING's Alt-A portfolio at a price of $0.90 on the euro.

112.    On the same day, the Company announced that Tilmant's reign as CEO had ended. The bank would eventually post a €3.3 billion loss for the fourth quarter of 2008, much worse than analysts expected, including another €1.8 billion impairment charge to its Alt-A portfolio.

113.    Plaintiffs have been damaged by defendants' false and misleading statements. On the date the first lawsuits were filed in this action, the 6.375% Securities closed at a price of $10.20 per share, or $14.80 per share less than the $25 per share offering price, the 7.375% Securities closed at a price of $10.92 per share, or $14.08 per share less than the $25 per share offering price, and the 8.50% Securities closed at a price of $13.47 per share, or $11.53 per share less than the $25 per share offering price.

**The Offering Materials Contained False and Misleading Statements**

114.    Throughout the Offering Period, the Company misrepresented the scope and nature of its exposure to Alt-A and subprime RMBS, as well as the material risk it posed to the Company's Capital ratios and liquidity.  In the June 2007 Offering, defendants simply provided no information whatsoever concerning its massive exposure to the rapidly declining RMBS market.   In the September 2007 Offering, defendants provided very limited information and assured investors that its RMBS portfolio was "high quality" and the risk these assets posed was "limited."  In the June 2008 Offering, defendants provided much more detail concerning the amount and type of RMBS held by ING, but massively over-valued those assets even as other banks and institutional investors had taken huge writedowns.  As a result, throughout the Offering Period investors were unaware of the very substantial risks to – and deterioration of – the Company's capital, shareholder equity, and liquidity.

**The June 2007 Offering**

115.    On or about June 8, 2007, ING filed, pursuant to Rule 424(b)(5) of the 1933 Act, its Prospectus for the June 2007 Offering, which formed part of the Registration Statement (the "June 2007 Prospectus").  Pursuant to the Registration Statement and the June 2007 Prospectus, on June 13, 2007, defendants sold at least 41,800,000 6.375% Securities to the public at $25 per share.

116.    The June 2007 Prospectus reported, as of March 31, 2007, ING shareholders' equity of €40.117 billion.  The June 2007 Prospectus also incorporated by reference: (1) ING's  Annual Report on Form 20-F for the year ended December 31, 2006, filed on April 20, 2007; ING's Report on Form 6-K filed on June 4, 2007; and ING's Report on Form 6-K filed on May 22, 2007.

117.    The 2006 Form 20-F stated:

Our residential mortgage portfolio reached EUR 69 billion, and in terms of profit, mortgage business achieved break-even in 2006.

\*        \*        \*

Managing risks

Important progress has been made in 2006 in improving risk modelling and measurement techniques. At Group level, we are developing risk metrics that capture bank and insurance risk into a single view. We significantly improved the quantification and our understanding of the credit risk in our banking book in line with Basel II, and on the insurance side, we have introduced a market consistent framework which enables more accurate pricing of complex products.

ING strengthened the risk management organisation and centralised the risk function by means of creating the position of (deputy) Chief Risk Officer (CRO) who is responsible for managing and controlling risk on a consolidated level. ***These improvements further enhance the full integration of risk management in our daily business activities and strategic planning*** . . . .

118.    The 2006 Form 20-F also sets forth the Company's risk management policies, stating:

RISK MANAGEMENT

\*        \*        \*

The objective of ING Group's risk management function is to build a sustainable competitive advantage by fully integrating risk management into daily business activities and strategic planning.

The following principles support this objective:

1. Products and portfolios are structured, underwritten, priced, approved and managed appropriately and internal and external rules and guidelines are complied with.

2. ***ING Group's risk profile is transparent, "no surprises," and consistent with delegated authorities***.

3. Delegated authorities are consistent with the overall Group strategy and risk appetite.

4. ***Transparent communication to internal and external stakeholders on risk management and value creation***.

119.    The 2006 Form 20-F also reported ING's financial performance for 2006. Among other things, it reported total annual income of $62.378 billion and net annual profit of $8.949 billion. The May 22, 2007 Form 6-K attached ING's May 16, 2007 press release announcing the

Company's financial results for ING's most recent quarter, the first quarter of 2007. In the section entitled "Capital Management," ING stated:

> **ING's capital position strengthened further in the first quarter. Shareholders' equity increased to EUR €31 billion from EUR 38.3 billion at the end of 2006**, mainly due to EUR 1.9 billion of net profit generated and an increase in unrealised gains on equity securities. The leverage position of ING Group remained well within the 10% target, declining to 8.49% from 9.01%. The E.U. capital coverage ratio of ING Insurance increased slightly to 277% and the Tier-1 ratio of the Bank increased to 7.66%. **Given ING's strong capital position and increased leverage capacity that is expected to develop under Basel II, ING announced today that it plans to buy back EUR 5 billion in shares**. The buyback is expected to begin in June and continue for about 12 months.

120.     The statements above in ¶¶117-119 from the June 2007 Offering Materials and the documents incorporated by reference therein were materially false and misleading. Although defendants had access to information concerning ING's huge exposure to risky and declining subprime and Alt-A RMBS and, in the exercise of due care should have provided that information to investors – they did not. More specifically, defendants failed to disclose:

(a)     that ING had more than €31 billion ($45.26) of exposure to Alt-A and subprime RMBS;

(b)     the extremely risky nature of ING's RMBS, including the fact that billions of dollars of the Company's portfolio was composed of "Option ARM" and negative amortization loans, that up to 65% of the loans were generated during 2006 and 2007, and that up to 68% of the NegAm loans – and a significant and undisclosed amount of other loans – were located in California and Florida;

(c)     that as a result of the foregoing factors, and similar to what had occurred at other large banks and the overall market, ING's RMBS had begun defaulting at a much faster and higher rate than RMBS comprised of conforming loans, thereby reducing the value of ING's portfolio and significantly increasing the likelihood of future default;

(d)    the substantial and material risk that ING's exposure to Alt-A and subprime RMBS had on the Company's stated capital ratio , shareholders equity and its liquidity, and the risk that same exposure posed to the Company's future;

(e)    as defendants would reveal shortly after the offering, during the quarter from March 2007 to June 2007, the unrealized losses on ING's debt portfolio – which includes the Company's RMBS securities – ***increased by more than 10-fold*** – from a loss of €347 million to €3.9 billion during that three-month period;

(f)    that the Company's failure to disclose items (a)-(e) above was in contravention of ING's stated risk management policies and public representations;

(g)    that defendants, in failing to disclose items (a)-(e) above, violated International Accounting Standards ("IAS") 30 and 32 as set forth more fully below in ¶¶128-130; and

(h)    that defendants, in failing to disclose items (a)-(e) above, violated Item 503 of Regulation S-K (17 C.F.R. §229.503) as set forth more fully below in ¶¶157-160.

**The September 2007 Offering**

121.    On or about September 27, 2007, pursuant to Rule 424(b)(5) of the 1933 Act, ING filed the Prospectus for the September 2007 Offering, which formed part of the Registration Statement.  Pursuant to the Registration Statement and Prospectus, on September 27, 2008, defendants sold more than $1.45 billion worth of 7.375% Securities to the public at $25 per share.

122.    The September 2007 Prospectus reported, as of June 30, 2007, ING shareholders' equity of  €38.166 billion.  The September 2007 Prospectus also incorporated by reference: (1) ING's 2006 Form 20-F; (2) ING's Form 6-K filed on September 24, 2007; (3) the June 4, 2007 Form 6-K; and (4) May 22, 2007 Form 6-K.

123.    The September 24, 2007 Form 6-K reported ING's condensed consolidated interim accounts for the six month period ended June 30, 2007.  It reported, *inter alia*, total income of €37.676 billion and net profit (before minority interests) of €4.594 billion.

124.    The September 24, 2007 Form 6-K stated:

**RECENT DEVELOPMENTS IN CREDIT MARKETS**

Credit markets have recently become more turbulent amid concerns about U.S. subprime mortgages, collateralised debt obligations (CDOs) and leveraged finance.  This in turn has resulted in a general widening of credit spreads, reduced price transparency, reduced liquidity, ratings agencies downgrades and increased volatility across all markets.  Resulting market corrections have affected, through mark-to-market valuations, our trading books and leveraged loan book.  In addition, these market conditions have led and could continue to lead to an increase in retained loans resulting from leveraged finance activities, which may result in an increase in the allowance for loan losses.

***To date this market disruption has had a limited impact on ING. Overall, ING considers its subprime, Alt-A and CDO/CLO exposure to be of limited size and of relatively high quality***.  ING's total exposure to CDOs and CLOs was EUR 0.9 billion, or 0.07% of assets, as of July 31, 2007.  As of that date, subprime exposure amounted to EUR 3.2 billion, representing 0.24% of total assets, and Alt-A exposure amounted to EUR 28.7 billion, representing 2% of total assets.  The Group's exposure to subprime and Alt-A mortgages is almost entirely through asset-backed securities.

ING classifies a security for Alt-A if one of the following three conditions is met with respect to the underlying portfolio: (a) the weighted-average FICO-credit scores are between 640 and 730, (b) the Loan-To-Value (LTV) equals or exceeds 70% but does not exceed 100% or (c) low documentation including limitations to income verification, are at least 50%, but less than 100%.  ***ING's Alt-A portfolio has an average FICO score of 721 and an LTV of 70%***.  ING does not originate subprime mortgages in the U.S. ING Direct has originated Alt-A mortgages in the U.S. in the amount of EUR 1.7 billion.

***As of July 31, 2007, 93% of the subprime assets and 99.9% of the Alt-A assets were rated AAA or AA***.  ING is not responsible for these securities ratings, which are not a measure of liquidity and which may be changed or withdrawn without notice by the rating agencies. ***As of July 31, 2007, the negative revaluation, based on a mark-to-market approach reflecting credit developments and prevailing interest rates, were EUR 35 million (for CDOs and CLOs), EUR 58 million (for subprime) and EUR 233 million (for Alt-A), respectively, despite the significant market downturn. These negative revaluations are reflected through equity and no net impairments have been necessary through the income statement***.

- 37 -

125.    Concerning shareholders' equity, defendants reported:

**Shareholders' Equity**

Shareholders' equity decreased by EUR 0.1 billion, or 0.3%, to EUR 38.2 billion at June 30, 2007 compared to EUR 38.3 billion at December 31, 2006. This decrease was mainly due to unrealized revaluations of EUR (1.9) billion, a change in cash-flow hedge reserve of EUR (1.0) billion, realized gains/losses transferred to profit and loss of EUR (1.2) billion and the cash dividend payment of EUR (1.6) billion, offset by retained net profit of EUR 4.5 billion and transfer to insurance liabilities/DAC of EUR 1.3 billion.

126.    The statements above in ¶¶122-125 from the September 2007 Offering Materials and the documents incorporated by reference therein were materially false and misleading. Although defendants had access to information concerning ING's huge exposure to risky and declining subprime and Alt-A RMBS and, in the exercise of due care should have provided that information to investors – they did not. More specifically, defendants failed to disclose or negligently misrepresented:

(a)    the extremely risky nature of its Alt-A and subprime RMBS portfolio, including that by the time of the September 2007 Offering up to 36% of ING's Alt-A portfolio (more than €8 billion) was comprised of negative amortization loans and as much as 41% (more than €12 billion) were hybrid variable rate "Option" mortgages, that up to 65% of the loans were generated during 2006 and 2007, and that up to 68% of the negative amortization loans – and a significant undisclosed percentage of other loans – were located in California and Florida;

(b)    that as a result of the foregoing factors, and similar to what had occurred at other large banks and the overall market, ING's RMBS were defaulting at a much faster and higher rate than RMBS comprised of conforming loans, thereby reducing the value of ING's portfolio and significantly increasing the likelihood of future default;

- 38 -

(c)    the substantial and material effect that ING's exposure to Alt-A and subprime RMBS had on the Company's stated capital ratio, shareholders' equity, and its liquidity, and the risk that exposure posed to the Company's future;

(d)    that defendants failed to include in ING's quarterly report for the six months ending June 30, 2007, an explanation of the Company's capital position even though it had provided such detail in its report for the prior quarter;

(e)    that the Company's failure to disclose items (a)-(d) above was in contravention of ING's stated risk management policies and public representations;

(f)    that defendants, in failing to disclose items (a)-(d) above, violated IAS 30 and 32 as set forth more fully below in ¶¶128-130; and

(g)    that defendants, in failing to disclose items (a)-(d) above, violated Item 503 of Regulation S-K, 17 C.F.R. §229.503, as set forth more fully below in ¶¶157-160.

127.    Defendants' reliance upon, and republication of, FICO scores, LTV ratios, and agency ratings as set forth above in ¶124 were also false and misleading.  For the reasons set forth in ¶¶154-156, defendants' reliance on *historic* FICO scores and LTV ratios was highly unreasonable. While these metrics may have been relevant *at the time the underlying loans were issued*, in the rapidly declining housing market these metrics had themselves deteriorated rapidly, such that the historic numbers repeated by defendants were a poor indicator of the borrowers' *present* ability or willingness to repay the mortgage.  For the reasons set forth below in ¶¶143-153, the agency ratings cited by defendants were similarly misleading.  As the ratings agencies themselves would admit, the AAA and AA ratings did not accurately reflect the risk of default, and although defendants had access to the necessary information to verify these ratings, they made no effort to ensure that the ratings accurately reflected the risk before repeating those ratings to investors.

128.    In addition, ING's Registration Statement and Prospectuses for the June and September 2007 Offerings failed to provide the disclosure of its RMBS and CDO/CLO exposures pursuant IAS No. 32, *Financial Instruments: Disclosure and Presentation*. Specifically, the Offering Materials failed to the disclose the following required by IAS No. 32:

> Transactions in financial instruments may result in an enterprise's assuming or transferring to another party one or more of the financial risks described below. ***The required disclosures provide information that assists users of financial statements in assessing the extent of risk*** related to both recognised and unrecognised financial instruments:

>> (a) Price risk – There are three types of price risk: currency risk, interest rate risk and market risk.

>> \*        \*        \*

>> (iii) Market risk is the risk that the value of a financial instrument will fluctuate as a result of changes in market prices whether those changes are caused by factors specific to the individual security or its issuer or factors affecting all securities traded in the market.

>> \*        \*        \*

>> (b) Credit risk – ***Credit risk is the risk that one party to a financial instrument will fail to discharge an obligation and cause the other party to incur a financial loss***.

>> (c) Liquidity risk – Liquidity risk, also referred to as funding risk, is the risk that an enterprise will encounter difficulty in raising funds to meet commitments associated with financial instruments. Liquidity risk may result from an inability to sell a financial asset quickly a close to its fair value.

>> \*        \*        \*

> For each class of financial asset, financial liability and equity instrument, both recognized and unrecognized, an enterprise should disclose:

>> (a) information about the extent and nature of the financial instruments, ***including significant terms and conditions that may affect the amount, timing and certainty of future cash flows***;

IAS No. 32, ¶¶43, 47.

129.    Additionally, ING's Registration Statement and Prospectuses for the June 2007 and September 2007 Offerings failed to accurately disclose ING's exposure of its financial assets to *credit risk*, including significant concentrations of credit risk, pursuant to IAS No. 32:

> Concentrations of credit risk are disclosed when they are not apparent from other disclosures about the nature and financial position of the business and they result in a significant exposure to loss in the event of default by other parties. Identification of significant concentrations is a matter for the exercise of judgement by management taking into account the circumstances of the enterprise and its debtors. . . .
>
> *Concentrations of credit risk may arise from exposures to a single debtor or to groups of debtors having a similar characteristic such that their ability to meet their obligations is expected to be affected by changes in economic or other conditions. Characteristics that may give rise to a concentration of risk include the nature of the activities undertaken by debtors*, such as the industry in which they operate, the geographic area in which activities are undertaken *and the level of creditworthiness of groups of borrowers*. . . .
>
> *Disclosure of concentrations of credit risk includes a description of the shared characteristic that identifies each concentration and the amount of the maximum credit risk exposure* associated with all recognised and unrecognised financial assets sharing that characteristic.

IAS No. 32, ¶¶74-76.

130.    The Offering Materials for the June 2007 and September 2007 Offerings also failed to accurately disclose information required pursuant to IAS No. 30, Disclosures in the Financial Statements of Banks and Similar Financial Institutions:

> *A bank shall disclose any significant concentrations of its assets, liabilities and off balance sheet items*. Such disclosures should be made in terms of geographical areas, customer or industry groups *or other concentrations of risk*. . . .
>
> *A bank discloses significant concentrations in the distribution of its assets and in the source of its liabilities because it is a useful indication of the potential risks inherent in the realisation of the assets* and funds available to the bank. Such disclosures are made in terms of geographical areas, customer or industry groups *or other concentrations of risk which are appropriate in circumstances of the bank*.

IAS No. 30, ¶¶40-41.

**The June 2008 Offering**

131.    On or about June 12, 2008, ING filed, pursuant to Rule 424(b)(5) of the 1933 Act, its Prospectus for the June 2008 Offering, which formed part of the Registration Statement.  On June 17, 2008, defendants sold at least 80 million 8.50% Securities to the public at $25 per share pursuant to the Registration Statement and June 2008 Prospectus.

132.    The June 2008 Prospectus reported, as of March 31, 2008, ING shareholders' equity of €31.584 million.  The June 2008 Prospectus also incorporated by reference the Company's SEC Form 6-K filed on May 15, 2008 (containing ING's consolidated condensed interim accounts for the three-month period ended March 31, 2008) and ING's Annual Report on Form 20-F for the year ended December 31, 2007, filed on March 19, 2008.

133.    The 2007 Form 20-F stated:

> In a very challenging environment in 2007, ***ING performed strongly, both on the commercial front and in the areas of risk management and capital allocation***.

*        *        *

> ***ING has weathered the turmoil in credit markets with limited direct impact***.  All in all, we believe that our performance in 2007 demonstrates that the fundamentals underpinning our business are sound.

134.    The 2007 Form 20-F reported ING's financial performance for 2007.  Among other things, it reported total annual income of $117.707 billion and net annual profit of $14.202 billion. In the 2007 Form 20-F the Company stated:

> ***ING's exposure to the US housing market is predominantly via highly rated RMBS investments***.  As a result the total direct pre-tax negative impact on ING's 2007 profit and loss account was EUR 255 million (EUR 61 million in the third quarter and EUR 194 million in the fourth quarter) from exposures to sub-prime and Alt-A RMBS, and CDO and CLO asset classes and leveraged finance in the third quarter, as well as monoline insurers, SIVs and Asset-Backed Commercial Paper (ABCP) in the fourth quarter.
>
> *ABS portfolio*

- 42 -

The US sub-prime RMBS, US Alt-A RMBS, CDO and CLO portfolios are part of ING's Asset Backed Security (ABS) portfolio. The investments ABS portfolio, almost entirely available for sale, was EUR 84 billion at year end. *The ABS portfolio comprises mainly AAA rated securities (89%) and AA rated securities (10%). Unrealized gains/(losses) relating to available for sale (fixed income) securities, including Mortgage Backed Securities (MBS), are taken to the revaluation reserve in shareholders equity, unless there is evidence of impairment, in which case the negative revaluation reserve is recognized in profit or loss account*. In addition, Loans and advances to customers, valued at amortized costs, contained EUR 13 billion European asset-backed products with market value around 100% and an average credit rating of AAA.

*US sub-prime mortgages*

*ING has a very limited exposure to US sub-prime RMBS* and does not originate sub-prime mortgages. Investment decisions have been based on internal research. Exposure to US sub-prime RMBS amounted to EUR 2.8 billion at December 31, 2007, representing 0.2% of total assets and was fair valued at 90.1% of its cost. *The negative pre-tax revaluation on US sub-prime RMBS at December 31, 2007 was EUR 307 million. Net impairments and trading losses combined amounted to EUR 64 million (EUR 17 million in the third quarter and EUR 47 million in the fourth quarter). At year end, 96.0% of the portfolio was rated AA or higher, and in the fourth quarter only EUR 31 million was downgraded by ratings agencies*.

*Alt-A portfolio*

Alt-A mortgage loans are regular residential mortgage loans in the US market which are frequently packaged into RMBS. Notwithstanding the widespread existence of Alt-A RMBS a single standardized definition does not exist. *At times, ING has generally applied a "broad" definition to Alt-A RMBS. Under the broad definition of Alt-A RMBS, the applicable RMBS contains at least one of the following three characteristics: on average a Loan-to-Value ratio between 70%-100%, a FICO credit score between 640-730, and "low documentation" (referring to reduced requirements regarding personal income and/or asset verification) of 50% of the debt holders in the portfolio or more. ING's exposure under the broad definition amounted to EUR 27.5 billion at December 31, 2007, representing 2.1% of total assets*. ING Direct's share of this exposure was EUR 23.6 billion. At times ING Direct reports Alt-A RMBS under a so called "narrow definition." In this instance a security qualifies as Alt-A RMBS if it meets all three criteria simultaneously. Hence, average FICO scores higher than 730, LTVs of less than 70% and "low documentation" less than 50% are excluded from Alt-A. *In accordance with the narrow definition ING's Direct exposure amounted to EUR 9.7 billion at December 31, 2007. On average, the ING Direct Alt-A RMBS portfolio is near prime and of high-quality with a loan-to-value ratio of 71%, an average FICO score of 723 and more than 99% of the portfolio is rated AAA*. S&P's estimates average AAA Alt-A RMBS credit enhancement at approximately

7.5%, whereas ING Direct's Alt-A RMBS portfolio has a 12% average credit enhancement. ING Direct's average credit enhancement can absorb 8 times the current pipeline losses in the underlying Alt-A mortgages. The portfolio had a negative pre-tax revaluation of EUR 936 million at December 31, 2007. The rating agencies downgraded EUR 10 million of ING's Alt-A RMBS portfolio in the fourth quarter of 2007. *There were no impairments or trading losses taken in respect of the Alt-A RMBS portfolio. ING continues to review its RMBS portfolio very closely, and performs structural monitoring activities at the level of the individual security.*

135.    The 2007 Form 20-F also stated that the fair value of the Company's subprime RMBS portfolio was 90.1% of fair value, with total revaluations through equity of negative €307 million, and that the fair value of Company's Alt-A RMBS portfolio was 96.7% of fair value, with total revaluations through equity of negative €936 million.

136.    In the 2007 Form 20-F, ING made the following statements regarding the Company's risk management:

In recent years, ING has systematically invested to improve its risk management capabilities. *We have built a risk management function and fully integrated risk management into the daily management of all business units and strategic planning, embedding a philosophy of sound risk management at ING. The turmoil in financial markets over recent months illustrated the importance of having sound risk management in times of stress.* ING has weathered this market turmoil with limited direct impact. Moreover, risk management also functions as an enabler, working with the businesses to identify and execute business opportunities, lower the cost of funding and support strategic decisions.

\*        \*        \*

*Moreover, with risk management fully integrated at all levels, ING is well-insulated from the worst effects of the market turmoil.*

137.    The "Risk Management" section stated that "ING's risk management organisation and its liquidity position helped it to manage the problems that occurred in the credit and other financial markets in 2007." As a result, "*ING's exposure to pressurised asset classes [e.g., U.S. subprime and Alt-A RMBS, CDOs and CLOs] is of high quality and has not led to major impairments.*"

- 44 -

138.    The Form 6-K ING filed with the SEC on May 15, 2008, and which was incorporated by reference into the Registration Statement, reported ING's condensed consolidated interim accounts for the three month period ended March 31, 2008.  It reported, *inter alia*, total income of €19.998 billion and net profit (before minority interests) of €1.564 billion.

139.    In the May 15, 2008 Form 6-K, the Company stated:

Chairman's Statement

\*        \*        \*

"***While the credit and liquidity crisis deepened in the first quarter, extending the disruption of global financial markets, ING's impairments on pressurized asset classes remained limited to EUR 55 million after tax***.  Market prices for these assets were inevitably impacted, with fluctuations in valuation reflected in shareholders' equity.  ***ING's capital position remained strong, with key ratios within target and a spare leverage capacity of EUR 6.2 billion at the end of March***."

\*        \*        \*

The deterioration of financial markets continued through the first quarter as concerns about the US housing market deepened and the credit and liquidity crisis persisted.

ING continued to manage its business well in this challenging environment. ***There was limited direct impact from the credit and liquidity crisis in the first quarter***.  ***Losses on ING's investments in pressurised asset classes were limited to EUR 55 million after tax, reflecting the high structural credit protection of the securities in ING's subprime and Alt-A RMBS portfolios***.

\*        \*        \*

**Risk Management**

***ING continued to weather the credit and liquidity crisis well, with limited losses on distressed asset classes***.  Impairments, fair value changes and trading losses through the P&L totalled EUR 80 million before tax (EUR 55 million after tax) in the first quarter. Of that total, EUR 33 million before tax relates to US subprime RMBS, EUR 17 million to US Alt-A RMBS, EUR 16 million to CDOs/CLOs, EUR 4 million to monoline insurers and EUR 10 million to investments in SIVs and ABCP.

\*        \*        \*

Under IFRS, impairments are only taken on RMBS if it is probable that the cash flows from interest rate or principal repayments will not be recovered. In the first quarter of 2008 this applied to just 9 bonds in the Insurance Americas portfolio, which were impaired by EUR 17 million. *There were no impairments in ING Direct's Alt-A RMBS portfolio as the cashflows from the RMBS continue to perform in line with contractual terms*.

ING increased its CDO/CLO portfolio during the first quarter of 2008 to EUR 2.1 billion compared to EUR 1.9 billion at the end of 2007 as corporate credit spreads offered attractive yields. Only EUR 6 million of ING's CDO/CLO exposure is backed by US subprime mortgages. ING Group recorded EUR 16 million in losses on its CDO/CLO exposure in the first quarter, including EUR 13 million fair value changes at Insurance Asia/Pacific and EUR 3 million in impairments at Wholesale Banking.

\*        \*        \*

**Capital Management**

*The adverse market environment inevitably had a negative impact on ING's capital position, however all key capital ratios remained within target*.

\*        \*        \*

*ING Bank's tier-1 ratio increased significantly from 7.4% at the end of 2007 under Basel I to 9.9% under Basel II at the start of 2008.* The Basel II tier-1 ratio ended the first quarter at 8.3% following a dividend upstream to the Group, as well as growth in risk-weighted assets. Basel II risk-weighted assets rose 5.4% to EUR 309 billion at the end of the first quarter from EUR 293 billion on 1 January.

\*        \*        \*

*The direct impact of the credit and liquidity crisis remained limited to EUR 30 million, including a EUR 7 million impairment on subprime RMBS, EUR 17 million on Alt-A RMBS, and EUR 6 million on a SIV.*

\*        \*        \*

*The credit and liquidity crisis had a limited impact on ING Direct's results. The fair value of the US Alt-A RMBS portfolio stood at 83.5% at the end of March with no impairments*. The total direct impact on pre-tax profit amounted to EUR 4 million in impairments on investments in bank-sponsored asset-backed commercial paper (ABCP) in Canada.

140.    In addition, the Company stated in the May 15, 2008 Form 6-K that the fair value of its subprime RMBS portfolio was 81.4% of amortized cost, with total revaluations through equity of

negative €528 million, and that the total revaluations through equity of the Company's Alt-A RMBS portfolio was negative €4.253 billion.

141.    The statements above in ¶¶132-140 from the June 2008 Offering Materials and the documents incorporated by reference therein were materially false and misleading.  Although defendants had access to information concerning ING's huge exposure to risky and declining subprime and Alt-A RMBS and other debt securities and, in the exercise of due care should have provided it to investors – they did not.  More specifically, defendants failed to disclose or negligently misrepresented:

(a)    the extremely risky nature of its Alt-A and subprime RMBS portfolio, including that over 36% of ING's Alt-A portfolio (more than €8 billion) was comprised of negative amortization loans and another 41% (more than €12 billion) were hybrid variable rate "Option" mortgages, that up to 65% of the loans were generated during 2006 and 2007, and that up to 68% of the negative amortization loans and a significant undisclosed percentage of other loans were for properties in California and Florida;

(b)    that as a result of the foregoing factors, and similar to what had occurred at other large banks and the overall market, ING's RMBS were defaulting at a much faster and higher rate than RMBS comprised of conforming loans, thereby reducing the value of ING's portfolio and significantly increasing the likelihood of future default;

(c)    the substantial and material effect that ING's exposure to Alt-A and subprime RMBS had on the Company's stated capital ratio, shareholder equity, and its liquidity, and the risk that exposure posed to the Company's future;

(d)    that, as set forth more fully below in ¶¶171-218, ING should have taken a €409 million in impairment charges on mortgage-related securities backed by Alt-A and sub-prime

loans, a €416 million in impairment charges on debt securities, including Icelandic Bank and Washington Mutual, Inc. ("WaMu") debt securities, and approximately a €400 million in loan loss reserve increases. These charges, which totaled more the €1.2 billion and should have been taken before the June 2008 Offering, rendered the financial statements included in the June 2008 Offering materially false and misleading. Indeed, when ING finally incurred these charges it forced ING to procure capital from the Dutch government to remain adequately capitalized and functioning;

(e) that the Company's failure to disclose items (a)-(d) above was in contravention of ING's stated risk management policies and public representations; and

(f) that defendants, in failing to disclose items (a)-(d) above, violated Item 503 of Regulation S-K, 17 C.F.R. §229.503, as set forth more fully below in ¶¶157-160.

142. Defendants' reliance upon and republication of FICO scores, LTV ratios and agency ratings as set forth above in ¶134 were also false and misleading. For the reasons set forth in ¶¶154-156, defendants' reliance on *historic* FICO scores and LTV ratios was unreasonable and, in fact, misleading. While these metrics may have been relevant *at the time the underlying loans were issued*, in the rapidly declining housing market these metrics had themselves deteriorated rapidly, such that the historic numbers were a poor indicator of the borrowers' *present* ability or willingness to repay the mortgage. For the reasons set forth in ¶¶143-153, agency ratings were similarly misleading. As the ratings agencies themselves would admit, the AAA and AA ratings materially understated the risk of default, and although defendants had access to the necessary information, they made no effort to ensure that the ratings accurately reflected the risk before repeating those ratings to investors.

**False and Misleading Statements Regarding the Ratings of ING's RMBS**

143. In the September 2007 and June 2008 Offering Materials, in an effort to demonstrate the strength and stability of its RMBS portfolio as the housing and mortgage market collapsed, ING

repeatedly relied on ratings by ratings agencies to convey a lack of risk. For example, the September 24, 2007 Form 6-K represented that ING considers its "exposure to be of limited size and of relatively high quality," in part because "*93% of the subprime assets and 99.9% of the Alt-A assets were rated AAA or AA*." Similarly, the 2007 Form 20-F stated that ING's "Alt-A RMBS portfolio is *near prime and of high-quality*" and that "*more than 99% of the portfolio is rated AAA*."

144.    According to S&P, "An obligor rated 'AAA' has extremely strong capacity to meet its financial commitments. 'AAA' is the highest issuer credit rating assigned by Standard & Poor's" and "An obligor rated 'AA' has very strong capacity to meet its financial commitments. It differs from the highest-rated obligors only to a small degree." *A "AAA" rating is meant to convey the risk of default is similar to that of U.S. Treasuries*.

145.    Even though defendants had access to underwriting and payment history information for each mortgage pooled in each RMBS it held, defendants did nothing to assure themselves the ratings attributed to their RMBS were appropriate or reasonable before repeating them to investors, or before relying upon them as a basis for asserting ING's RMBS were "high quality." Unfortunately, the ratings relied upon in the Offering Materials were based on outdated assumptions, relaxed ratings criteria, and inaccurate loan information. These flaws produced artificially high credit ratings for the Company's Alt-A and subprime RMBS portfolios, making them appear much safer and less risky than they really were.

**The Rating Agencies Used Models Based
upon Outdated Assumptions**

146.    S&P used models to produce the ratings for ING's RMBS portfolios. These models were based largely upon loan performance *prior* to the year 2000. However, an unprecedented deterioration in mortgage lending standards occurred *after* 2000. For instance, from 2001 through 2005: (i) the percentage of "sub-prime" mortgage loans tripled; (ii) the combined LTV ratio of loans

in excess of 90% tripled; (iii) "limited documentation" loans (or "liar loans") nearly quadrupled; (iv) "interest only" and "option" ARMs quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for "second homes" more than tripled; (viii) the percentage of loans including "silent seconds" experienced a 16,000% increase; and (ix) the volume of nontraditional mortgages more than quintupled.

147.    This decline in lending standards and huge increase in riskier exotic mortgage products after 2000 rendered S&P's pre-2000 loan performance data obsolete. However, S&P did not update its models to reflect these changes. Thus, by the time S&P provided "AAA" and "AA" ratings to the Company's RMBS, the rating themselves were deceptive because the historical data that produced those ratings no longer reflected the reality of the mortgage market.

148.    S&P continued to use these outmoded models *even though more current and accurate models were available*. According to Frank Raiter – the Managing Director and Head of RMBS Ratings at S&P from March 1995 to April 2005 – S&P had developed models that accounted for the new type of mortgage products available after 2000 (particularly Alt-A loans). These models better captured the changes in the post-2000 mortgage landscape and were therefore better at determining default risks posed by these new mortgages. However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues (as S&P's RMBS group already enjoyed the largest market share amongst the three major rating agencies). As Raiter explained, the unfortunate consequences of continuing to use out-dated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market." President of S&P, Deven Sharma, agreed, noting: "It is by now clear

that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . . [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

149.    Executives at Moody's also acknowledged a "lack of investment" in Moody's rating models and the failure of Moody's rating models to capture the deterioration in lending standards. In an internal e-mail, Raymond McDaniel, the Chairman and CEO of Moody's, noted that a lack of investment in updating the rating models can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment." McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape. Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job of monitoring that [decline in underwriting standards]."

**The Relaxation of Ratings Criteria Led to Artificially High Ratings**

150.    In addition to using flawed models to generate ratings, Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business. This easing of ratings standards was in large part due to the fact that rating agencies like Moody's and S&P were compensated by the very entities that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide them with the highest ratings. As former S&P Managing Director – Richard Gugliada – explained, the easing of standards resulted from a "***market-share war where criteria were relaxed***" and admitted "***I knew it was wrong at the time . . . [i]t was either that or skip the business***. That wasn't my mandate. My mandate was to find a way. Find the way." According to Gugliada, when the subject of tightening S&P's rating criteria came up, the co-director of CDO ratings, David Tesher, said "[d]on't kill the golden goose."

- 51 -

151.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts describing S&P's rating of an investment similar to the Trusts:

Shah:  btw – that deal is ridiculous

Mooney:  i know right . . . *model def[initely] does not capture half of the rish* [sic]

Mooney:  *risk*

Shah:  *we should not be rating it*

Mooney:  *we rate every deal*

Mooney:  *it could be structured by cows and we would rate it*

Shah:  but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

**The Rating Agencies Relied Upon Inaccurate Data**

152.    In addition to the eroding rating standards and the flawed rating models S&P's ratings were also based on inaccurate information.  The rating agencies rated ING's subprime and Alt-A RMBS based in large part on data about each of the mortgage loans, including appraisal values, LTV ratios, borrower credit-worthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  But much of this data was inaccurate or outdated due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and other facets of defective underwriting.  S&P did not engage in any due diligence or otherwise attempt to verify the accuracy or quality of the loan data underlying the RMBS pools they rated.  Nor did they seek representations from sponsors that due diligence was performed.

153.    Because S&P was using flawed information and models to generate their ratings, the ratings assigned to ING's RMBS portfolios grossly understated their risk.  ING's Alt-A and subprime RMBS were given the very highest investment grade ratings when in reality they were not

of investment grade quality.  As such, defendants' statements regarding the ratings of the portfolios were false and misleading in that they did not reflect the true risk of the Company's RMBS holdings. And while ING had access to much of the same information concerning the mortgages pooled in its own RMBS, defendants chose not to review that information but simply rely on the ratings agencies unwarranted assumptions, erroneous data and faulty models.

**False and Misleading Statements Concerning LTV and FICO Scores**

154.    In an effort to demonstrate its RMBS portfolio was "high quality," in the September 2007 and June 2008 Offerings, ING also relied in part on the FICO scores and LTV ratios of the borrowers for the underlying mortgages.  For example, in the September 2007 Offering Materials ING stated that, "ING's Alt-A portfolio has an average FICO score of 721 and an average LTV of 70%."  In the June 2008 Prospectus ING stated "on average, the ING Direct Alt-A RMBS portfolio is near prime and of high-quality with a loan-to-value ratio of 71%, an average FICO acore of 723 and more than 99% of the portfolio is rated AAA."  Historic FICO scores and LTV ratios, however, are a poor indicator of default probability in a rapidly declining economy and housing market.

155.    Although reported in the Prospectuses in the present tense, ING's reported FICO scores and LTV ratios were based on the *historic* information of the homeowners *at the time the mortgages were issued*.  Thus, a FICO score for a loan taken in 2005 was not necessarily the same homeowner's FICO score in 2007 or 2008, rendering it a particularly poor indicator of the borrower's risk of default in late 2007and 2008.

156.    Defendants' reliance on the supposed LTV ratio of mortgages underlying their RMBS portfolios to support their claim that those portfolios were of "high quality" was even more misleading.  Like the historic FICO scores, LTV ratios at the time the mortgages were issued are a weak indicator of default risk, as many Alt-A borrowers were counting on ever-increasing real estate values when they purchased their homes, and put little money down or borrowed the down payment.

Moreover, in many situations Alt-A borrowers took additional lines of credit out or second mortgages on their homes, creating a total effective LTV ratio of 100%. More importantly, however, as housing prices throughout the United States plummeted during 2006, 2007 and 2008, LTV ratios quickly became out-dated and, in fact, significantly understated the risk of default. *See, e.g.*, ¶77. For mortgages in areas like California and Florida – where foreclosures skyrocketed and price declines could exceed 30% in some areas – what were reported as safe LTV ratios were in fact extremely risky.[3]

**The Offering Materials Failed to Comply with Regulation S-K**

157.    In the Registration Statement and Prospectuses defendants had the duty to disclose information pursuant to Item 503 of Regulation S-K, 17 C.F.R. §229.503, including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

158.    The disclosure in the Registration Statement and Prospectuses failed to adequately alert investors to the actual risks associated with ING's investments in Alt-A and subprime RMBS and financial institution debt securities. As noted herein, ING's Alt-A and subprime RMBS debt securities were backed by mortgages extended to borrowers who did not qualify for standard loans, and therefore are inherently more risky.

159.    In addition, as set forth more fully below in ¶¶190-211, the June 2008 Registration Statement and Prospectus  failed to adequately alert investors to the actual risks associated with ING's investments in Icelandic Banks and WaMu debt securities.  Since defendants had not

---

[3]    For example, a purchaser who buys a $400,000 home with 20% down ($80,000) owes $320,000 on a mortgage and has an LTV of 80%.  If that home declines in value by 10% the owner now owes approximately $320,000 on a $360,000 home.  The new LTV ratio would be 89%.  In areas like California and Florida, where housing prices declined in excess of 30% in some areas, loan-to-value rations could vastly exceed 100%.

disclosed ING's exposure to such securities at a time when the issuers of such securities were experiencing unprecedented financial distress, investors could not, and did not, have the ability to make an informed investments decision since they could not appreciate the adverse impact that theses securities could, and did, have on ING's operating results.

160.    In addition, Item 5 of Form F-3, required that the Registration Statements describe **any and all** material changes in the ING's affairs that occurred since the end of the latest fiscal year for which certified financial statements were included in the Registration Statements.  As set forth above, the disclosure in the Registration Statements failed to adequately alert update investors to the material adverse change in ING's capital adequacy resulting from its investments in Alt-A and subprime RMBS and financial institution debt securities as alleged herein.

**THE FINANCIAL STATEMENTS INCLUDED IN THE JUNE 2008
REGISTRATION STATEMENT AND PROSPECTUS
WERE MATERIALLY FALSE AND MISLEADING**

161.    The Registration Statement for the June 2008 Offering incorporated by reference ING's May 14, 2008 Form 6-K.  That 6-K, filed with the SEC, included the Company's financial statements for the quarter ended March 31, 2008 (the "2008 Interim Financial Statements").

162.    The 2008 Interim Financial Statements included in the June 2008 Offering Registration Statement were materially inaccurate as they negligently failed to recognize hundreds of millions of euros in impairments on ING's mortgage-related securities backed by Alt-A and sub-prime loans, and also on debt securities issued by financial institutions domiciled in Iceland (the "Icelandic Banks"), and by WaMu (collectively referred to as "financial institution debt securities").  In addition, the 2008 Interim Financial Statements were materially inaccurate due to ING's significant understatement of its loan loss reserves.

163.    Had ING not engaged in these improper practices, it would have had to recognize losses that would have caused the Company to be dangerously close to breaching regulatory capital

standards, thereby exposing the Company's true capital inadequacy.  Just a few months after the

issuance of the Registration Statement for the June 2008 Offering, ING, in the fall of 2008,

announced a €409 million in impairment charges on mortgage-related securities backed by Alt-A

and sub-prime loans, a €416 million in impairment charges on debt securities, including Icelandic

Bank and WaMu debt securities, and approximately a €400 million in loan loss reserve increases.

These charges, which totaled more the €1.2 billion, forced ING to procure capital from the Dutch

government.

**Applicable Accounting Principles and Securities Regulations**

164.    The June 2008 Registration Statement and Prospectus falsely represented that ING's

2008 Interim financial statements were presented in accordance with IFRS as adopted by the

European Union:

> ING Group's Annual Accounts are prepared in accordance with the
> International Financial Reporting Standards as adopted by the European Union
> ("IFRS-EU").
>
> In preparing the financial information in this press release, the same
> accounting principles are applied as in the 2007 ING Group Annual
> Accounts.

165.    IFRS are those principles adopted by the International Accounting Standards Board

("IASB") and recognized by the accounting profession as the conventions, rules and procedures

necessary to define accepted international accounting practices at a particular time.  IFRS are

promulgated by the IASB (formerly the Board of the International Accounting Standards Committee

("IASC")).

166.    As a publicly traded company, ING is required by the EU Commission, Regulation

(EC) No. 1606, Article 4, to issue financial results in accordance with IFRS.  In addition, as a

company whose securities trade on the NYSE,  ING is required to maintain books and records in

sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with the Securities Exchange Act of 1934:

> (A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
>> i.    transactions are executed in accordance with management's general or specific authorization;
>>
>> ii.    transactions are recorded as necessary to (I) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) maintain accountability for assets;
>>
>> iii.    access to assets is permitted only in accordance with management's general or specific authorization; and
>>
>> iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences;

15 U.S.C. §78m(b)(2).

**ING's Regulatory Capital Adequacy**

167.    According to ING's 2008 Annual Report, the Company monitors its capital adequacy on a consolidated basis at three different levels: ING Group, ING Insurance and ING Bank.  In determining its capital adequacy, ING considers the metrics and requirements of its regulators (EU Solvency, Tier-1 and BIS ratios and limits for hybrid capital), its rating agencies (leverage ratios, Adjusted Equity) and internal risk management models and market value balance sheets.

168.    In determining the amount of regulatory capital for each of ING Group, ING Insurance and ING Bank, regulators add to the Company's reported shareholders' equity, calculated in conformity with IFRS, any unrealized losses ING has accumulated on its investments in securities.  Accordingly, ***as long the unrealized loss on ING's securities are not recognized in the***

*Company's earnings as a result of their sale or via an impairment charge pursuant to IFRS*

*standards, the accumulated unrealized losses on ING's securities do not adversely impact the*

*amount of its capital for purposes of regulatory sufficiency*.  As a result, ING was incentivized not

to record an impairment on its Alt-A and subprime RMBS and financial institution debt securities

portfolio (ING was similarly incentivize to understate the amount of its loan loss provisions) in

conformity with IFRS standards.

169.    On December 31, 2007, ING reported unrealized losses of €1.9 billion on its debt

securities.  During the March 31, 2008 quarter, the unrealized losses on ING's debt securities

exploded, reaching a reported *€5.2 billion* on March 31, 2008.  *Accordingly, in only a 90-day*

*period, the unrealized losses on ING's debt securities increased by more than 250%*.

170.    While the increase in ING's unrealized losses on its debt securities had a material

adverse effect on the Company's reported shareholders' equity during the first quarter of 2008, such

losses did not adversely affect ING's reported net income or the amount of its regulatory capital as

those calculations remain unaffected until the unrealized losses are realized via a sale of the debt

securities or a determination by ING that the debt securities were "impaired" pursuant to IFRS.

**ING's 2008 Interim Financial Statements Improperly Failed
to Timely Recognize Losses on the Impairment of Its Financial Instruments**

171.    Pursuant to IFRS, specifically IAS No. 39, an entity, at the end of each financial

statement reporting period, shall assess whether existing objective evidence indicates that a financial

asset or group of financial assets is impaired.[4]  A financial asset or a group of financial assets is

impaired and impairment losses are to be recognized if existing objective evidence of impairment as

---

[4]    A financial asset includes any asset that results from a contractual right to receive cash or
another financial asset from another entity.

a result of one or more events (a "loss event") and that loss event (or events) has an impact on the estimated future cash flows of the financial asset or group of financial assets that can be reliably estimated.  It may be that the combined effect of several events will cause an impairment.

172.    IAS No. 39 identifies the following loss events as objective evidence that a financial asset or group of assets is impaired:

(a)    the significant financial difficulty of the issuer or obligor;

(b)    a breach of contract, such as a default or delinquency in interest or principal payments;

(c)    the lender, for economic or legal reasons relating to the borrower's financial difficulty, granting to the borrower a concession that the lender would not otherwise consider;

(d)    it becoming probable that the borrower will enter bankruptcy or other financial reorganization;

(e)    the disappearance of an active market for that financial asset because of financial difficulties; or

(f)    observable data indicating that there is a measurable decrease in the estimated future cash flows from a group of financial assets since the initial recognition of those assets, although the decrease cannot yet be identified with the individual financial assets in the group, including:

(i)    adverse changes in the payment status of borrowers in the group (*e.g.*, **an increased number of delayed payments** or an increased number of credit card borrowers who have reached their credit limit and are paying the minimum monthly amount); or

(ii)    **national or local economic conditions that correlate with defaults on the assets in the group** (*e.g.*, an increase in the unemployment rate in the geographical area of the borrowers, **a decrease in property prices for mortgages** in the relevant area, a decrease in oil prices for loan assets to oil producers, or adverse changes in industry conditions that affect the borrowers in the group).

173.    By no later than March 31, 2008, ING inaccurately failed to record an impairment in the values of the Company's financial assets, including its mortgage-related securities, *i.e.*, RMBSs and CDO/CLO securities, backed by Alt-A and subprime loans and its financial institution debt

securities.  This failure caused ING's reported net income and retained earnings in the 2008 Interim

Financial Statements to be materially overstated and the Company's representations about its capital

as set forth in the Registration Statement for the June 2008 Offering to be materially inaccurate.

**ING's Failure to Record an Impairment on**
**Debt Securities Backed by Alt-A and Subprime Loans**

174.    Defendants, self-proclaimed financial market investment and risk-management

experts, negligently ignored numerous events identified in IAS No. 39 as "loss events" evidencing

hundreds of millions of euros of impairment losses on its financial assets pursuant to IFRS standards

by no later than March 31, 2008.  Such evidence included:

- the significant financial difficulty of Alt-A and subprime mortgagees;

- escalating default or delinquency rates on mortgage loans underlying Alt-A and subprime RMBS and CDO/CLOs;

- a disappearance of an active market for Alt-A and subprime RMBS and CDO/CLOs;

- data indicating that there was a measurable decrease in the estimated future cash flows on Alt-A and subprime RMBS and CDO/CLOs; and

- national economic conditions correlated with defaults on Alt-A and subprime RMBS and CDO/CLOs, including, the decrease in real property prices that collateralized Alt-A and subprime RMBSs and CDO/CLOs.

175.    The totality of these observable loss events required ING to report hundreds of

millions of euros in impairment losses on its RMBS and CDO/CLO assets in its 2008 Interim

Financial Statements included in the Registration Statement for the June 2008 Offering.

176.    The significantly escalating default and delinquency rates on mortgage loans

underlying Alt-A and subprime RMBS and CDO/CLOs securities was objective evidence, as

contemplated by IAS No. 39, that ING's Alt-A and subprime RMBS and CDO/CLO securities were

impaired by no later than March 31, 2008.

177.    As set forth in detail above in ¶¶74-101, by 2007 the market for these securities began to freeze up as some of the top mortgage lenders with Alt-A and sub-prime U.S. mortgage exposure started to reveal enormous losses and warned of future market losses.  In addition to escalating default or delinquency on mortgage loans underlying Alt-A and subprime RMBS and CDO/CLOs securities, market activity for Alt-A and subprime RMBS and CDO/CLOs securities had essentially disappeared by March 31, 2008, otherwise indicating that ING had suffered impairment losses on its financial assets pursuant to IAS No. 39.

178.    In fact, on a conference call with securities analysts and investors to discuss ING's 2008 first quarter financial results, ING's Chief Risk Officer, Koos Timmermans admitted that there was "a considerable amount of market illiquidity" associated with ING's Alt-A RMBS debt securities.  This greatly diminished market activity was another example of objective evidence of impairment, as specifically cited in IAS No. 39, that ING's Alt-A and subprime RMBS and CDO/CLOs securities were materially impaired by no later than March 31, 2008.

179.    In addition, the national economic conditions that were correlated with defaults on the loans underlying ING's Alt-A and subprime RMBS and CDO/CLOs securities, such as the significant decrease in real property prices that collateralized such securities, was yet another example objective evidence specifically identified in IAS No. 39 that ING's Alt-A and subprime RMBS and CDO/CLOs debt securities were materially impaired.

180.    These conditions signaled that ING Alt-A and subprime RMBS and CDO/CLOs securities has suffered hundreds of millions of euros of impairment losses by no later than March 31, 2008.

181.    In fact, the rate of delinquencies on ING's Alt-A RMBS securities reached approximately 9% in March 2008, more than double the rate just six months prior in October 2007.

Similarly, the percentage of ING's Alt-A RMBS securities that the Company itself expected to be non-performing in March 2008 more than doubled from that in October 2007, reaching a staggering *€1.3 billion* at March 31, 2008. Even on overly optimistic basis, where two out of three of these non-performing securities would *not* ultimately end up in default, losses on ING Alt-A RMBS securities would have totaled more than €400 million.

182.    The precipitous decline in the value of ING's Alt-A and subprime RMBS and CDO/CLO securities during, at least, the first quarter of 2008, was the recognition by the marketplace of a significant decrease in the estimated future cash flows that ING expected to receive on its Alt-A and subprime RMBS and CDO/CLOs securities. This measurable decrease in the estimated future cash flows ING expected to receive on its Alt-A and subprime RMBS and CDO/CLOs securities was evidenced by the following:

- During the first quarter of 2008 alone, more than *20%* of ING's U.S. RMBS portfolio was downgraded from AAA to AA;

- During the first quarter of 2008, the sum of the more than 60+ day delinquent, bankrupt, foreclosed and REOs mortgage loans underlying ING's Direct's Alt-A RMBS portfolio increased by more than *46%*;[5]

- During the first quarter of 2008, the sum of the more than 60+ day delinquent, bankrupt, foreclosed and REOs mortgage loans underlying ING's Insurance America' subprime RMBS portfolio increased by more than *27%*;

- During the first quarter of 2008, the market value of ING's massive €22.8 billion U.S. Alt-A RMBS portfolio declined precipitously, from 97% to 84% of its notional value;

- On March 31, 2008, approximately 48% and 39% of the notional value of ING Direct's U.S. Alt-A RMBS portfolio were 2005-2006 and 2007 vintages (*i.e.*, the year that the underlying sub-prime collateral was issued), respectively. During the first quarter of 2008, the market value of ING Direct's 2005-2006 vintage Alt-A U.S.

---

[5]    On March 31, 2008, ING Direct held approximately 85% of ING's total Alt-A RMBS portfolio.

- 62 -

RMBS declined from approximately 97% to 86% of its notional value and the 2007 vintage Alt-A RMBS declined from approximately 96% to 78% of its notional value;

- During the first quarter of 2008, the market value of ING Direct's negative amortization RMBS securities declined from **94% to 65%** of their notional value. At March 31, 2008, ING held approximately €4.8 billion negative amortization loans;

- During the first quarter of 2008, the sum of the more than 60+ day delinquent, bankrupt, foreclosed and REOs mortgage loans underlying ING's Direct's Alt-A RMBS negative amortization loans increased by more than **55%**; and

- During all of 2007, the unrealized losses of ING debt securities totaled €4.725 billion. During the first quarter of 2008, the incremental unrealized losses on such securities accelerated rapidly, totaling €3.248 billion, or an amount equal to almost 70% of the unrealized losses ING incurred on its debt securities during all of 2007.

183. Even public indices, such as the ABX index, which tracks the cost of buying protection for sub-prime mortgage-backed assets, demonstrated the impairment of ING Alt-A and subprime RMBS and CDO/CLO securities by no later than March 31, 2008.

184. The ABX index tracks a basket of CDSs based on the performance of 15 to 20 RMBS tranches rated from AAA to BBB- and is composed of a number of "series" that are classified by loan type, credit rating, and the vintage year. As set forth in the chart below, during the fourth quarter of 2006 and most of 2007, the values of ABX/indices plummeted, evidencing the market's expectation of a measurable decrease in the estimated future cash flows on Alt-A and subprime RMBS and CDO/CLO.

185. And even though defendants purportedly relied on the "AAA" ratings of ING's Alt-A and subprime RMBS and CDO/CLO securities, in part, to support their unreasonable failure to record an impairment in such securities, ABX indices tied to these purportedly higher quality mortgage bonds also declined significantly:



## MBS valuations plunge



186. The precipitous decline in the value of the AAA rated ABX indices provided yet additional objective evidence to defendant's that ING had incurred hundreds of millions of euros of impairment losses on its Alt-A and subprime RMBSs and CDO/CLOs securities.

187. Moreover, rating agencies themselves began downgrading non-prime AAA rated RMBSs at a rapid pace. For example, between December 31, 2007 and February 25, 2008, the credit

- 64 -

ratings associated with *more than $16 billion* of Freddie Mac's AAA RMBS securities backed by subprime loans were downgraded below AAA by at least one nationally recognized rating agency. As noted above, during the first quarter of 2008 alone, more than 20% of ING's U.S. RMBS portfolio was downgraded from their AAA rating.

188.    Unlike ING, numerous other financial institutions during this time had written-off their non-prime related assets.  As set forth in detail above in ¶¶74-101, by early 2008 numerous mortgage originators had gone bankrupt and many of the world's largest financial institutions had taken tens of billions of dollars in impairments and writedowns.

189.    Confronted with a distinctively unique financial crisis and overwhelming objective evidence that ING's Alt- A and subprime RMBS and CDO/CLO securities were impaired by hundreds of millions of euros no later than March 31, 2008, defendants ignored the obvious and during the March 31, 2008 quarter recorded only a €26 million impairment on ING's U.S. subprime RMBS debt securities (an amount which equaled less than 1% such securities €2.8 billion amortized cost), a €17 million impairment on ING's Alt-A RMBS debt securities (an amount which equaled just *.06%* of such securities €27.1 billion amortized cost) and a €3 million impairment on ING's CDO/CLO securities (an amount which equaled just .13% of such assets €2.3 billion in amortized cost).  In so doing, defendants materially overstated ING's reported net income and capital adequacy in the Registration Statement for the June 2008 Offering.

**ING's Failure to Record an Impairment on Its Financial Institution Debt Securities**

190.    The 2008 Interim Financial Statements included in the Registration Statement for the June 2008 Offering also were materially inaccurate due to ING's negligent failure to record in conformity with IAS No. 39 an impairment in its financial institution debt securities, *i.e.*, those debt securities issued by the Icelandic Banks and WaMu.  This failure caused ING's reported net income and retained earnings in the 2008 Interim Financial Statements to be materially overstated and the

- 65 -

Company's representations about its capital as set forth in the Registration Statement for the June

2008 Offering to be materially inaccurate.  Just a few months after the issuance of such Registration

Statement, in the fall of 2008, ING announced a €416 million impairment charge on such debt

securities.

191.    During the later half of 2007 and into 2008, the financial crisis wrecked havoc on

Icelandic Banks, forcing them to shut down operations and/or sell assets to preserve desperately

needed capital.

192.    For example, on January 9, 2008, *Dow Jones Factiva*, reported:

> Iceland's stock market slid and the country's currency weakened Wednesday
> on concern that woes for Gnupur Investment Company Hf signal broader financial
> instability.

> Word that Gnupur needed to restructure its finances, which the company
> confirmed late in the day, sparked yet more losses on the Icelandic stock exchange
> and has market participants and watchers again on high alert less than two years after
> the country faced economic crisis.

193.    On January 28, 2008, *Dow Jones Factiva*, reported:

Landsbanki Islands HF (LAIS.IC), one of Iceland's largest banks, Monday reported a
sharp drop in fourth-quarter net profit, as its operating expenses rose and it took
higher impairments on loans.

194.    On January 31, 2008, *Dow Jones Factiva*, reported:

> Iceland's Kaupthing Bank Hf. (KAUP.IC) on Thursday posted a 46% decline
> in fourth-quarter net profit following a significant loss in trading income, and said the
> bank is shifting focus in operations due to the downturn in global financial markets.

> Kaupthing said that to adopt to the new adverse operating environment, the
> bank will slow its growth, diversify funding and place increasing emphasis on
> deposit and commission income.

195.    In February 2008, Moody's Investor Services ("Moody's") expressed concern about

Iceland's financial system generally and the Icelandic banking sector in particular.  As a result, the

credit agency downgrade Iceland's three big banks, Kaupthing Bank Hf [Kaupthing], Landsbanki Hf

[Landsbanki] and Glitnir Banki Hf [Glitnir] due to weakened credit conditions, stating "the risk of contagion among these three banks has raised concerns about a system-wide crisis."

196.    On February 25, 2008, *Reuters UK*, reported:

> Icelandic bank Kaupthing Kaup.IC said on Monday it was getting out of the business of British asset finance and commodity finance in a move that will free up more than 1 billion pounds ($2 billion) of liquidity.
>
> **It is the second major structural change this year by Kaupthing, whose shares have been hit hard over concerns about its balance sheet**.

197.    On February 29, 2008, Moody's downgraded the bank financial strength rating of Landsbanki to "C-" from "C."

198.    On February 29, 2008, *Dow Jones Factiva*, reported:

> Formerly fast-growing and high-borrowing Icelandic banks, finding global lending markets now freezing up, are streamlining their operations to free up financing and signal the market that they are tightening ship.
>
> Glitnir banki Hf (GLB.IC), the Atlantic island's third-largest bank by value, said this week that it was shutting down its Danish operation, citing a need to focus its operation around its core business in the current market environment.  The move will create cost synergies, Reykjavik-based Glitnir said, and added that it will continue to serve its Danish clients from elsewhere within the group.
>
> In a similar move, Kaupthing Bank Hf (KAUP.IC), Iceland's largest bank by value, Monday said it was `exiting the asset-finance business of its U.K. operation Singer & Friedlander, hoping to free up GBP1 billion in 2008.

199.    In an attempt to preserve much needed capital, on March 7, 2008, Kaupthing announced that it was closing its offices in Manchester and Leeds.

200.    On March 20, 2008, S&P put Iceland's Glitnir Bank's counterparty credit rating on negative watch, citing heightened pressure on the banks earnings capacity stemming from the turbulence in capital markets and investment banking.

201.    The significantly escalating financial crisis in Iceland and its particular adverse affect on the Icelandic banking sector was objective evidence, as contemplated by IAS No. 39, that ING's debt securities issued by Icelandic Banks were impaired by no later than March 31, 2008.

202.    Indeed, the risk of default by the Icelandic Banks was evidenced by their CDS rates, which **surged from 30 basis points in 2007 to 1,000 basis points in the first quarter of 2008**.[6]  The following charts depict the surge in Kaupthing's, Landsbanki's and Glitnir's CDS rates during the year ended March 31, 2008:



_____

[6]    A CDS is a financial instrument that functions as a form of insurance, whereby the purchaser of a CDS makes a series of payments to the CDS seller in exchange for credit protection if a particular credit instrument covered by the CDS, typically a mortgage, experiences a defined event (typically a default or bankruptcy).  As the risk the default increases, so does the cost of a CDS.  At 1,000 basis points, the cost of insuring $1 million of bonds is $100,000.





203.    On March 30, 2008, the *Sunday Business Post*, Ireland's financial, political and economic newspaper, reported:

> *Every single financial measure in Iceland is now screaming 'meltdown'.*
> *For example, interest rates on credit default swaps for Iceland's main banks are*
> *now trading at 1,500 basis points*.   A credit default swap is an instrument that
> ensures against the risk of default.  This means that if you are lending to an Icelandic

bank and you want to ensure against the likelihood of a default, it will cost you 1.5 million to insure every 10 million loan you give it.

**This is ten times the rate of the average European bank, implying that the market believes that a serious default is now only a matter of time**. Banks simply can't do business on these terms.

204.    On April 1, 2008, *Business World*, reported:

**Iceland is facing banking crisis**

Worries that a major Icelandic bank may default - and send losses rippling into European economies – became more acute today as the country's main banks were put on "Negative Watch" by a global ratings agency.

Fitch Ratings cut its outlook for the Republic of Iceland's long-term foreign and local currency issuer default ratings (IDR) to negative from stable following its decision to place the country's three biggest banks Glitnir Banki hf., Kaupthing Bank hf. and Landsbanki Islands hf., on negative watch.

In such a scenario, Fitch pointed out that downward pressure on Iceland's sovereign ratings could result if it judges that the risks to macroeconomic stability and sovereign creditworthiness arising from distress in the banking system "have materially increased."

205.    The foregoing was objective evidence to defendant's that ING's Icelandic Bank debt securities were materially impaired no later than March 31, 2008.

206.    Similarly, WaMu, one of the U.S.'s biggest home lenders, also came under significant financial distress in late 2007 and early 2008, particularly due to rapid increase in residential mortgage default and delinquency rates and the illiquidity in the secondary U.S. mortgage markets. As a result, on January 17, 2008, WaMu announced a $1.87 billion net loss for the fourth quarter of 2007.

207.    On March 6, 2008, S&P lowered its long-term counterparty credit rating on WaMu to "BBB" from "BBB+" and placed WaMu's ratings on Credit-Watch with negative implications. The following day, Fitch also cut its ratings on WaMu by two notches to "BBB," the second lowest investment grade, and *The Wall Street Journal* reported that federal regulators were pushing WaMu

to raise more capital.  A few days later, on March 14, 2008, Moody's cut WaMu's rating to Baa3, just one step above junk, saying its capital need in 2008 would be at least $4 billion more than expected to cover bad mortgages.

208.    Like the Icelandic Banks, WaMu CDS rates surged during the fourth quarter of 2007 and the first quarter of 2008:



209.    The foregoing was objective evidence to defendant's that ING's WaMu debt securities were materially impaired no later than March 31, 2008.

210.    Nonetheless, in violation of IFRS, Specifically IAS No. 39, ING failed to record hundreds of millions of euros in impairment losses on Icelandic Banks and WaMu debt securities. Just a few months after the June 2008 Offering, ING announced hundreds of millions of euros impairments on it financial institution debt securities.

211.    Moreover, since defendants had not disclosed ING's exposure to Icelandic Bank and WaMu debt securities, investors could not, and did not, appreciate the adverse impact that theses

securities could, and did, have on ING's operating results. Defendants, however, knew of ING's exposure to theses securities and negligently failed to disclose ING's exposure to its Icelandic Bank and WaMu debt securities.

**ING Materially Understated Its Loan Loss Reserves
in Violation of Applicable Accounting Principles**

212. Pursuant to IFRS, a receivable or loan is considered impaired if its carrying amount is greater than its estimated recoverable amount. The amount of the loss is the difference between the carrying amount and the fair value of expected discounted future cash flows. Impairment losses are to be recognized as a reduction to the carrying amount of the asset, either directly or through use of an allowance, *i.e.*, loan loss reserve, account. Entities are then to assess whether objective evidence of impairment exists for receivables and loans that are individually significant. Loans and receivables that are not individually significant may be assessed with other similar assets on a portfolio basis.

213. During a November 2000 speech, the then Deputy Chief Accountant of the SEC stated the following:

> In plain English, the allowance for loan losses must reflect, on a timely basis, the changes in the credit quality of an institution's loan portfolio. As credit quality deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred.

214. The 2008 Interim Financial Statements included in the Registration Statement for the June 2008 Offering were materially inaccurate and violated IFRS, including, in particular IAS No. 39. On March 31, 2008, the Company's loan loss provisions were materially inadequate and did not timely reflect the high risk of loss inherent in its Icelandic Banks and Alt-A and subprime RMBS debt securities. As a result, ING's reported net income and retained earnings in the 2008 Interim Financial Statements were materially overstated and the Company's representations about its capital as set in the Registration Statement for the June 2008 Offering was materially inaccurate.

215.    ING's loan loss reserves were materially understated no later than March 31, 2008 as a result its failure to take adequate specific reserves related to the impairment of its Icelandic Bank and Alt-A and subprime RMBS debt securities for the reasons detailed herein.

216.    IFRS required ING evaluate the ability of the issuers of the Icelandic Banks and Alt-A and subprime RMBS debt securities to pay all amounts due to ING in accordance with the contractual terms of such securities.  Since loan loss reserves are to account for expected bad loans on existing securities, during a period of economic turndown, let alone an unprecedented global financial crisis, the reserve for loan losses should increase.  As illustrated in the charts below, however, *while the percentage of ING's non-performing U.S. mortgage loans were increasing, i.e., those loans that were not likely to pay amounts due in accordance with their contractual terms, ING loan loss provisions declined*:



**US mortgages NPLs (90+ days delinquencies)
ING Direct portfolio vs. industry**

Source: ING, True Standing / Loan Performance



217.    In the face of massive increases in delinquencies and foreclosures associated with Alt-A and subprime U.S. mortgage loans, the ongoing adverse trends in U.S. home prices and interest rates, and the dire financial situation of the Icelandic Banks, ING *lowered* its loan loss provisions.  In so doing, ING materially overstated its reported net income and retained earnings by hundreds of millions of euros in the 2008 Interim Financial Statements included in the Registration Statement for the June 2008 Offering and the Company's representations about its capital as set forth therein were materially inaccurate.

218.    Just weeks after the June 2008 Offering, when the Company announced its earnings for the third quarter of 2008, ING disclosed that it increased its loan loss provision by €373 million "due to market turmoil and exposure to Icelandic banks."  Indeed, the very conditions that caused ING to increase its loan loss provisions during the third quarter of 2008 were in existence by  March 31, 2008.

**Additional Violations of IFRS**

219.    In addition to accounting principle violations noted above, the 2008 Interim Financial Statements included in the June 2008 Offering Materials were presented in a manner that also violated IAS No. 1, *Presentation of Financial Statements*; IAS No. 10, *Events After the Reporting Period*; IAS No. 34, *Interim Financial Reporting*; and the IASB's *Framework for the Preparation and Presentation of Financial Statements*.

220.    More specifically, ING's financial statements in the Registrations Statements violated the general requirements of IAS No. 1, which states, in relevant part:

> An entity whose financial statements comply with IFRSs shall make an explicit and unreserved statement of such compliance in the notes. Financial statements shall not be described as complying with IFRSs unless they comply with all the requirements of IFRSs. . . . The application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation.

> *        *        *

> All items of income and expense recognised in a period shall be included in profit or loss unless a Standard or Interpretation requires otherwise.

> *        *        *

> The notes shall:

> (a)    present information about the basis of preparation of the financial statements and the specific accounting policies used in accordance with paragraphs 108-115;

> (b)    disclose the information required by IFRSs that is not presented on the face of the . . . [financial statements]; and

> (c)    provide additional information that is not presented on the face of the . . . [financial statements], but is relevant to an understanding of any of them.

221.    ING's financial statements in ING's Registration Statements violated IAS No. 34 Interim Financial Reporting, which states:

An entity shall include the following information, as a minimum, in the notes to its interim financial statements, if material and if not disclosed elsewhere in the interim financial report. The information shall normally be reported on a financial year-to-date basis. However, the entity shall also disclose any events or transactions that are material to an understanding of the current interim period:

> (a)    a statement that the same accounting policies and methods of computation are followed in the interim financial statements as compared with the most recent annual financial statements or, if those policies or methods have been changed, a description of the nature and effect of the change;

> *        *        *

> (c)    **the nature and amount of items affecting assets, liabilities, equity, net income, or cash flows that are unusual because of their nature, size, or incidence**;

> (d)    the nature and amount of changes in estimates of amounts reported in prior interim periods of the current financial year or changes in estimates of amounts reported in prior financial years, if those changes have a material effect in the current interim period;

> *        *        *

> (h)    **material events subsequent to the end of the interim period that have not been reflected in the financial statements for the interim period**;

222.    In addition, the financial statements in ING's Registration Statements violated IAS No. 10, *Events After the Reporting Period*, which requires disclosure of certain events that arise after the balance sheet date, but prior to the issuance of the financial statements (non-adjusting events after the balance sheet date). IAS No. 10 provides as follows, in relevant part:

> **An example of a non-adjusting event after the reporting period is a decline in market value of investments between the end of the reporting period and the date when the financial statements are authorised for issue**. The decline in market value does not normally relate to the condition of the investments at the end of the reporting period, but reflects circumstances that have arisen subsequently. Therefore, an entity does not adjust the amounts recognised in its financial statements for the investments. Similarly, the entity does not update the amounts disclosed for the investments as at the end of the reporting period, although it may need to give additional disclosure under paragraph 21.

> *        *        *

If non-adjusting events after the reporting period are material, non-disclosure could influence the economic decisions that users make on the basis of the financial statements.  Accordingly, an entity shall disclose the following for each material category of non-adjusting event after the reporting period:

> (a)   the nature of the event; and

> (b)   an estimate of its financial effect, or a statement that such an estimate cannot be made.

The following are examples of non-adjusting events after the reporting period that would generally result in disclosure:

> \*       \*       \*

> (g)   abnormally large changes after the reporting period in asset prices or foreign exchange rates.

223.   In addition, IFRS No. 7 requires disclosures to enable users of the financial statements to evaluate the significance of financial instruments to an entity's financial position and performance, the nature and extent of risks arising from financial instruments to which an entity is exposed and how the entity manages those risks.

224.   Specifically ING failed to comply with the following requirements of IFRS No. 7:

> An entity shall disclose information that enables users of its financial statements to evaluate the nature and extent of risks arising from financial instruments to which the entity is exposed at the end of the reporting period.

> . . . These risks typically include, but are not limited to, credit risk, liquidity risk and market risk.

> \*       \*       \*

> For each type of risk arising from financial instruments, an entity shall disclose:

> (a)   the exposures to risk and how they arise;

> (b)   its objectives, policies and processes for managing the risk and the methods used to measure the risk; and

> (c)   any changes in (a) or (b) from the previous period.

> \*       \*       \*

- 77 -

[E]ntities [are required] to provide disclosures in their financial statements that enable users to evaluate:

>    (a)    the significance or financial instruments for the entity's financial position and performance; and
>
>    (b)    the nature and extent of risks arising from financial instruments to which the entity is exposed during the period and at the end of the reporting period, and how the entity manages those risks.

225.    ING also failed disclose in the Registration Statement for the June 2008 Offering, pursuant to requirements of IFRS No. 7, the sensitivity of its results to movements in market risks as a consequence of its Alt-A and subprime RMBS and CDO/CLO financial instruments.

226.    As detailed herein, in violation of IFRS and SEC regulations, the Registration Statements inaccurately failed to disclose ING's significant exposure to Alt-A and subprime RMBS and CDO/CLO securities.

227.    The violations of each of the foregoing standing alone, was a material breach of IFRS and/or SEC regulations, which otherwise caused the Registration Statements to be materially inaccurate. As noted Regulation S-X, financial reports filed with the SEC that fail to comply with Generally Accepted Accounting Principles ("GAAP") or, for foreign issuers, a comprehensive body of accounting principles (such as IFRS) are presumed to be misleading and inaccurate.

## CLASS ACTION ALLEGATIONS

228.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

229.    The members of the Class are so numerous that joinder of all members is impracticable.  Each of the Securities were traded on the NYSE.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are at least hundreds of members in the proposed Class for each security.  Record owners and other members of the Class may be identified from records maintained by ING or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

230.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

231.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

232.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the 1933 Act was violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public in the Registration Statement and Prospectuses misrepresented material facts or omitted material facts necessary not to make the statements misleading about the business, operations and management of ING; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

233.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

234.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this complaint.

235.    First, none of the statements complained of herein was a forward-looking statement. Rather they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.  Second, the statutory safe harbor does not apply to statements included in financial statements which purport to have been prepared in accordance with GAAP.

236.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted defendants' statements regarding the Company's business and financial condition and its purported compliance with IFRS.

## CAUSES OF ACTION
## COUNT I

Violations of §11 of the 1933 Act
Against All Defendants

237.    Plaintiffs repeat and reallege each and every allegation contained above.

238.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.  For purposes of this Count, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

239.    The Registration Statement was false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

240.    ING was the registrant for the Offerings.  As issuer of the Securities, ING is strictly liable to plaintiffs and the Class for the misstatements and omissions.

241.    Defendants ING Holdings and Stichting ING were responsible for the contents and dissemination of the Registration Statement.  Defendants ING Holdings and Stichting ING signed the Registration Statement.

242.    The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  Each of the Individual Defendants signed or authorized the signing of the Registration Statement.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

243.    The Underwriter Defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus, as alleged above in ¶¶43-57.

244.    By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

245.    Plaintiffs acquired the Securities pursuant and/or traceable to the Registration Statement.

246.    Plaintiffs and the Class have sustained damages. At the time of their purchases of the Securities, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to October 2008. Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiffs filed this complaint. Less than three years elapsed between the time that the Securities upon which this Count is brought were offered to the public and the time plaintiffs filed this complaint.

## COUNT II

Violations of §12(a)(2) of the 1933 Act
Against the Underwriter Defendants and ING

247.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

248.    This count is brought pursuant to §12(a)2 of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against all the Underwriter Defendants and ING. For purposes of this Count, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

249.    ING was the registrant for the Offerings. By means of the defective Prospectuses, the Underwriter Defendants assisted ING in the sale of each of the Securities to plaintiffs and other members of the Class as set forth in ¶¶43-57.

250.    The Prospectuses contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. ING and the Underwriter Defendants owed plaintiffs and the other members of the Class who purchased the Securities pursuant to the

Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

251.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectuses at the time plaintiffs acquired the Securities.

252.    By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiffs and the other members of the Class who purchased the Securities pursuant to the Prospectuses sustained substantial damages in connection with their purchases of the Securities.  Accordingly, plaintiffs and the other members of the Class who hold such Securities have the right to rescind and recover the consideration paid for their Securities.  Class members who have sold their Securities seek damages to the extent permitted by law.

## COUNT III

Violations of §15 of the 1933 Act
Against the Individual Defendants and Stichting ING

253.    Plaintiffs repeat and reallege each and every allegation contained above.

254.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.  For purposes of this Count, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

255.    Each of the Individual Defendants was a control person of ING by virtue of his or her position as a director, senior officer and/or major shareholders of ING which allowed each of these defendants to exercise control over ING and its operations.

256.    Each of the Individual Defendants was a culpable participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having reviewed, signed or authorized the signing of the Registration Statement and Prospectuses, and having otherwise participated in the process which allowed the Offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiffs as Class representatives;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  September 25, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD


SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
ANDREW J. BROWN
LUKE F. OLTS
ERIC I. NIEHAUS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICES OF BERNARD M.
  GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

Co-Lead Counsel for Plaintiffs

## CERTIFICATION OF RAY RAGAN

1.    I, Ray Ragan, have reviewed the Complaint and have authorized the filing of same;

2.    I did not purchase the common stock of ING Groep N.V. at the direction of plaintiff's counsel or in order to participate in any private action arising under this title of the federal securities laws;

3.    I am willing to serve as class representative and provide testimony at deposition and trial if necessary;

4.    My purchase of the ING bonds issued in September 2007 of ING Groep N.V. consisted of the following:

| **Date** | **Purchase(s)** ~~**or Sales(s)**~~ | **Amount** | **Price** |
|---|---|---|---|
| 9-27-07 | PURCHSE | 1000 | 25 00 |

5.    During the previous three years, I have not been a lead plaintiff in the any securities fraud class action.

6.    I will not accept any payment for serving as a class representative beyond my pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18 day of SEPT. , 2009, at SELLERSVILLE .(City/state) PA.

_Ray Ragan_
**RAY RAGAN**

<u>DECLARATION OF SERVICE BY MAIL</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on September 25, 2009, declarant served the **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 25th day of September, 2009, at San Diego, California.

_____
CHRISTINE CLARK

S:\CasesSD\ING Groep\CPT00061804.doc

ING GROEP
Service List - 9/24/2009    (09-0026)
Page 1 of 2

## Counsel For Defendant(s)

Mitchell A. Lowenthal
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006
  212/225-2000
  212/225-3999 (Fax)

Michael J. Dell
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY  10036
  212/715-9100
  212/715-8000 (Fax)

Adam S. Hakki
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY  10022-4676
  212/848-4000
  212/848-7179 (Fax)

## Counsel For Plaintiff(s)

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173 (Fax)

Daniel C. Girard
Jonathan K. Levine
Aaron M. Sheanin
Girard Gibbs LLP
601 California Street, Suite 1400
San Francisco, CA  94108
  415/981-4800
  415/981-4846 (Fax)

Joseph C. Kohn
Denis F. Sheils
William E. Hoese
Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107-3389
  215/238-1700
  215/238-1968 (Fax)

Deborah R. Gross
Law Offices Bernard M. Gross, P.C.
100 Penn Square East, Suite 450
Wanamaker Bldg.
Philadelphia, PA  19107
  215/561-3600
  215/561-3000 (Fax)

ING GROEP

Service List - 9/24/2009    (09-0026)

Page 2 of 2

Bruce G. Murphy
Law Offices of Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL 32963
   772/231-4202
   772/234-0440 (Fax)

Brian P. Murray
Brian D. Brooks
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY 10016
   212/682-1818
   212/682-1892 (Fax)

Gregory M. Nespole
David L. Wales
Matthew M. Guiney
Wolf Haldenstein Adler Freeman & Herz, LLP
270 Madison Avenue
New York, NY 10016
   212/545-4600
   212/545-4653 (Fax)

Richard A. Speirs
Zwerling, Schachter & Zwerling, LLP
41 Madison Avenue, 32nd Floor
New York, NY 10010
   212/223-3900
   212/371-5969 (Fax)