UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

|  |  |
|---|---|
| MARSHALL FREIDUS and EDWARD P. ZEMPRELLI, Individually and on Behalf of All Others Similarly Situated, | : 09 Civ. 1049 (LAK) and consolidated cases |
| Plaintiffs, | : 09 Civ. 1284 (LAK) : 09 Civ. 1410 (LAK) |
| - against - | : 09 Civ. 1820 (LAK) : 09 Civ. 2667 (LAK) |
| ING GROEP N.V., et al., | : 09 Civ. 3066 (LAK) |
| Defendants. | : **ORAL ARGUMENT** : **REQUESTED_____** |

------------------------------------------------------------------------ X

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Mitchell A. Lowenthal, Esq.
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Tel: (212) 225-2000
Fax: (212) 225-3999

Giovanni P. Prezioso, Esq.
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 974-1500
Fax: (202) 974-1999

Attorneys for Defendants ING Groep N.V.,
ING Financial Holdings Corp., and ING
Financial Markets LLC

Stuart J. Baskin, Esq.
Adam S. Hakki, Esq.
Herbert S. Washer, Esq.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
Fax: (212) 848-7179

Attorneys for UBS Securities LLC, Citigroup
Global Markets Inc., Merrill Lynch, Pierce,
Fenner & Smith Incorporated, Wachovia
Capital Markets, LLC, Morgan Stanley & Co.
Incorporated, Banc of America Securities LLC,
RBC Capital Markets Corporation, J.P.
Morgan Securities Inc., Credit Suisse
Securities (USA) LLC, HSBC Securities
(USA) Inc., ABN AMRO Incorporated, and
A.G. Edwards & Sons, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iv

TABLE OF ABBREVIATIONS ................................................................................... viii

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND......................................................................................... 4

A.    The Global Liquidity Crisis.............................................................................. 4

B.    ING's RMBS Investments................................................................................. 6

C.    Plaintiffs' Allegations....................................................................................... 8

ARGUMENT................................................................................................................. 10

I.    THE JUNE 2007 OFFERING CLAIMS ARE TIME-BARRED........................... 10

    A.    The June 2007 Offering Claims Rest On ING's Alleged
          Failure To Disclose Its Exposure to Non-Prime RMBS............................ 11

    B.    By August 2007, Plaintiffs Concede
          ING Disclosed Its RMBS Portfolio............................................................. 12

II.    THE CAC FAILS TO STATE A CLAIM UNDER
     THE SECURITIES ACT ...................................................................................... 14

    A.    The Applicable Legal Standards.................................................................. 14

          1.    Sections 11 And 12(a)(2) Of The Securities Act............................ 14

          2.    Allegations That Sound In Fraud Or Challenge
               Forward-Looking Statements Must Be Pleaded
               With Particularity ........................................................................... 14

    B.    The June 2007 Offering Claims Should Be Dismissed ............................... 17

          1.    Allegations Of General Market Conditions
               Fail To Raise An Inference That There
               Was A Material Omission ................................................................ 17

          2.    Plaintiffs' Exclusive Reliance On
               Later Events In 2007 Is Impermissible
               Hindsight Pleading ........................................................................... 21

3.      The CAC Fails To Raise An Inference
        That ING Violated International
        Accounting Standards Or Reg S-K................................................. 23

4.      ING's RMBS Investments Were An
        Immaterial Portion Of Its Assets ..................................................... 24

5.      ING's Statements About Risk Management
        Are Either Inactionable "Puffery" Or
        Forward-Looking Statements ............................................................ 26

C.      The September 2007 Offering Claims Should Be Dismissed .................... 28

1.      The Omission Of Certain Details About
        Mortgages Underlying ING's RMBS
        Investments Was Not Misleading..................................................... 28

        (a)     The September 2007 Offering Materials
                Disclose Extensive Information About
                ING's Investments In RMBS ............................................. 29

        (b)     Details About Mortgages Underlying ING's
                RMBS Investments Were Immaterial
                In Light Of ING's Extensive Disclosure ............................ 30

2.      Disclosure Of FICO Scores And LTV
        Ratios Was Not Misleading............................................................. 32

3.      ING's Disclosure Of RMBS Ratings
        Was Not Misleading ........................................................................ 34

4.      Plaintiffs Otherwise Fault Language That Is
        Not Actionable As Puffery, Opinion, or Forward-Looking ........... 37

D.      The June 2008 Offering Claims Should Be Dismissed .............................. 38

1.      The June 2008 Offering Materials Disclose Extensive
        Information About ING's Investments In RMBS .......................... 38

2.      The CAC Fails To Raise An Inference That ING
        Should Have Taken Additional Impairments
        Or Increased Loan Loss Reserves Earlier........................................ 42

        (a)     Plaintiffs' Reliance On Later Events In 2008 Is
                Impermissible Hindsight Pleading...................................... 42

        (b)     The Amount Of Additional Impairment And
                Increased Loan Loss Reserve Is Immaterial....................... 43

(c)    ING's Valuation Of Its RMBS And Debt
Securities And Its Related Accounting Decisions
Were A Matter Of Judgment And Opinion ........................ 44

3.    Plaintiffs Allege No Separate Facts To Support
Their Assertion That ING Violated International
Accounting Standards Or Reg S-K ................................................. 49

CONCLUSION ................................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

15 U.S.C. § 77k(a) ........................................................................................................ 14

15 U.S.C. § 77l(a)(2) .................................................................................................... 14

15 U.S.C. § 77m (2009).................................................................................................. 10

15 U.S.C. § 77z-2(c)(1) ........................................................................................... 16, 26

Private Securities Litigation Reform Act of 1955, Pub. L 104-67, 109 Stat. 737,
15 U.S.C. § 77z-2(c)(1)(B)....................................................................................... 14-15

Fed. R. of Civ. P. 9(b)................................................................................................... 14

**Cases**

Acito v. IMCERA Group Inc.,
47 F.3d 47 (2d Cir. 1995) ............................................................................................. 32

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009).................................................................................... 17, 25, 43

Basic Inc. v. Levinson,
485 U.S. 224, 108 S. Ct. 978 (1988) ................................................. 14, 25, 30, 41

Bell Atl. Corp. v. Twombly,
550 U.S. 544, 127 S. Ct. 1955 (2007) ............................................................... 17

Ciresi v. Citicorp,
782 F. Supp. 819 (S.D.N.Y. 1991) ............................................................................ 22

Coronel v. Quanta Capital Holdings Ltd.,
No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)............... 15, 16, 42

Cross v. 21st Century Holding Co.,
No. 00 Civ. 4333 (MBM), 2001 WL 34808272 (S.D.N.Y. Aug. 6, 2001) ...................... 13

Denny v. Barber,
576 F.2d 465 (2d Cir. 1978) ......................................................................................... 15

Dodds v. Cigna Sec., Inc.,
12 F.3d 346 (2d Cir. 1993) ................................................................................. 2, 10,11

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase,
553 F.3d 187 (2d Cir. 2009) .................................................................................. passim

**Page(s)**

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.,
376 F. Supp. 2d 385 (S.D.N.Y. 2005) ............................................................. 23, 44

Garber v. Legg Mason, Inc.,
537 F. Supp. 2d 597 (S.D.N.Y. 2008),
aff'd, No. 08-1831-cv, 2009 WL 3109914 (2d Cir. Sept. 30, 2009) ................................. passim

Garber v. Legg Mason, Inc.,
No. 08-1831-cv, 2009 WL 3109914 (2d Cir. Sept. 30, 2009) ............................................ 30

Halperin v. eBanker USA.com, Inc.,
295 F.3d 352 (2d Cir. 2002) ............................................................................. 37

Hinerfield v. United Auto Group,
No. 97 Civ. 3533 (RPP), 1998 WL 397852 (S.D.N.Y. July 15, 1998) ............................. 23

In re Allied Capital Corp. Sec. Litig.,
No. 02 Civ. 3812 (GEL), 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) ........................... 24, 45

In re Alstom SA Sec. Litig.,
406 F. Supp. 2d 402 (S.D.N.Y. 2005) ................................................................. 10

In re Axis Capital Holdings Ltd. Sec. Litig.,
456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................. 16

In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410 (3d Cir. 1997) ........................................................................... 16

In re Chaus Sec. Litig.,
No. 88 Civ. 8641 (SWK), 1990 WL 188921 (S.D.N.Y. Nov. 20, 1990) ........................... 10

In re CIT Group, Inc. Sec. Litig.,
349 F. Supp. 2d 685 (S.D.N.Y. 2004) ...........................................................22, 23, 42

In re Citigroup, Inc. Sec. Litig.,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................................. 23

In re Duke Energy Corp. Sec. Litig.,
282 F. Supp. 2d 158 (S.D.N.Y. 2004) ................................................................. 50

In re Flag Telecom Holdings, Ltd. Sec. Litig.,
308 F. Supp. 2d 249 (S.D.N.Y. 2004) ................................................................. 14

In re Global Crossing, Ltd. Sec. Litig.,
313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................. 37, 45

**Page(s)**

In re Livent, Inc. Noteholders Sec. Litig.,
151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................................ 26

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................................ 18

In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.,
448 F. Supp. 2d 466 (E.D.N.Y. 2006) ................................................................... 25-26, 31

In re NovaGold Res. Inc. Sec. Litig.,
629 F. Supp. 2d 272 (S.D.N.Y. 2009) .............................................................. 10, 13, 45

In re Salomon Analyst Level 3 Litig.,
373 F. Supp. 2d 248 (S.D.N.Y. 2005) ............................................................................ 44-45

Indiana State Dist. Council of Laborers and Hod
Carriers Pension and Welfare Fund v. Omnicare, Inc.,
__F.3d__, 2009 WL 3365189 (6th Cir. Oct. 21, 2009) ....................................................... 49-50

Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,
32 F.3d 697 (2d Cir. 1994) ................................................................................................ 10

Kronfeld v. Trans World Airlines, Inc.,
832 F.2d 726 (2d Cir. 1987) .............................................................................................. 14

Ladmen Partners, Inc. v. Globalstar, Inc.,
No. 07 Civ. 0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) ......................... 16

Landmen Partners Inc. v. Blackstone Group, L.P.,
No. 08 Civ. 3601 (HB), 2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009) ............................ passim

LC Capital Partners, LP v. Frontier Ins. Group, Inc.,
318 F.3d 148 (2d Cir. 2003) .............................................................................................. passim

Lin v. Interactive Brokers,
574 F. Supp. 2d 408 (S.D.N.Y. 2008) ................................................................................ 21

Masters v. GlaxoSmithKline,
271 F. App'x 46 (2d Cir. 2008) ......................................................................................... 24, 43

Newman v. Warnaco Group, Inc.,
335 F.3d 187 (2d Cir. 2003) .............................................................................................. 13

OSRecovery, Inc. v. One Groupe Int'l, Inc.,
354 F. Supp. 2d 357 (S.D.N.Y. 2005) ............................................................................... 15-16

**Page(s)**

Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,
538 F. Supp. 2d 662 (S.D.N.Y. 2008) .................................................................. passim

Parnes v. Gateway 2000, Inc.,
122 F.3d 539 (8th Cir. 1997) ................................................................................ 24

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,
No. 08 Civ. 10446 (RGS), 2009 WL 3149775 (D. Mass. Sept. 30, 2009)......................... passim

Rolon v. Henneman,
517 F.3d 140 (2d Cir. 2008) ................................................................................ 25

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004) ................................................................................ 15,16, 26,27

Rubin v. MF Global, Ltd.,
634 F. Supp. 2d 459 (S.D.N.Y. 2009) .................................................................. 27-28

Soto v. Morgan Stanley Dean Witter & Co.,
No. 01 Civ. 7611 (MP), 2001 WL 958929 (S.D.N.Y. Aug. 21, 2001) .............................. 21

Staehr v. Hartford Fin. Servs. Group,
547 F.3d 406 (2d Cir. 2008) ................................................................................ 11,13, 41

Stern v. Leucadia Nat'l Corp.,
844 F.2d 997 (2d Cir. 1988) ................................................................................ 21

Survivor Prods. LLC v. Fox Broad. Co.,
No. 01 Civ. 3234 (LGB), 2001 WL 35829267 (C.D. Cal. June 12, 2001)........................ 21

Three Crown Ltd. P'ship v. Caxton Corp.,
817 F. Supp. 1033 (S.D.N.Y. 1993) .................................................................... 21

VTech Holdings, Ltd. v. PriceWaterhouseCoopers,
348 F. Supp. 2d 255 (S.D.N.Y. 2004) .................................................................. 37

Wielgos v. Commonwealth Edison Co.,
892 F.2d 509 (7th Cir. 1989) ................................................................................ 31

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DESCRIPTION | EXHIBIT |
|---|---|---|
| **ING Groep N.V. SEC Filings** | | |
| 2004 Annual Report | ING Groep N.V. Annual Report for fiscal year ended December 31, 2004 (Form 20-F) (Apr. 18, 2005) | N |
| 2005 Annual Report | ING Groep N.V. Annual Report for fiscal year ended December 31, 2005 (Form 20-F) (Mar. 28, 2006) | O |
| 2006 Annual Report | ING Groep N.V. Annual Report for fiscal year ended December 31, 2006 (Form 20-F) (Apr. 20, 2007) | P |
| 2007 Annual Report | ING Groep N.V. Annual Report for fiscal year ended December 31, 2007 (Form 20-F) (Mar. 19, 2008) | R |
| May 22, 2007 6-K | ING Groep N.V. Report of Foreign Issuer (Form 6-K) (May 22, 2007) | BB |
| June 4, 2007 6-K | ING Groep N.V. Report of Foreign Issuer (Form 6-K) (June 4, 2007) | |
| Aug. 9, 2007 6-K | ING Groep N.V. Report of Foreign Issuer (Form 6-K) (Aug. 9, 2007) | Q |
| Sept. 24, 2007 6-K | ING Groep N.V. Report of Foreign Issuer (Form 6-K) (Sept. 24, 2007) | D |
| Nov. 8, 2007 6-K | ING Groep N.V. Report of Foreign Issuer (Form 6-K) (Nov. 8, 2007) | T |
| May 15, 2008 6-K | ING Groep N.V. Report of Foreign Issuer (Form 6-K) (May 15, 2008) | S |
| Nov. 13, 2008 6-K | ING Groep N.V. Report of Foreign Issuer (Form 6-K) (Nov. 13, 2008) | KK |
| Apr. 9, 2009 6-K | ING Groep N.V. Report of Foreign Issuer (Form 6-K) (Apr. 9, 2009) | L |
| **ING Groep N.V. Offering Materials** | | |
| Registration Statement | ING Groep N.V. Registration Statement (Form F-3) (Dec. 1, 2005) | |
| June 2007 Offering Materials | ING Groep N.V. Prospectus Supplement for the 6.375 % ING Perpetual Hybrid Capital Securities (June 6, 2007), incorporating by reference the Registration Statement, 2006 Annual Report, May 22, 2007 6-K, and June 4, 2007 6-K | |
| September 2007 Offering Materials | ING Groep N.V. Prospectus Supplement for the 7.35 % ING Perpetual Hybrid Capital Securities (Sept. 27, 2007), incorporating by reference the Registration Statement, 2006 Annual Report, May 22, 2007 6-K, June 4, 2007 6-K, and Sept. 24, 2007 6-K | |

| ABBREVIATION | DESCRIPTION | EXHIBIT |
|---|---|---|
| June 2008 Prospectus | ING Groep N.V. Prospectus Supplement for the 8.50 % ING Perpetual Hybrid Capital Securities (June 10, 2008) | |
| June 2008 Offering Materials | June 2008 Prospectus, incorporating by reference the Registration Statement, 2007 Annual Report, May 15, 2008 6-K, ING Groep N.V. Report of Foreign Issuer (Form 6-K) (May 19, 2008), and ING Groep N.V. Report of Foreign Issuer (Form 6-K) (May 27, 2008) | |
| **Miscellaneous ING Groep N.V. Materials** | | |
| 2008 1Q Analyst Presentation | ING Groep N.V. First Quarter 2008, Analyst Presentation (May 14, 2008), available at http://www.ing.com | II |
| 2008 1Q Earnings Call | Transcript of ING Groep N.V. Earnings Conference Call (May 14, 2008), available at http://www.ing.com | LL |
| 2008 3Q Analyst Presentation | ING Groep N.V. Third Quarter 2008, Analyst Presentation (Nov. 12, 2008), available at http://www.ing.com | I |

Defendants[1] submit this memorandum of law in support of their motion to dismiss the

Consolidated Amended Complaint (the "CAC").[2]

## PRELIMINARY STATEMENT

ING played no part in originating, underwriting, or selling non-prime residential

mortgage-backed securities ("RMBS") – the focus of Plaintiffs' claims. It was just an investor in

them – and a conservative one at that. ING's RMBS portfolio represented only a tiny portion of

ING's total assets: in the aggregate, less than 3% at the highest level during the putative class

period from June 2007 to June 2008. And ING's RMBS assets were considered among the

safest of their kind: virtually all bore the highest investment-grade ratings (AA or AAA),

reflecting the maximum degree of credit protection against any default on the underlying

mortgages. Yet in the face of the "distinctively unique financial crisis" that befell the credit and

mortgage markets, CAC ¶ 189, even these well-insulated assets lost value. As they did, ING

disclosed the pertinent details of its investments, including the size of its holdings, their defining

characteristics, the associated risks, any declines in value, and, later, impairments on certain of

them.

Plaintiffs – purchasers of perpetual hybrid securities issued by ING in three offerings in

June 2007, September 2007, and June 2008[3] – fault ING for not disclosing sooner certain

---

[1] Defendants are ING Groep N.V. ("ING Groep") and ING Financial Holdings Corp. ("ING Financial Holdings" and, collectively, "ING"), and UBS Securities LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wachovia Capital Markets, LLC, Morgan Stanley & Co. Incorporated, Banc of America Securities LLC, RBC Capital Markets Corporation, J.P. Morgan Securities Inc., ING Financial Markets LLC, Credit Suisse Securities (USA) LLC, HSBC Securities (USA) Inc., ABN AMRO Incorporated, and A.G. Edwards & Sons, Inc. (collectively, the "Underwriter Defendants"). Plaintiffs have not served the Consolidated Amended Complaint, or any of the six original complaints, on any of the remaining named defendants.

[2] The CAC is attached as Exhibit A to the accompanying Declaration of Mitchell A. Lowenthal, dated November 5, 2009. References to "Ex __" are to the Exhibits to the Lowenthal Declaration.

[3] Not all Underwriter Defendants participated in all three offerings  Specifically, Credit Suisse Securities (USA) LLC did not participate in the June 2007 Offering; and defendants ABN AMRO Incorporated and A.G.

information about ING's portfolio of RMBS and other debt securities. They bring claims under Sections 11 and 12 of the Securities Act of 1933, alleging that the Offering Materials[4] were materially false and misleading.[5] The thrust of the allegations shifts somewhat from offering to offering, as Plaintiffs attempt to downplay ING's increasingly detailed disclosures as the economic downturn evolved. For the June 2007 Offering, Plaintiffs focus on the alleged lack of any specific mention of subprime or Alt-A RMBS assets; for the September 2007 Offering, Plaintiffs complain that the details provided on the now-disclosed assets were not specific enough; for the June 2008 Offering, Plaintiffs assert that the stated losses on the now-detailed disclosure were still insufficient. But all of these claims are meritless.

First, because Plaintiffs' allegations about the June 2007 Offering are based on ING's alleged complete failure to disclose its Alt-A and subprime RMBS holdings, they were obligated to bring suit within one year of being put on notice of that claim. Here, Plaintiffs concede they learned ING held precisely those assets no later than August 2007 – more than one year before the initial complaints in this action were filed. As such, their June 2007 Offering claims are barred by the applicable statute of limitations. See infra Point I.

Second, Plaintiffs' challenges to all three offerings fall far short of stating a plausible claim of a material misstatement or omission. Not once does the CAC set forth a fact relating to

---

Edwards & Sons, Inc. did not participate in the June 2008 Offering. The Underwriter Defendants do not construe the CAC to assert claims against underwriters related to offerings in which they did not participate.

[4]     The June 2007 Offering Materials, September 2007 Offering Materials, and June 2008 Offering Materials are as defined in the CAC, and include the registration statement, prospectuses, and other SEC filings incorporated by reference as set forth therein. CAC ¶ 59.

[5]     Plaintiffs also bring a cause of action pursuant to Section 15 of the Securities Act against Stichting ING Aandelen (the "Stichting") and more than a dozen individual officers and directors of ING or the Stichting. However, none of these named defendants has been served with the CAC or any of the original six complaints. Additionally, Plaintiffs' failure to state a primary claim under Section 11 or 12 compels dismissal of the Section 15 claim. See Dodds v. Cigna Sec., Inc., 12 F.3d 346, 349 n.1 (2d Cir 1993) ("Section 15 merely creates a derivative liability for violations of Sections 11 and 12.").

the <u>specific</u> RMBS assets held by ING that demonstrates further disclosure was required <u>at the</u> <u>time of any Offering</u>, rather than in hindsight. Nor does it plead that the estimated valuations and stated opinions regarding those assets were not as management truly believed (or that they were contrary to the judgment of Ernst & Young – notably not named as a defendant here – who served as ING's independent auditors and gave unqualified opinions on ING's financial statements). Conspicuously absent from the CAC is any reference to an ING internal document or a confidential witness statement about ING's RMBS (or, for that matter, ING at all).

Instead, Plaintiffs rely on general market conditions that either relate to entirely different classes of assets – assets distinct in structure or rating, or both, from those held by ING – or that are not linked in any way to the specific RMBS ING held. Similarly, they resort to irrelevant apples-to-oranges comparisons with write-downs taken by other institutions on wholly separate mortgage-related assets. And much of the market data relied on by Plaintiffs comes from sources post-dating the Offerings at issue. Plaintiffs offer no basis for concluding that ING, as a mere investor in RMBS, had the ability to uncover or report those general trends sooner, much less a legal duty to do so.

The only allegations about ING's specific assets come from ING's own disclosures; Plaintiffs argue these disclosures should have been made sooner. But even here Plaintiffs fail to plead materiality. The impairments on RMBS and other debt securities and increases in loan loss reserves that Plaintiffs allege ING should have taken at the end of March 2008, rather than September 2008 – totaling €1.2 billion – represented less than <u>one-tenth of one percent</u> (0.09%) of ING's total assets at that time. Further, Plaintiffs' entire theory of liability is premised on a bald exercise of impermissible pleading by hindsight. Complaints that depend on then-as-now inferences are always insufficient; but the CAC is especially defective in this regard. Plaintiffs

3

fault ING for not making disclosures about deteriorating conditions sooner, and yet, in the same breath they portray a "rapidly declining" market, which suffered a "precipitous" "collapse." See, e.g., CAC ¶¶ 6, 15, 114, 182. See infra Point II.

The CAC should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    The Global Liquidity Crisis

Most independent market observers and regulators initially believed that the problems that began in early 2007 in the subprime market would be contained to that sector.[6]  In late 2007, however, those problems began affecting other markets, as rating agencies downgraded subprime mortgage-related securities, and investors retreated from a wide range of structured finance markets.  Markets around the world suffered, ultimately affecting virtually every financial institution that held real estate-related assets.  ING disclosed to investors, commencing in 2007, the changing market conditions and their adverse impact on its results.[7]

Beginning in September 2008, after more than a year of gradual market deterioration, the stock prices of financial institutions around the world declined sharply following sudden and unprecedented events.  On September 15, 2008, Lehman Brothers Holdings Inc. filed the largest bankruptcy case in history, Bank of America announced the acquisition of Merrill Lynch, and the Dow Jones Industrial Average lost 504 points, or 4.4% – the steepest one-day decline since the first trading day following September 11, 2001.  See John Helyar, "Ten Days Changed Wall

---

[6]    See Ben Bernanke, Chairman, Federal Reserve, Address at the Federal Reserve Bank of Chicago's 43rd Annual Conference on Bank Structure and Competition (May 17, 2007) ("[W]e do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system."), Ex. B, at 6; Emily Kaiser, "Paulson Sees U.S. Housing Downturn Near End," Reuters (July 2, 2007), Ex. C.

[7]    See, e.g., CAC ¶ 124 ("Credit markets have recently become more turbulent amid concerns about U.S. subprime mortgages .  . Resulting market corrections have affected, through mark-to-market valuations, our trading books and leveraged loan book[s].") (quoting Sept. 24, 2007 6-K, Ex. D, at 4).

Street As Bernanke Saw 'Massive Failures,'" Bloomberg (Sept. 22, 2008), Ex. E.  The next day,

the United States government took control of AIG, and the Dow Jones Industrial Average

dropped another 4.7%.  See id.  Like all financial services companies, ING's securities were

adversely affected by these events (there are no well-pled allegations in the CAC that ING was

affected in some unique way).  In fact, the price of ING's perpetual hybrid capital securities

during the Class Period was entirely consistent – in virtual lockstep – with market fluctuations

generally.[8]

During the months following the Dow Jones Industrial Average's September 2008

precipitous decline, the United States government undertook a $700 billion bailout plan that

committed funds to more than 600 companies.  See U.S. TARP Transaction Report for the period

ending July 1, 2009, Ex. G.  Various European governments, including the Netherlands, took

similar measures in an effort to level the playing field and support their major financial

institutions.[9]  ING, a Dutch company, received such an infusion that permitted it to increase its

Tier 1 ratio (a measure of capital strength), increase shareholders' equity in its banking unit, and

pay down its debt.[10]  Since that time, ING has announced measures taken to fortify its position in

light of the changed market conditions.[11]  Further, the price of ING's perpetual hybrid capital

securities offered in June 2007, September 2007, and June 2008 rebounded from lows of $2.60,

---

[8]    See Charts Comparing ING Perpetual Hybrid Capital Securities with Index of Hybrid Securities during Class Period, Ex. F.

[9]    See Press Release, De Nederlandsche Bank, Measures by the Dutch Authorities to Protect the Financial Sector (Oct. 9, 2008), Ex. H; Timeline of government assistance to companies included in 2008 3Q Analyst Presentation, Ex I, at 15.  In October 2008, ING accepted a €10 billion infusion of capital offered by the Dutch government "to sound and viable financial enterprises that are facing unexpected external shocks."  Press Release, De Nederlandsche Bank, Government Reinforces ING's Core Capital by EUR 10 Billion (Oct. 19, 2008) (emphasis added), Ex. J.

[10]    See Press Release, ING, ING to Strengthen Core Capital by EUR 10 Billion (Oct. 19, 2008), Ex. K.

[11]    See, e.g., Apr. 9, 2009 6-K, Ex. L, at 3.       .

$3.50, and $3.84, respectively, on March 9, 2009, to close at $14.50, $17.40, and $19.19,

respectively, on September 25, 2009, the date of the CAC – representing an average increase of

approximately 518%. See ING Hybrid Securities Trading Rates Chart, Ex. M.

>    B.    ING's RMBS Investments

ING's principal lines of business are insurance and banking.[12] As Plaintiffs recognize,

"'ING does not originate subprime mortgages in the U.S.'" See CAC ¶ 124 (quoting Sept. 24,

2007 6-K, Ex. D, at 4). ING does maintain an investment portfolio of proprietary assets, and,

long before the putative class period began, ING disclosed that its portfolio included mortgage-

backed securities.[13] As problems in the subprime mortgage market came to the fore and began to

affect other markets in 2007, ING disclosed more details about its mortgage-backed securities.

On August 8, 2007, ING specifically disclosed that its investment portfolio included €3.2 billion

of RMBS secured by subprime mortgages, which represented 0.25% of ING's total assets, and

announced that it took a negative revaluation on those assets in the amount of €58 million.[14]

On September 24, 2007, ING announced that, as of July 31, 2007, its RMBS investments

also included €28.7 billion securitized by "Alt-A," or "Alternative to Agency," mortgages, which

represented 2% of total assets, CAC ¶ 124, and disclosed a negative revaluation, "reflecting

---

[12]    Plaintiffs name three ING entities as defendants· ING Groep issued the hybrid securities Plaintiffs purchased; an officer of its wholly owned subsidiary, ING Financial Holdings, signed the December 1, 2005 registration statement on Form F-3 ("Registration Statement") as the duly authorized representative of ING Groep in the United States, and ING Financial Markets LLC is one of the Underwriter Defendants, which underwrote one or more of the challenged offerings. CAC ¶¶ 24-25, 51.

[13]    See, e.g., 2004 Annual Report, Ex. N, at 79-80; 2005 Annual Report, Ex. O, at 54-56; 2006 Annual Report, Ex. P, at 71, 73, F-113, F-114.

[14]    See CAC ¶ 7; Aug. 9, 2007 6-K, Ex. Q, at 5.

credit developments," in the amount of €233 million on its Alt-A RMBS investments. Sept. 24, 2007 6-K, Ex. D, at 4.[15]

Significantly, ING was not investing in the mortgage loans themselves: it was investing in securities backed by those loans – securities that had been structured to allocate loss exposure among various classes (or "tranches") sold to investors, see CAC ¶ 62, and ING invested nearly exclusively in the highest quality, investment-grade tranches of those RMBS, leaving the "risky" tranches to others. Indeed, as of July 31, 2007, fully 93% of ING's subprime RMBS investments, and 99.9% of ING's Alt-A RMBS, were rated AAA or AA. Sept. 24, 2007 6-K, Ex. D, at 4. In addition, ING invested primarily in RMBS backed by Alt-A (rather than subprime) loans, further reducing its risk profile. See CAC ¶ 66 (acknowledging that subprime RMBS have a "significantly higher default risk than . . . Alt-A mortgages").

As market conditions worsened, ING provided ongoing disclosure of the decline in the market value of its RMBS investments, even as they remained a miniscule percentage of its total assets. ING's 2007 Annual Report, which incorporated financials on which Ernst & Young gave an unqualified opinion, reported impairments and trading losses on ING's U.S. subprime RMBS portfolio that reflected the deterioration in the market. See id. ¶ 134. The 2007 Annual Report also disclosed comprehensive risk factors, including that "[o]ngoing volatility in the financial markets has impacted and may continue to impact [ING],"[16] and that the valuation of ING's RMBS investments was complex and could change. Id.

---

[15]      `ING classified RMBS as Alt-A broadly and conservatively. See CAC ¶ 65. ING considered an RMBS in its portfolio to be Alt-A, rather than prime, if any one of the following three conditions was met with respect to the underlying mortgages: (a) the weighted-average FICO-credit scores were lower than 730 (but higher than 640); (b) the weighted-average loan-to-value ratios were equal or lower than 70% (but under 100%); or (c) at least 50% of borrowers had "low documentation." Id. ¶ 124.

[16]      2007 Annual Report, Ex. R, at 10.

On May 15, 2008, as the market crisis deepened, ING disclosed further details and risks associated with its investment in RMBS, including that market prices for ING's "'pressurized asset classes . . . were inevitably impacted,'" and "'[t]he adverse market environment inevitably had a negative impact on ING's capital position.'" Id. ¶ 139 (quoting May 15, 2008 6-K, Ex. S, at 1, 5). During the first quarter of 2008, ING took an additional €33 million of pre-tax impairments and losses on its U.S. subprime RMBS investments, and €17 million on its investment in U.S. Alt-A RMBS. Id. In a special appendix entitled "Direct Impact of Credit and Liquidity Crisis," ING disclosed that pre-tax negative revaluations on its subprime RMBS investment totaled €528 million, and pre-tax negative revaluations on its Alt-A RMBS investment totaled approximately €4.3 billion, at March 31, 2008. May 15, 2008 6-K, Ex. S, at 22.

C.    Plaintiffs' Allegations

Plaintiffs allege that the June 2007 Offering Materials were materially false and misleading because they did not disclose the amount of ING's Alt-A and subprime RMBS investments, or an increase in unrealized losses on ING's debt portfolio from March through June 2007.  CAC ¶ 120(a), (e).  Further, Plaintiffs contend that the omission of the following alleged facts from each of the June 2007, September 2007, and June 2008 Offering Materials rendered them materially false and misleading:

- Some of the mortgages underlying ING's RMBS investments were negative amortization loans, hybrid variable rate "option" mortgages, or mortgages originated in 2006 or 2007 or in California or Florida – characteristics allegedly associated with higher rates of default;

- The RMBS in ING's investment portfolio allegedly began defaulting at a much faster and higher rate than RMBS comprised of conforming loans, thereby reducing the value of ING's portfolio and increasing the likelihood of future default; and

- ING's exposure to Alt-A and subprime RMBS allegedly posed a substantial risk to the company's stated capital ratio, shareholders' equity, and liquidity.

8

Plaintiffs assert that, in allegedly failing to disclose these details, Defendants violated International Accounting Standard ("IAS") Nos. 30 and 32, and Item 503 of Regulation S-K ("Reg S-K") under the Securities Exchange Act of 1934. Id. ¶¶ 120, 126, 141.

Additionally, with respect to the September 2007 and June 2008 Offerings, Plaintiffs allege that Defendants' disclosure of FICO scores, loan-to-value ("LTV") ratios and agency ratings in the Offering Materials was materially false and misleading. Id. ¶¶ 127, 142. This allegation is both characteristic of the CAC and stunning. Plaintiffs do not deny that the FICO scores and LTVs were absolutely accurate based on the offering documents pursuant to which ING bought the relevant RMBS. Rather, the CAC asserts that ING somehow should have obtained FICO updates and appraisals on the thousands of borrowers and properties underlying the RMBS. As for the ratings, the CAC identifies not a single investment for which ING inaccurately reported its agency rating. Instead, it charges that ING somehow should have known that months or years later the rating agencies would announce that their models were flawed.

Finally, Plaintiffs allege that, prior to the June 2008 Offering, ING should have taken an additional €1.2 billion in charges on its RMBS and debt securities (including securities issued by unidentified Icelandic banks and Washington Mutual, Inc. ("WaMu")) and loan loss reserve increases. Id. ¶ 141(d). Plaintiffs also allege that ING's interim financial statements for the quarter ended March 31, 2008, incorporated by reference into the June 2008 Offering Materials, were not prepared in accordance with International Financial Reporting Standards ("IFRS") and violated IAS Nos. 1, 10, 34, and 39. Id. ¶¶ 164-166, 171-173, 219-227.

9

**ARGUMENT**

**I.    THE JUNE 2007 OFFERING CLAIMS ARE TIME-BARRED**

Under Section 13 of the Securities Act, "[n]o action shall be maintained to enforce any liability created under Section 11 or Section 12(a)(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m (2009). "Discovery, however, includes constructive and inquiry notice as well as actual notice." Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993). Thus, "Section 13 imposes a duty of inquiry."[17] Plaintiffs have the burden of pleading compliance with the applicable statute of limitations.[18]

Where claims do not require a showing of actual fraud, a plaintiff is "on inquiry notice when it learns of the probability of an earlier 'untrue statement' or 'omission.'" In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 288 (S.D.N.Y. 2009). The amount of information required to trigger inquiry notice is thus lower than for fraud claims. Claims not brought within one year of that notice must be dismissed with prejudice.

Plaintiffs were put on inquiry notice of their June 2007 Offering claims no later than August 8, 2007. On that date, ING announced a negative revaluation of its investment in RMBS and provided a detailed analysis of its exposure to these mortgage-backed securities. See Aug. 9, 2007 6-K, Ex. Q, at 4-5.[19] Plaintiffs acknowledge as much in the CAC, noting that in August

---

[17]    Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 701 (2d Cir. 1994); see also In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402, 421-22 (S.D.N.Y. 2005) (one-year statute of limitations begins "once a plaintiff is put on either actual notice or . . . inquiry notice, of the facts giving rise to his claim") (citing Menowitz v. Brown, 991 F.2d 36, 41 (2d Cir. 1993)).

[18]    See In re Chaus Sec. Litig., No. 88 Civ. 8641 (SWK), 1990 WL 188921, at *3 (S.D.N.Y. Nov. 20, 1990) ("Compliance with [the Section 13] limitations period is an essential, substantive element of a claim under §§ 11 and 12(2) ").

[19]    Courts are permitted to consider the complaint, documents related to the complaint, and related press coverage in considering whether there was a duty of inquiry, LC Capital Partners, LP v Frontier Ins. Group, Inc., 318 F.3d 148, 155-56 (2d Cir. 2003) ("Dismissal is appropriate when the facts from which knowledge may be

2007, "shortly after the [June 2007] offering," ING announced a "dramatic" exposure to such assets. See CAC ¶¶ 7, 120(e).

Despite their insistence that those assets posed a material risk two months earlier (at the time of the June 2007 Offering), Plaintiffs fail to allege that they made any investigation following the August 2007 announcement. The one-year statute of limitations for the Securities Act claims, therefore, began to run no later than August 8, 2007.[20] Accordingly, Plaintiffs had to bring their claims no later than August 7, 2008, but instead waited until February 3, 2009, long after the applicable limitations period had expired, to bring the first complaint.[21]

### A.    The June 2007 Offering Claims Rest On ING's Alleged Failure To Disclose Its Exposure To Non-Prime RMBS

Facts putting an investor on inquiry notice as to a portion of its claim are sufficient to trigger the duty to inquire into the investor's entire claim. See Dodds, 12 F.3d at 352 ("[T]he issue is not whether appellant was given inadequate information about the advisability of investments in multiple limited partnerships but whether she had constructive notice of facts sufficient to create a duty to inquire further into that matter."). An investor need not have notice of each and every alleged misstatement or omission. See Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 427 (2d Cir. 2008) (citing Dodds, 12 F.3d at 352).

Plaintiffs' June 2007 Offering claims are based on a core allegation that ING "failed to disclose any mention whatsoever of ING's massive position in [RMBS]," CAC ¶ 7 (emphasis in original), and thereby omitted "the financial and liquidity risk that those securities posed to the

---

imputed are clear from the pleadings and the public disclosures themselves.") (citing In re Ultrafem Inc. Sec. Litig., 91 F Supp 2d 678, 692 (S.D.N.Y. 2000)), or "in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice," Staehr v Hartford Fin. Servs. Group, 547 F.3d 406, 425 (2d Cir. 2008).

[20]    See LC Capital Partners, LP, 318 F.3d at 154 ("If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose.").

[21]    The first of the six consolidated complaints filed was Freidus v. ING Group N.V., No. 09 Civ. 1049 (S.D.N.Y. filed Feb. 3, 2009).

Company," id.; see also ¶¶ 15, 114, 120, 158, 239, 250. Plaintiffs repeat this allegation

throughout the CAC, stating, for example, that the June 2007 Offering Materials "simply

provided no information whatsoever concerning [ING's] massive exposure to the rapidly

declining RMBS market." Id. ¶ 114 (emphasis added); see also id. ¶ 120(a). All other

allegations regarding the June 2007 Offering either repeat this allegation or rely on it as their

factual predicate.[22]

### B.    By August 2007, Plaintiffs Concede ING Disclosed Its RMBS Portfolio

ING expressly disclosed, no later than August 8, 2007, that it held billions of euro of non-

prime RMBS. See Aug. 9, 2007 6-K, Ex. Q, at 5 (disclosing, for example, €3.2 billion of

subprime RMBS, and a negative revaluation thereon of €58 million as of July 31, 2007). ING

also announced that "[c]redit markets have recently become more turbulent amid concerns about

U.S. subprime mortgages." Id. As the CAC concedes, in August 2007, ING disclosed it was

holding €3.2 billion ($4.6 billion) in subprime RMBS, a "dramatic" €28.7 billion ($41.9 billion)

in its Alt-A RMBS portfolio, CAC ¶ 7, and that unrealized losses on its debt portfolio "increased

by more than 10 fold." Id. ¶ 120(e). For investors who had allegedly been "provided no

information whatsoever concerning [ING's] massive exposure to the rapidly declining RMBS

market," id. ¶ 114 (emphasis added), the August 8, 2007 announcement was – at a minimum – a

---

[22]    See, e.g., id. ¶ 120(b), (c) (allegations that ING should have disclosed certain details about its RMBS
investments presume that ING should have disclosed its RMBS investments in the first place), ¶¶ 119, 120(d)
(alleging that statements regarding shareholder equity, capital position, and liquidity were misleading because of the
alleged "substantial and material risk that ING's exposure to Alt-A and subprime RMBS had on [these
measurements]"), ¶¶ 118, 120(f) (alleging that disclosure about risk management policies and strategies was
materially misleading because ING's exposure to RMBS "was in contravention of ING's stated risk management
policies and public representations"), ¶ 120(e) (alleging that increase in unrealized losses on debt portfolio was a
result of ING's RMBS exposure).

Plaintiffs' allegations of non-compliance with IAS and Reg S-K also stem from the allegation that ING
failed to disclose its RMBS investments in the June 2007 Offering Materials. See id. ¶ 120(g), (h). Specifically,
Plaintiffs allege that ING did not disclose its concentration of credit risk purportedly resulting from its exposure,
through RMBS, to non-prime assets. See id. ¶¶ 129-130.

"storm warning" to the contrary. <u>See</u> <u>Staehr</u>, 547 F.3d at 427 ("Storm warnings" need not detail

every aspect of the alleged misstatement or omission to put investors or inquiry notice).[23]

Further, on September 24, 2007, ING announced results for the first six months of 2007.

It once again disclosed the amount of its investments in subprime and Alt-A RMBS, <u>see</u> Sept.

24, 2007 6-K, Ex. D, and also explained the factors it considered in determining whether to

classify the mortgages underlying an RMBS as Alt-A or subprime. <u>Id.</u>  Plaintiffs themselves cite

extensively to the Sept. 24, 2007 6-K. <u>See, e.g.</u>, CAC ¶¶ 124-125.  In light of new market

developments, on November 8, 2007, ING again disclosed the total amount of its Alt-A and

subprime RMBS, and revealed further impairments and negative revaluations. <u>See</u> Nov. 8, 2007

6-K, Ex. T, at 4 (disclosing €26.9 billion in Alt-A RMBS, €3.1 billion in subprime RMBS, and

€1.1 billion in CDO and CLO exposure).

These critical disclosures imposed on Plaintiffs a duty of further inquiry.[24]  But Plaintiffs

did nothing.  Instead, Plaintiffs waited to assert their June 2007 Offering claims until February 3,

2009, more than a year after all of these disclosures about ING's RMBS assets.  Accordingly,

their claims are time-barred and should be dismissed with prejudice.

---

[23]    Similarly, if, as Plaintiffs assert, the early press reports and market data indicated that ING should have disclosed these "highly risky" assets earlier, then those same sources should likewise have served as storm warnings for Plaintiffs once those disclosures were made.

[24]    <u>See</u> <u>Newman v</u> <u>Warnaco Group, Inc.</u>, 335 F.3d 187, 193 (2d Cir. 2003) (duty of inquiry arises when information would "alert a reasonable person to the probability that there were either misleading statements or significant omissions involved"); <u>LC Capital Partners</u>, 318 F.3d at 155 (approving lower court's determination that changes in reserve charges sufficed as storm warnings of alleged fraudulent policies, inadequate information systems, and unavailable information); <u>Cross v. 21st Century Holding Co.</u>, No. 00 Civ. 4333 (MBM), 2001 WL 34808272, at *5 (S.D.N.Y. Aug. 6, 2001) ("An investor need not have notice of the full extent of the fraud or misstatements to be put on inquiry notice. . . . Knowledge of facts giving rise to a duty of inquiry into a portion of . . . misstatements is sufficient"); <u>NovaGold</u>, 629 F. Supp. 2d at 288 ("A plaintiff is thus on inquiry notice when it learns of the probability of an earlier 'untrue statement' or 'omission.'").

## II.     THE CAC FAILS TO STATE A CLAIM UNDER THE SECURITIES ACT

### A.     The Applicable Legal Standards

#### 1.     Sections 11 And 12(a)(2) Of The Securities Act

Section 11 of the Securities Act imposes liability for a registration statement that

"contained an untrue statement of a material fact or omitted to state a material fact required to be

stated therein or necessary in order to make the statements therein not misleading." 15 U.S.C.

§ 77k(a). Section 12(a)(2) of the Securities Act imposes liability for "a prospectus or oral

communication, which includes an untrue statement of a material fact or omits to state a material

fact necessary in order to make the statements, in the light of the circumstances under which they

were made, not misleading." 15 U.S.C. § 77*l*(a)(2).

Critically, the truth of a statement is evaluated by the facts "as they existed" at the time of

the offering. See, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 254

(S.D.N.Y. 2004). An untrue statement of fact is material only when there is "a substantial

likelihood" that a reasonable investor would consider it important when making investment

decisions. Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 731 (2d Cir. 1987) (internal

quotation marks omitted). An omission is material only when a reasonable investor would have

viewed it as having "significantly altered the 'total mix' of information." Basic Inc. v. Levinson,

485 U.S. 224, 231-32, 108 S. Ct. 978, 983 (1988).

#### 2.     Allegations That Sound In Fraud Or Challenge Forward-Looking Statements Must Be Pleaded With Particularity

Allegations that "sound in fraud" or challenge forward-looking statements must satisfy

the heightened pleading standard imposed by Federal Rule of Civil Procedure Rule 9(b) and the

Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 77z-2(c)(1)(B) (requiring

proof of "actual knowledge" that the forward-looking statement was false or misleading); see

14

also Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). To satisfy this standard, the

complaint must "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent." Id. at 170.[25] Plaintiffs "must convey through factual

allegations that the defendants made materially false statements." Coronel v. Quanta Capital

Holdings Ltd., No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *16 (S.D.N.Y. Jan. 26, 2009).

They may not imply prior knowledge based upon subsequent disclosures or events – what Judge

Friendly called "fraud by hindsight," Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) – to try

to bypass the heightened pleading standard.

      Although Plaintiffs allege only Securities Act claims and "expressly exclude and

disclaim" any fraud allegations, see CAC ¶¶ 238, 248, 254, the CAC is replete with "wording

and imputations . . . classically associated with fraud: that the . . . statement was 'inaccurate and

misleading'; that it contained 'untrue statements of material facts'; and that 'materially false and

misleading written statements' were issued." OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F.

Supp. 2d 357, 380 n.165 (S.D.N.Y. 2005) (Kaplan, J.) (quoting Rombach, 355 F.3d at 172).

Thus, Plaintiffs repeatedly allege that Defendants "chose not to review," CAC ¶ 153, and

"ignored," id. ¶ 174, certain "evidence," id. ¶ 189, all of which imply that Defendants acted

intentionally. Similarly, Plaintiffs' allegation that Defendants "purportedly relied on the 'AAA'

ratings of ING's [securities], in part, to support their unreasonable failure to record an

impairment in such securities," id. ¶ 185, also implies that Defendants willfully concealed

information and were using the ratings as a smoke-screen. In the same vein, Plaintiffs allege that

---

[25]   See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008)
(dismissing claim where plaintiffs' allegations "with regard to what [defendants] knew, and when they knew it, lack
the specificity and detail needed to rise above the 'speculative' level and into the realm of a 'plausible' pleading").

ING "finally admitted" that market prices had collapsed and then implied a causal link to the firing of ING's CEO. Id. ¶ 17.

Plaintiffs further imply a motive behind the alleged scheme of misconduct. They argue Defendants were allegedly "incentivized not to record an impairment on [ING's] Alt-A and subprime RMBS and financial institution debt securities portfolio . . . [and were] similarly incentivize [sic] to understate the amount of its loan loss provisions" because "[h]ad ING not engaged in these improper practices, it would have had to recognize losses that would have caused the Company to be dangerously close to breaching regulatory capital standards, thereby exposing the Company's true capital inadequacy." Id. ¶¶ 163, 168. Thus, Plaintiffs allege, Defendants "repeatedly tried to distance ING from the crisis" by "reassur[ing] investors of 'limited direct impact' from the collapsing market," id. ¶ 102, so they could "raise over $4.4 billion of precious 'Tier 1' capital," id. ¶ 13.

The CAC thus clearly alleges an intent to defraud and is therefore subject to the heightened pleading requirements of Rule 9(b). See Rombach, 355 F.3d at 171 (Rule 9(b) applies to fraud claims brought under Sections 11 or 12(a)(2) of the Securities Act).[26] Under the PSLRA, Plaintiffs must also plead that Defendants had "actual knowledge" that the forward-looking statements the CAC challenges were "false and misleading." 15 U.S.C. § 77z-2(c)(1).[27]

---

[26]     Plaintiffs cannot escape Rule 9(b) by disclaiming reliance on fraud while simultaneously alleging that Defendants acted knowingly and fraudulently. See, e.g., Coronel, 2009 WL 174656, at *15 (applying Rule 9(b) to Securities Act claims where allegations implying defendant possessed a financial incentive to falsify information "infer an intent to defraud") See also Ladmen Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (stating that the ultimate question in determining whether Rule 9(b) applies to Securities Act claims is whether the complaint, at its core, is predicated on allegations of fraudulent conduct); In re Axis Capital Holdings Ltd. Sec Litig., 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient.").

[27]     See also Rombach, 355 F.3d at 174 (dismissing claims based on defendants' predictions where plaintiffs failed to allege that defendants knew their predictions were false); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997) (applying Rule 9(b) to forward-looking statements).

But even if tested solely against Rule 8, the CAC fails to plead meritorious claims. "To survive a motion to dismiss [under Rule 8], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570, 127 S. Ct. at 1974). "[L]abels and conclusions and a formulaic recitation of the elements of a cause of action will not do," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007), and "legal conclusions couched as factual allegations" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are to be disregarded. Iqbal, 129 S. Ct. at 1949-51. Finally, "plausibility" requires "more than a sheer possibility [of]" or "mere[] consisten[cy] with" wrongful conduct. Id. at 1949, 1951 (internal quotation marks and citation omitted). In determining whether a claim is plausible -- and not just possible -- the Court must "draw on its judicial experience and common sense." Id. at 1950.

### B.    The June 2007 Offering Claims Should Be Dismissed

Plaintiffs fail to plead facts sufficient to raise an inference that the June 2007 Offering Materials contained false or misleading statements or omissions.

#### 1.    Allegations Of General Market Conditions Fail To Raise An Inference That There Was A Material Omission

To raise a plausible inference of Securities Act violations, Plaintiffs must allege facts that can be linked to ING's disclosure in the Offering Materials. Allegations that pertain only to general market conditions, unaccompanied by any nexus to ING's particular RMBS investments, flunk Rule 8 – and even more so Rule 9(b). See, e.g., Landmen Partners Inc. v. Blackstone Group, L.P., No. 08 Civ 3601 (HB), 2009 WL 3029002, at *8 (S.D.N.Y. Sept. 22, 2009) (dismissing Securities Act claim under Rule 8(a) where plaintiffs "[do] not identify a single real

17

estate investment or allege a single fact capable of linking the problems in the subprime

residential mortgage market . . . to [defendants'] real estate investments . . .").[28]

Conspicuously absent from the CAC is any reference to an internal document or a

confidential witness statement relating to ING's RMBS investments; indeed, Plaintiffs make <u>no</u>

allegations about the actual RMBS held by ING at all. Instead, they make only general

assertions about the subprime housing market in 2006 and early 2007, and expect the Court to

connect the dots to ING's specific investments. <u>See, e.g.</u>, CAC ¶¶ 68-101 (citing mortgage

delinquencies unrelated to ING holdings). However, "generalized allegations that problems

brewing in the market at large made it 'foreseeable' that a particular set of unidentified

investments would sour are insufficient to 'nudge[] [the] claims across the line from conceivable

to plausible.'" <u>Landmen Partners</u>, 2009 WL 3029002, at *9 (quoting <u>Twombly</u>, 550 U.S. at 570,

127 S. Ct. at 1974) (alterations in original).

The dots are also impossible to connect. In all their recitation of the timeline of the

market collapse, Plaintiffs fail to distinguish between different tranches of RMBS assets,

between sub-prime and Alt-A RMBS and, indeed, between entirely different classes of assets.

For example, to support their claim that the June 2007 Offering Materials should have disclosed

ING's RMBS investments in light of alleged market conditions, Plaintiffs cite two November

2006 articles and two December 2006 studies. CAC ¶¶ 79-81, 83. But the sources themselves

focus on losses from <u>direct</u> subprime loans and say nothing about Alt-A loans, much less the

---

[28]    <u>See also</u> <u>Garber v. Legg Mason, Inc.</u>, 537 F Supp. 2d 597, 613 (S.D.N.Y. 2008), <u>aff'd</u>, No. 08-1831-cv, 2009 WL 3109914, at *3 (2d Cir. Sept. 30, 2009) (dismissing plaintiffs' Securities Act claims under Rule 8(a)) (citing <u>Twombly</u>, 550 U.S. at 554-55, 127 S. Ct. at 1964-65); <u>In re Merrill Lynch & Co. Research Reports Sec. Litig.</u>, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003).

highly-rated tranches of Alt-A RMBS that comprised the vast bulk of ING's assets.[29] Nor do downgrades of Alt-A assets bearing an unspecified credit rating point to the assets held by ING. See id. ¶ 82. Indeed, according to the CAC, it was not until April 2008 that the initial downgrades of AAA-rated Alt-A RMBS took place. See id. ¶ 87; Paul Jackson, "Moody's Begins Downgrading AAA-Rated Alt-A RMBS to Junk," Housingwire (Apr. 24, 2008), Ex. Y, at 1.

Plaintiffs' allegations about the ABX.HE and TABX.HE indices ("ABX" and "TABX," respectively) are similarly inapposite. As the CAC alleges, those indices "track[] the cost of buying protection for sub-prime mortgage-backed assets," CAC ¶ 183; specifically, the ABX index is composed of only twenty of the most liquid credit default swaps on U.S. home equity asset-backed securities, and the TABX index comprises credit default swaps on certain BBB and BBB- rated asset-backed securities.[30] Moreover, the CAC focuses on these indices' measurements of credit default swaps on BBB-rated assets, see id. ¶¶ 88-92, while ING's RMBS were virtually all rated AA or AAA at the time. Plaintiffs thus fail to allege – and indeed cannot allege – that these indices, which track wholly different securities, could plausibly show that ING was required to make additional disclosures about its RMBS portfolio.

Likewise, that major mortgage originators were taking losses on direct subprime loans do not suggest a mere investor in investment-grade RMBS had toxic assets. Id. ¶ 85. Even where Plaintiffs do refer to the proper type of assets held by ING, they still fail to link their allegations

---

[29]    See Kate Berry, "Lender Woes Seen Worsening As Delinquency Losses Mount," American Banker (Nov. 13, 2006), Ex. U, at 3; James Comtois, "UBS: 2006 Vintage Shaping Up as a Bad One," National Mortgage News (Nov. 27, 2006), Ex V, at 1; "Some Delinquency Measures Increase in Latest MBA National Delinquency Survey," Mortgage Bankers Association (Dec. 13, 2006), Ex. W; "Report Reveals 2.2 Million Borrowers Face Foreclosure on Subprime Home Loans," Center for Responsible Lending (Dec. 19, 2006), Ex. X.

[30]    See "Markit Structured Finance Indices" (2009) (Markit owns and administers the ABX and TABX indices), Ex. Z, at 1, available at http //www.markit com/en/products/data/indices/structured-finance-indices/structured-finance-indices.page?.

to ING's actual assets. For example, although Plaintiffs make generalized allegations about the risks involved in different vintages and types of Alt-A and subprime RMBS, as well as measurements of the deterioration that these assets suffered through 2007 and 2008, see, e.g., id. ¶¶ 67-71, Plaintiffs never allege that ING's portfolio suffered these impairments, or that ING should have disclosed them, as of the date of the June 2007 Offering.

Paragraph 68 of the CAC is representative. It alleges that ING's Alt-A and subprime RMBS portfolios were backed by mortgages originated "primarily" in 2006 and 2007, allegedly "the very riskiest" mortgages. Id. ¶ 68. To support the allegation that these mortgages were especially prone to default, Plaintiffs cite a report by Standard & Poor's ("S&P") stating that at the end of 2007, 8.5% of all Alt-A mortgages originated in 2006 were delinquent. Id. But Plaintiffs fail to allege that this delinquent 8.5% of all Alt-A mortgages was in any way related to the Alt-A mortgages used to securitize ING's RMBS or that this level of delinquency would have had any impact on the tranches of RMBS ING held. Absent such allegation – and in light of the fact that 91.5% of all Alt-A mortgages were not delinquent as of the end of 2007 – the CAC fails to raise an inference that the June 2007 Offering Materials were misleading on the ground that they did not disclose ING's RMBS investment.

Plaintiffs attempt to skirt these deficiencies by creatively characterizing the data as pertaining broadly to all "nonprime" assets, see id. ¶¶ 81, 83, or selectively quoting early press articles to highlight only the most negative outlooks. This widely misses the mark.[31]

---

[31]     In this regard, it should be noted that the "doomsday" scenario Plaintiffs cite from the February 13, 2006 Barron's article (CAC ¶ 75) was posited by a hedge fund manager shorting the subprime market and was characterized by the article itself as "apocalyptic and self-serving." Jonathan Laing, "Coming Home to Roost," Barron's (Feb. 13, 2006), Ex. AA, at 2. The article goes on to quote two other sources to counter his outlook. Id. (citing Doug Duncan, chief economist of the Mortgage Bankers Association, as saying, "I just don't see any coming collapse in the sub-prime market as long as the U.S. economy and job growth stays strong and interest-rate increases remain subdued," and Guy Cecala, publisher of Inside B&C Lending, as saying, "People have been crying wolf about the looming sub-prime reset crisis for two years and nothing has happened. Lending standards are now being tightened up, so I expect we'll muddle through.").

Conclusory press articles should be stricken,[32] and in any event are no substitute for pleading requisite facts needed to support Securities Act claims.[33]

> ### 2.    Plaintiffs' Exclusive Reliance On Later Events In 2007 Is Impermissible Hindsight Pleading

Plaintiffs' allegations are further plagued by hindsight pleading. The CAC's repeated references to events that occurred after the June 2007 Offering are insufficient to plead that the June 2007 Offering Materials were false or misleading.[34] Paragraph 68 is again illustrative. There, the CAC alleges that ING's Alt-A and subprime RMBS portfolios were securitized by mortgages originated in 2006 and 2007, and that 8.5% of all such 2006- and 2007-vintage mortgages were delinquent "at the end of 2007." CAC ¶¶ 68, 72 (emphasis added). However, Plaintiffs fail to allege the delinquency rate at the time of the June 2007 Offering, much less the delinquency rate of mortgages underlying ING's RMBS at that time. Moreover, the stated source for this allegation is a September 2008 S&P report. Plaintiffs offer no explanation how ING would or could know these delinquency rates at the time of the June 2007 offering.[35]

---

[32] See Stern v. Leucadia Nat'l Corp., 844 F.2d 997, 1004 (2d Cir. 1988) ("It is not enough to quote press speculation about defendants' motives and press reports of [alleged wrongdoing by defendants].") (addressing Section 10(b) claim); Survivor Prods. LLC v. Fox Broad. Co., No. 01 Civ. 3234 (LGB), 2001 WL 35829267, at *3 (C.D Cal June 12, 2001) (striking references to newspaper articles and trade publications in copyright infringement case where quoted articles did not relate to parties and amounted to only a "post-hoc analysis" of the legal claim).

[33] See, e.g., Soto v. Morgan Stanley Dean Witter & Co., No. 01 Civ. 7611 (MP), 2001 WL 958929, at *1 (S.D.N.Y Aug. 21, 2001) (dismissing complaint for failure to plead facts in accordance with Rule 8(a) where plaintiffs relied on an "unrestrained litany" of reports, newspaper articles, and market gossip); cf. Three Crown Ltd. P'ship v Caxton Corp., 817 F. Supp. 1033, 1040 n.11 (S.D.N.Y. 1993) (noting that "[p]laintiffs cannot be permitted to free ride off the press . . . rather they must prove to the court that their complaint is backed by specific facts").

[34] See, e.g., Panther Partners, 538 F. Supp. 2d at 669-70 (holding that "craftily drafted" complaint implying "that what only became clear due to subsequent events was somehow known" is insufficient as a matter of law); Lin v. Interactive Brokers, 574 F. Supp. 2d 408, 416 (S.D.N.Y 2008) ("Plaintiffs pleading Sections 11 and 12 claims must state facts showing the 'allegedly omitted facts both existed and were known or knowable, at the time of the offering.'") (citation omitted) (emphasis added).

[35] Similarly, Plaintiffs' allegations about the type and geographic composition of the mortgages underlying ING's RMBS portfolio rely on economic conditions "by the end of 2007," CAC ¶ 73 (emphasis added), but once again never allege that these conditions were present in June of 2007 or that these conditions actually affected ING's RMBS portfolio. See, e.g., id. ¶¶ 72-73 (stating the amount of negative-amortization mortgages and California- and

21

Indeed, there is not one paragraph in Plaintiffs' entire discussion of why ING's assets were supposedly high-risk that pre-dates the June or even September 2007 Offering. See CAC ¶¶ 67-73. As one court recently held, allegations that "merely plead subsequent facts and developments in the attempt to establish an inference that these eventualities must have been known (or knowable) to defendants on the effective date of the [challenged statements]" must be dismissed. Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08 Civ. 10446 (RGS), 2009 WL 3149775, at *8 (D. Mass. Sept. 30, 2009); see also ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase, 553 F.3d 187, 197, 204 (2d Cir. 2009); Ciresi v. Citicorp, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (failure "to show 'greater clairvoyance'" is not a material misstatement or omission) (citation omitted).

Finally, ING's disclosures about its non-prime RMBS investments on August 8, 2007 do not raise an inference that the June 2007 Offering Materials failed to disclose any information that was material at the time. See CAC ¶ 7 (referring to August 8, 2007 disclosure); Aug. 9, 2007 6-K, Ex. Q; In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (holding defendant's subsequent revision of loan loss reserves to be irrelevant to whether earlier disclosure was misleading). Simply because ING disclosed the investments in August does not, standing alone, justify an inference that they were material at that time – much less that they were material two months earlier at the time of the June 2007 Offering. The market was changing rapidly during 2007, as the CAC itself alleges, see CAC ¶¶ 91-97, and the plausible inference to be drawn is that, even if ING's RMBS investments became material in August 2007, they were not in June.

---

Florida-based mortgages underlying ING's portfolio without clarifying the date of such composition, and without alleging that the general market trends cited by Plaintiffs had any impact on ING's portfolio).

### 3. The CAC Fails To Raise An Inference That ING Violated International Accounting Standards Or Reg S-K

Plaintiffs next attempt to allege that the June 2007 Offering Materials violated IAS Nos. 30 and 32 and Item 503 of Reg S-K, on the grounds that they failed to disclose "significant concentrations" of credit risk. See id. ¶¶ 120(g), 128-130, 157-158. First, Plaintiffs have not pleaded sufficient facts to demonstrate how triple- and double-A rated assets amounting to 0.25% and 2%, respectively, of total assets could be considered "significant concentrations" of risk. That is no doubt why ING's independent auditors – responsible for ensuring ING's compliance with the applicable accounting standards – did not require separate analysis of these assets in ING's financial statements, and ING has not had to restate its financial statements.

Second, the IAS themselves state that the determination of whether a risk is a significant concentration "is a matter for the <u>exercise of judgment by management</u> taking into account the circumstances of the enterprise and its debtors." See id. ¶ 129 (emphasis added). Plaintiffs may disagree with ING's management decisions, but that does not state a claim for violation of federal securities laws; they are not vehicles for second-guessing corporate decision-making.[36] In short, a passing reference to accounting standards without pleading specific facts to demonstrate the basis for the violation is inadequate, as Plaintiffs' allegations leave the Court with "no possibility at all of assessing materiality as a matter of law." See Garber v. Legg

---

[36]    See, e.g., Hinerfield v. United Auto Group, No. 97 Civ. 3533 (RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) ("The failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws."), quoted in CIT Group, 349 F. Supp. 2d at 689; cf. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., 376 F. Supp. 2d 385, 396 (S.D.N.Y. 2005) (Kaplan, J.) (holding that where valuations are subject to differing opinions, plaintiffs must plead more than mere disagreement because such decisions "involved the exercise of judgment") (addressing Section 10(b) claim); In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (holding that allegations regarding risk management are not actionable under federal securities laws because the securities laws were "not designed to provide an umbrella cause of action for the review of management practices") (addressing Section 10(b) claim).

Mason, Inc., 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008), aff'd, No. 08-1831-cv, 2009 WL 3109914, at *3 (2d Cir. Sept. 30, 2009) (plaintiff cannot state a claim merely by citing GAAP).

### 4.    ING's RMBS Investments Were An Immaterial Portion Of Its Assets

At the time of the June 2007 Offering, ING's subprime RMBS investment amounted to €3.2 billion, representing only 0.25% of total assets, and its Alt-A RMBS investment amounted to €28.7 billion, representing only 2% of total assets. See CAC ¶ 7. Even if all of Plaintiffs' allegations were true (and they are not), these de minimis percentages of assets are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [their] importance," rendering them immaterial as a matter of law. JP Morgan, 553 F.3d at 197. These asset holdings are quantitatively immaterial because they "do[] not even come close to [the 5%] threshold," id. at 197, 204 (affirming motion to dismiss where "an alleged misrepresentation relating to less than two percent of defendant's assets, when taken in context, could be immaterial as a matter of law"). Courts routinely dismiss claims where, as here, Plaintiffs do not – and cannot – demonstrate how these investments were material in light of other investments.[37]

Here, Plaintiffs simply repeat the legal conclusion that the June 2007 Offering Materials were "false and misleading" and that the alleged omission of ING's RMBS investments was material, as if repetition alone makes it so. See, e.g., CAC ¶¶ 7, 120. In the face of the stark – and unchallenged – facts, allegations that ING's position in these securities was "massive,"

---

[37]    See, e.g., Masters v. GlaxoSmithKline, 271 F. App'x 46, 49 (2d Cir. 2008) (affirming motion to dismiss where alleged misstatement dealt with less than 3% of defendant's revenues and was therefore "financially immaterial"), Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) (holding that misrepresentations with regard to 2% of a company's assets were immaterial as a matter of law); Landmen Partners, 2009 WL 3029002, at *6 (dismissing Sections 11 and 12 claims as immaterial because the assets at issue, representing 0.4% of total assets, "do[] not even come close" to the 5% threshold); In re Allied Capital Corp. Sec. Litig., No. 02 Civ. 3812 (GEL), 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) (motion to dismiss granted where plaintiffs alleged defendant misrepresented value of securities constituting only 10% of its portfolio without showing how this was material in light of defendant's overall holdings).

"dramatic," id. ¶ 7, or "substantial," id. ¶ 77, are not just empty, but wholly conclusory, and insufficient to plead a material misstatement or omission. Plaintiffs' one attempt to "quantify" losses underscores the CAC's inadequacy, referring to ING's unrealized losses on its total debt portfolio, id. ¶ 120(e), without any effort to isolate the only portfolio at issue – RMBS.[38]

Plaintiffs also fail to plead that the details of ING's RMBS portfolio were qualitatively material, because they fail to allege the importance of the alleged omissions to ING's operations, as required by JP Morgan. See 553 F.3d at 197, 204. The CAC simply alleges that the portfolio had a "substantial and material [effect on ING's] stated capital ratio, shareholders' equity, and its liquidity." CAC ¶ 120(d). These statements do not meet the Iqbal-Twombly pleading standard; they provide no concrete measurement of the supposed correlation between the RMBS holdings and ING's financial health, let alone any estimation of the magnitude of the alleged effect.[39]

Finally, Plaintiffs fail to explain how the disclosure of additional details about the composition of this minimal portion of its proprietary portfolio would have added to the "total mix" of information available to investors, given the undisputed historical disclosure that ING's proprietary portfolio contained mortgage-backed securities.[40]

---

[38]    See Garber, 2009 WL 3109914, at *3 (affirming motion to dismiss where complaint relied exclusively on negative, conclusory labels to demonstrate materiality); Rolon v. Henneman, 517 F.3d 140, 148-49 (2d Cir. 2008) ("[The Court is] not bound to accept 'conclusory allegations or legal conclusions masquerading as factual conclusions.'") (citation omitted); Iqbal, 129 S. Ct. at 1949 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal quotation marks omitted).

[39]    Nor do Plaintiffs even attempt to allege any other factor indicative of qualitative materiality, i.e., that the investment in RMBS was unlawful (clearly it was not), or that the ultimate disclosure of RMBS investments in August 2007 resulted in a significant market reaction (they allege none). See JP Morgan, 553 F.3d at 204-05. Indeed, the closing price of the 6.375% ING Perpetual Hybrid Capital Securities on August 8, 2007, the day the CAC alleges ING first disclosed its RMBS portfolio, was actually higher than the previous day. And over the next week, those securities outperformed or performed in alignment with the benchmark hybrid index. See Ex. M; see also Ex. F.

[40]    See, e.g., 2004 Annual Report, Ex. N, at 79-80; 2005 Annual Report, Ex O, at 54-56; 2006 Annual Report, Ex. P, at 71, 73, F-113, F-174; see also Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 983 (1988) (holding that materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information") (internal quotation marks omitted), In re N.Y. Cmty. Bancorp, Inc Sec. Litig., 448 F. Supp. 2d 466, 479 (E.D.N.Y 2006) (holding no

5. **ING's Statements About Risk Management Are Either Inactionable "Puffery" Or Forward-Looking Statements**

Plaintiffs lastly challenge ING's June 2007 disclosure as inconsistent with its "stated risk management policies and public representations." See id. ¶ 120(f). Specifically, they point to statements in ING's 2006 Annual Report that its risk management procedures "further enhance[d] the full integration of risk management in [ING's] daily business activities and strategic planning," id. ¶ 117, that its risk profile was "transparent, 'no surprises,' and consistent with delegated authorities," ¶ 118, and that there was "[t]ransparent communication to internal and external stakeholders on risk management and value creation," id. But these are the very type of statements that courts consistently hold immaterial as a matter of law because they are "no more than puffery."[41]

Further, any statement about risk management is inherently forward-looking because it relates to future events and potential losses and therefore is subject to the PSLRA safe harbor. See, e.g., In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 440 (S.D.N.Y. 2001) (statements concerning the health and viability of a company whose truth or falsity were discernible only after they were made necessarily referred to future performance). Accordingly, such statements are not actionable unless Plaintiffs plead that Defendants had "actual knowledge" that the statements were "false and misleading" when they were made. See 15 U.S.C. § 77z-2(c)(1); Rombach, 355 F.3d at 173 (dismissing allegations based on predictions where plaintiffs failed to allege that defendants knew predictions were false); Panther Partners,

---

additional disclosures regarding composition of RMBS portfolio were required when "it is apparent from the quarterly reports disclosed to the public that the company was heavily involved in investing in mortgage-backed securities").

[41]    See, e.g., JP Morgan, 553 F.3d at 205, 206 (statements touting "highly disciplined" risk management practices and focus on "financial discipline" are "no more than 'puffery' which does not give rise to securities actions"); N.Y. Cmty. Bancorp, 448 F. Supp. 2d at 480 (holding that "[g]eneralized statements regarding a company's fiscal discipline and risk management amount to no more than inactionable puffery").

538 F. Supp. 2d at 669 (stating that "safe harbor" protects forward-looking projections even if

they later turn out to be inaccurate).  Plaintiffs fail to do so here.

      In addition, Plaintiffs conveniently ignore the prominent cautionary language set forth

near the beginning of the 2006 Annual Report, warning investors that:

> Certain of the statements contained in this Annual Report . . . are
> statements of future expectations and other forward-looking statements
> that are based on management's current views and assumptions and
> involve known and unknown risks and uncertainties that could cause
> actual results, performance or events to differ materially from those
> expressed or implied in such statements . . ..

2006 Annual Report, Ex. P, at 4 (emphasis added).  This is followed by a detailed bullet list

warning investors of specific risks due to, inter alia, "changes in general economic conditions,

including in particular economic conditions in ING's core markets," "change in performance of

financial markets," and "changes affecting interest rate levels."  Id.  There is also a prominent

risk factors section near the beginning of the Report, which includes that:

> Factors such as . . . real estate market . . . the volatility and strength
> of the capital markets . . . all impact the business and economic
> environment and, ultimately, the amount and profitability of
> business we conduct in a specific geographic region . . . Similarly,
> a downturn in the equity markets could cause a reduction in . . .
> income generated and capital base from our own proprietary
> portfolios.

Id. at 9 (emphasis added).

      Such specific warnings to investors about the limitations of ING's corporate policies,

which include its risk management structure, against industry-wide factors outside its control

render any alleged misstatement about ING's ability to manage risk immaterial under the

"bespeaks caution doctrine."[42]  No reasonable investor would have interpreted ING's statements

---

[42]    See Rombach, 355 F.3d at 173 ("[A]lleged misrepresentations in a stock offering are immaterial as a matter
of law if it cannot be said that any reasonable investor would consider them important in light of cautionary
language set out in the same offering."); Rubin v. MF Global, Ltd., 634 F. Supp. 2d 459, 472 (S.D.N.Y. 2009)

to mean that its ability to manage risk was infallible or that its risk mitigation policies were guaranteed to be successful during unprecedented industry-wide turmoil in the credit and housing markets.

### C.    The September 2007 Offering Claims Should Be Dismissed

Plaintiffs make many of the same allegations about the September 2007 Offering Materials that they did for the June 2007 Offering.  They fail for the same reasons.  Once again, the CAC faults the Offering Materials for failing to disclose the extent and allegedly risky nature of ING's exposure to subprime and Alt-A assets and their likelihood of default.  See CAC ¶¶ 124-126.  But no more here than with respect to the June 2007 Offering do Plaintiffs explain how investments that in the aggregate comprised 2.24% of ING's total assets were material at the time of the September 2007 Offering, or that these specific assets were affected in some undisclosed way.  Id. ¶ 124 (citing Sept. 24, 2007 6-K, Ex. D, at 4).  See supra pp. 24-25.  Nor can Plaintiffs overcome the hurdle that allegations of risk factors that became known only "at the end of 2007" are equally inapplicable to the September 2007 Offering.  See supra pp. 21-22.

The remaining allegations made by the CAC about this offering also fail.

### 1.    The Omission Of Certain Details About Mortgages Underlying ING's RMBS Investments Was Not Misleading

The September 2007 Offering Materials contained extensive disclosures about ING's RMBS portfolio, including the value of such investments, negative revaluations taken thereon, and the turbulent market conditions affecting them.  See CAC ¶ 124.  Nevertheless, Plaintiffs fault ING for not disclosing more.  Plaintiffs allege that ING should have disclosed that certain of the underlying mortgages were negative amortization, hybrid or option mortgages, originated

---

(applying the bespeaks caution doctrine to reject allegations that defendant's risk management system was not as robust as described because there were sufficient warnings regarding the potential for that system to fail).

in 2006 or 2007, or originated in California or Florida – factors that allegedly made them
"extremely risky" due to higher rates of default. Id. ¶ 126(a). But Plaintiffs fail to raise a
plausible inference that these details would have materially altered the "total mix" of information
available with respect to the September 2007 Offering. See JP Morgan, 553 F.3d at 197.

### (a)    The September 2007 Offering Materials Disclose Extensive Information About ING's Investments In RMBS

As the CAC acknowledges, at the time of the September 2007 Offering ING had
disclosed the amount of its investments in subprime and Alt-A RMBSs. See, e.g., CAC ¶ 124;
Sept. 24, 2007 6-K, Ex. D, at 4. ING had already provided extensive disclosure about its RMBS
investments on August 8, 2007, see Aug. 9, 2007 6-K, Ex Q, including the amounts and ratings
of its subprime, Alt-A, and CDO and CLO holdings, and referred to the "turbulent" conditions in
the credit markets. Id.

ING reiterated and expanded upon these comprehensive disclosures in documents
incorporated into the September 2007 Offering Materials. In the Sept. 24, 2007 6-K, ING again
cautioned that the U.S. subprime mortgage situation had caused "turbulent" conditions in credit
markets, which had resulted in "reduced price transparency, reduced liquidity, ratings agencies
downgrades and increased volatility across all markets." Sept. 24, 2007 6-K, Ex. D, at 4. ING
also warned that these "market corrections" had affected its trading books and "ha[d] led and
could continue to lead to an increase in retained loans resulting from leveraged finance activities,
which may result in an increase in the allowance for loan losses." Id.

As Plaintiffs admit, as of July 31, 2007, ING disclosed that it had €3.2 billion of exposure
to subprime mortgages, and €28.7 billion of exposure to Alt-A mortgages, via its investments in
RMBS. These amounts represented 0.24% and 2% of ING's total assets, respectively. See id.
ING also disclosed the average FICO score and LTV ratio of its Alt-A RMBS portfolio and

29

explained in detail the conditions under which it classified an RMBS as Alt-A. Id. Plaintiffs do
not question the veracity of any of these figures, but instead make the blanket statement that ING
"in the exercise of due care should have provided information [about the risky nature of its
RMBS portfolio] to investors." CAC ¶ 126.

> **(b)    Details About Mortgages Underlying ING's RMBS
>          Investments Were Immaterial In Light Of ING's Extensive
>          Disclosure**

Apart from the fact that ING did disclose the risk of its RMBS portfolio, Plaintiffs fail to
allege that additional details about ING's RMBS investment portfolio were material to investors.
Again, the relevant question is whether "the disclosure of the omitted fact would have been
viewed by the reasonable investor as having significantly altered the total mix of information
made available." Basic, 485 U.S. at 231-32, 108 S. Ct. at 983 (internal quotation marks omitted).
Importantly, "the total mix of information may include 'information already in the public domain
and facts known or reasonably available to the shareholders.'" Garber v. Legg Mason, No. 08-
1831-cv, 2009 WL 3109914, at *2 (2d Cir. Sept. 30, 2009) (quoting United Paperworkers Int'l
Union v. Int'l Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993)).

Here, Plaintiffs cannot plausibly argue that they were unaware of the risks posed by
RMBS investments at the time of the September 2007 Offering. The CAC acknowledges that
the level of ING's exposure to these assets had been disclosed and that negative revaluations had
been taken on certain of those assets, see, e.g., CAC ¶ 124, and also cites a plethora of blunt
warnings about Alt-A and subprime mortgage exposure prior to September 2007. See, e.g., id.
¶¶ 75-86, 88-91. In the face of these extensive reports about the dangers and risks of RMBS
investments, Plaintiffs cannot allege that ING had to disclose microscopic details about the

mortgages underlying its RMBS investments in order to inform Plaintiffs that such investments carried some risk.[43]

The allegations fare no better in the required inquiry into their quantitative materiality. See generally JP Morgan, 553 F.3d at 197, 204. The portions of ING's RMBS portfolio that were allegedly rendered problematic on account of loan type, vintage, or geographic concentration amount to only fractions of the already de minimis RMBS portfolio. For example, although the CAC alleges that "up to 36%" of ING's Alt-A portfolio (which comprised 2% of ING's assets) consisted of negative amortization loans as of the September 2007 Offering, and of this 36%, "up to 68% . . . were located in California and Florida," CAC ¶ 126(a), this means that only about 0.49% (i.e., less than half a percentage point) of ING's total assets were of the supposedly problematic negative amortization type invested in California and Florida. The other allegedly problematic types of Alt-A loans the CAC identifies also amount to minuscule percentages of ING's total assets ("as much as 41%" of the Alt-A loans were allegedly hybrid variable rate options – i.e., no more than 0.82% of ING's total assets – and "up to 65%" of the Alt-A loans were generated during 2006 and 2007 – no more than 1.3% of ING's total assets). Id. Nor does the CAC explain what overlap existed between the types of mortgages and their year of origination, or the extent to which the performance of those mortgages would have had any impact on the RMBS securities actually held by ING. Under any benchmark, these amounts are patently immaterial.

---

[43]    See, e.g., Landmen Partners, 2009 WL 3029002, at *8 (holding that "Sections 11 and 12(a)(2) do not require the disclosure of publicly available information") (quoting In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 250 (S.D.N Y. 2003)); N.Y. Cmty Bancorp, 448 F. Supp. 2d at 479 (holding no additional disclosure regarding composition of RMBS portfolio was required when "it is apparent from the quarterly reports disclosed to the public that the company was heavily involved in investing in mortgage-backed securities"); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 517 (7th Cir. 1989) ("It is pointless and costly to compel firms to reprint information already in the public domain.").

Plaintiffs try to avoid this result by alleging that ING failed to make disclosures required by certain accounting standards. See id. ¶¶ 128-130. But passing references to accounting standards without demonstrating the basis for their violation is inadequate; the CAC's allegations leave the Court with "no possibility at all of assessing materiality as a matter of law." See Garber, 537 F. Supp. 2d at 613 (holding that plaintiff cannot state a claim merely by citing GAAP). Plaintiffs' allegations also ignore that application of accounting standards implies the exercise of judgment by management, which is not subject to second-guessing under the securities laws. See, e.g., Acito v. IMCERA Group Inc., 47 F.3d 47, 53 (2d Cir. 1995). The CAC provides no basis – in law or in fact – for finding further granularity was required in ING's disclosure.[44]

### 2.    Disclosure Of FICO Scores And LTV Ratios Was Not Misleading

Plaintiffs next allege that ING's disclosure of FICO scores and LTV ratios associated with the mortgages underlying its RMBS was "highly unreasonable" because these metrics were taken at the time of origination of the underlying mortgages. As such, Plaintiffs allege, the scores and ratios "were a poor indicator of the borrowers' present ability or willingness to repay the mortgage." CAC ¶ 127; see also id. ¶¶ 124, 154-156.

First, the CAC makes much ado about the supposed unreliability of FICO scores and LTV ratios, but does not once allege that the FICO scores and LTV ratios reported by ING were inaccurate. The CAC simply states that "a FICO score for a loan taken in 2005 was not

---

[44]    The CAC's allegation that the September 2007 Offering Materials were misleading because "defendants failed to include in ING's quarterly report for the six months ending June 30, 2007, an explanation of the Company's capital position even though it had provided such detail in its report for the prior quarter," CAC ¶ 126(d), can be addressed summarily. Plaintiffs erroneously characterize the September 2007 six-month report as a "quarterly report", this report contained an overview of ING's financial performance for the first six months of the fiscal year. The quarterly reports for both the first and second quarters of 2007, by contrast, did include an explanation of ING's capital position. See May 22, 2007 6-K, Ex. BB & Aug. 9, 2007 6-K, Ex. Q. Moreover, the CAC fails to allege that the six-month report's alleged failure to explain capital position was material.

necessarily the same homeowner's FICO score in 2007 or 2008," id. ¶ 155 (emphasis added),

and that LTV ratios were a weak indicator of default because "many Alt-A borrowers were

counting on ever-increasing real estate values when they purchased their homes," and because

price declines were steep "in some areas," id. ¶ 156 (emphasis added). The CAC fails to allege

that these problems applied to the mortgages underlying ING's RMBS holdings, much less in

any material way. Even giving the allegations the fullest possible weight, the Court would have

to accept multiple layers of pure speculation to sustain a claim. As one court recently held,

> that questionable appraisal practices were a common problem in
> the industry as a whole, without more, tells nothing about [a
> defendant's] underlying loans. 'To permit a plaintiff, on such a
> skimpy foundation, to drag a defendant past the pleading threshold
> would be to invite litigation by hunch and to open defendants to
> the most unrestrained of fishing expeditions.'

Nomura, 2009 WL 3149775, at *6 (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st

Cir. 1988)). In sum, Plaintiffs have identified nothing misleading or material about ING's

disclosures about FICO scores or LTV ratios sufficient to state a claim.

Second, plaintiffs cannot plausibly allege[45] – and they do not – that any reasonable

investor would have failed to understand that, consistent with industry practice, the disclosed

FICO scores and LTV values were as of the date of mortgage origination. It was obvious to

readers of the June 2008 Offering Materials – as it evidently was to Plaintiffs' counsel – that the

LTV ratios and FICO scores were historic, and not current.

---

[45]     Plaintiffs' allegations also lack common sense. For ING to have access, as a purchaser – not an issuer – of
RMBS, to updated FICO scores and LTV ratios, it would have to request that the mortgagors reappraise the tens of
thousands of mortgaged properties underlying the RMBS portfolio, and obtain tens of thousands of updated FICO
scores for the borrowers. The CAC does not allege – because it could not without defying all plausibility – that ING
had access or could gain access to such information, let alone that such information was legally available to the
mortgagors or that it is economically feasible to obtain. And the CAC does not allege that ING was in privity of
contract with the underlying mortgage holders, or even that the issuers of the RMBS ING purchased were the same
entities as the mortgagors. Given these obvious difficulties, Plaintiffs cannot plausibly argue that any reasonable
investor would have viewed the absence of updated FICO scores and LTV ratios as affecting the "total mix" of
information at the time of the September 2007 Offering.

### 3.    ING's Disclosure Of RMBS Ratings Was Not Misleading

The CAC also alleges that ING's disclosure of third-party agency ratings of its RMBS portfolio was misleading because the ratings "did not accurately reflect the risk of default," and because ING "made no effort to ensure that the ratings accurately reflected the risk before repeating those ratings to investors." CAC ¶ 127; see also id. ¶¶ 97, 124. Plaintiffs allege the third-party rating agencies assessed ratings based on (1) models using "obsolete" pre-2000 loan information, see id. ¶ 147; (2) lowered ratings criteria, see id. ¶ 150; and (3) inaccurate and outdated loan and borrower information, see id. ¶ 152.

These allegations are makeweight. Plaintiffs do not allege that ING ever misreported a rating or that any one of the ratings on its RMBS was improperly awarded by the rating agencies. Moreover, Plaintiffs' use of cherry-picked quotations and statements by various rating agency officers to assail ratings generally is disingenuous at best. Plaintiffs do not allege that any of these statements applied specifically to ratings of ING's RMBS investments, or that they applied at the time ING disclosed such ratings. Nor could Plaintiffs, who conveniently omit the date of the quoted statements because they were made after all the challenged offerings had closed. For example, the quoted statements by Frank Raiter and Devan Sharma, see id. ¶ 148, were made to the U.S. House of Representatives on October 22, 2008, more than a year after the September 2007 Offering, and months after the June 2008 Offering.[46] The other rating agency statements quoted in the CAC are similarly problematic. Raymond McDaniel's e-mail – which Plaintiffs admit was "an internal e-mail" (and the CAC offers no explanation how Defendants were

---

[46]    See Written Statement of Frank L. Raiter on "Credit Rating Agencies and the Financial Crisis," before the Committee on Oversight and Government Reform, U.S. House of Representatives (Oct. 22, 2008), Ex. CC, at 5-6 ("[T]he analysts at S&P had developed better methods for determining default which did capture some of the variations among products that were to become evident at the advent of the crisis. It is my opinion that had these models been implemented we would have had an earlier warning about the performance of any of the new products that subsequently lead [sic] to such substantial losses."); "Credit Rating Agencies Admit Ranking Many Mortgage-Related Securities Too High," TimesOnline, Oct. 23, 2008, Ex. DD.

supposed to gain access to it) – was sent on October 21, 2007, after the September 2007

Offering. See Email from Raymond McDaniel (Oct. 21, 2007), Ex. EE; CAC ¶ 149. Likewise,

the earliest date on which Richard Gugliada made statements regarding the rating agencies,

including David Tesher's "golden goose" comments, was September 25, 2008, months after even

the June 2008 Offering. See CAC ¶ 150; Elliot Smith, "Race to the Bottom at Moody's, S&P

Secured Subprime Boom and Bust," Bloomberg (Sept. 25, 2008), Ex. FF. Finally, the "instant

message" conversation between Rahul Shah and Shannon Mooney, CAC ¶ 151, emerged on

October 22, 2008, again months after the June 2008 Offering. See Karim Bardeesy, "Structured

by Cows: All the Juicy Bits from the credit-rating agencies," The Big Money (Oct. 22, 2008),

Ex. GG. The only statement cited in the CAC that pre-dates the September 2007 Offering is

Brian Clarkson's, which was made in a Moody's town hall presentation on September 10, 2007.

See Moody Town Meeting Notes (Sept. 10, 2007), Ex. HH. However, there is no allegation that

any Defendant attended the meeting, and even if any did, Plaintiffs cannot plausibly argue that

the statement "[w]e should have done a better job of monitoring that [decline in underwriting

standards]" was a sufficiently material warning to require ING to disclose problems with the

ratings or to avoid disclosing ratings altogether. Moreover, as explained below, ING did include

extensive warnings about the reliability of the ratings in the relevant Offering Materials.

  Plaintiffs cannot use these after-the-fact statements to plead that ING had any reason – or

duty – to suspect the reliability of the rating agencies' ratings of its RMBS at the time of the

September 2007 or June 2008 Offerings. See Nomura, 2009 WL 3149775, at *8 (rejecting

allegations that "merely plead subsequent facts and developments in the attempt to establish an

inference that these eventualities must have been known (or knowable) to defendants on the

effective date of the [challenged statements]"). In Nomura, like here, plaintiffs contended that

35

the investment ratings of certain mortgage-backed securities were misleading because they were based on outdated models "applicable only to years prior to 2000," lowered ratings criteria, and inaccurate loan information. Id. Indeed, they relied on the same "instant message" conversation between Shah and Mooney as do Plaintiffs in this case. Compare id. with CAC ¶ 151. However, Nomura soundly rejected these arguments as supported only by "uncited and undated after-the-fact admissions and laments by purported insiders," emphatically stating that "[n]one of the purported comments made by S&P's and Moody's employees in the wake of the collapse of the sub-prime mortgage market . . . 'support the inference that the ratings were compromised as of the dates'" the statements at issue were made. See Nomura, 2009 WL 3149775, at *8 (citation omitted).

Finally, Plaintiffs conveniently ignore ING's cautionary language about the third-party ratings it disclosed: ING expressly disclosed that it was "not responsible for these securities ratings, which are not a measure of liquidity and which may be changed or withdrawn without notice by the rating agencies." See Sept. 24, 2007 6-K, Ex. D, at 4. Given these warnings, Plaintiffs cannot plausibly allege that a reasonable investor would have been misled by the disclosed ratings, and, notably, the CAC never alleges that there was ever a finding that any rating – much less one disclosed by ING – was incorrect or deliberately falsified. Accordingly, these allegations must be dismissed. See Nomura, 2009 WL 3149775, at *8 (dismissing similar claims because plaintiffs were "duly cautioned" about the value of securities ratings).[47]

---

[47]    It is worth noting that despite Plaintiffs' complaints about the rating agencies' reliability – which they imply ING should have somehow known about before the rest of the market – Plaintiffs themselves rely extensively on RMBS credit ratings to make conclusory statements about the state of the RMBS market at the time of the Offerings. See, e.g., CAC ¶ 87 (noting that Moody's began downgrading Alt-A RMBS in March 2008). The irony of Plaintiffs' reliance on the rating agencies while criticizing ING's reliance on them before their internal problems were widely known is apparently lost on Plaintiffs.

### 4.    Plaintiffs Otherwise Fault Language That Is Not Actionable As
###         Puffery, Opinion, or Forward-Looking

The remainder of Plaintiffs' September 2007 Offering claims criticize forward-looking

statements and opinions in the Sept. 24, 2007 6-K, even though it is well established that these

statements are not actionable.  For example, the CAC emphasizes ING's statement that "[t]o date

this [RMBS] market disruption has had a limited impact on ING" and that "ING considers its

[RMBS] exposure to be of limited size and of relatively high quality."  See CAC ¶¶ 8, 124.

Much like statements challenged in the June 2007 Offering Materials, these too "are no more

than 'puffery' which does not give rise to securities violations."  See JP Morgan, 553 F.3d at

206.  Statements about the financial health and quality of ING's RMBS exposure were

management's opinions, and Plaintiffs never allege, as they must, that they were not truthfully

held at the time they were expressed.[48]  They are "mere expressions of hope" that do not give

rise to a Securities Act violation.  LC Capital Partners, 318 F.3d at 156.  Plaintiffs also cannot

plausibly claim they were misled by the labels applied to ING's RMBS portfolio, i.e., that it was

of "limited size" and "relatively high quality," when such characterizations were immediately

followed by the disclosure of the actual amount of assets held and an explanation of the precise

features (i.e., loan statistics and high securities ratings) that made them high quality.  See CAC

¶ 124 (citing Sept. 24, 2007 6-K, Ex. D, at 4).

Finally, these statements are also plainly protected by the bespeaks caution doctrine.  See

Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).  Immediately before its

statement that the market disruption had "limited impact" on ING, the Sept. 24, 2007 6-K

---

[48]    See, e.g., In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 210 (S.D.N.Y. 2003) (dismissing
Section 11 claim where plaintiff did not allege adequately that "opinion or belief" was not "truly held"); VTech
Holdings, Ltd. v. PriceWaterhouseCoopers, 348 F. Supp. 2d 255, 271 (S.D.N.Y. 2004) (dismissing fraud claim
where the complaint did not plead that a statement "did not actually represent [Defendants'] opinion" at the time it
was made).

explicitly warned that turbulent market conditions "could continue to lead" to negative revaluation of ING's RMBS holdings. See CAC ¶ 124; Sept. 24, 2007 6-K, Ex. D, at 4. No reasonable investor could have interpreted ING's opinions that the impact of RMBS exposure had been, to date, limited, meant that ING's RMBS portfolio would not pose any risk to the company in the future. And both the 2006 Annual Report and the Sept. 24, 2007 6-K contained meaningful cautionary language with respect to forward-looking statements. 2006 Annual Report, Ex. P, at 4; Sept. 24, 2007 6-K, Ex. D, at 3.

### D.    The June 2008 Offering Claims Should Be Dismissed

In challenging the adequacy of the June 2008 Offering Materials, Plaintiffs repeat many of the – mistaken – criticisms they hurl at the other offerings. To the extent they allege anything unique to the June 2008 Offering Materials, those allegations fail for the reasons set forth below.

### 1.    The June 2008 Offering Materials Disclose Extensive Information About ING's Investments in RMBS

Plaintiffs concede that the June 2008 Offering Materials contained "much more detail concerning the amount and type of RMBS held by ING." CAC ¶ 114. For example, in its 2007 Annual Report, ING disclosed €64 million of net impairments and trading losses, and €307 million of negative revaluation, on its subprime RMBS investment. Id. ¶ 134. ING also reported that its Alt-A RMBS investment had a negative pre-tax revaluation of €936 million, and the rating agencies had downgraded €10 million of ING's €27.5 billion Alt-A RMBS portfolio. Id. ¶¶ 134-135.

The 2007 Annual Report disclosed comprehensive risk factors, including that "[o]ngoing volatility in the financial markets has impacted and may continue to impact [ING]," and that

> [a]s a result of ongoing and unprecedented volatility in the global financial markets in recent quarters, we have incurred negative revaluations on our investment portfolio, which have impacted our shareholders' equity. Furthermore, we have incurred certain

> impairments and other losses, which have impacted our profit and
> loss accounts. <u>Such impacts have arisen primarily as a result of
> valuation issues arising in connection with our exposures to US
> mortgage-related structured investment products, including sub-
> prime and Alt-A Residential Mortgage-Backed Securities (RMBS)</u>,
> Collateralized Debt Obligations (CDOs) and Collateralized Loan
> Obligations (CLOs) . . . .  In many cases, the markets for such
> instruments have become highly illiquid.

2007 Annual Report, Ex. R, at 10 (emphasis added).  ING also disclosed that the valuation of

ING's RMBS investments could change:

> While we continue to monitor our exposures in this area, in light of
> the ongoing market environment and the resulting uncertainties
> concerning valuations, <u>there can be no assurances that we will not
> experience further negative impacts to our shareholders' equity or
> profit and loss accounts from such assets in future periods</u>.

<u>Id.</u> (emphasis added).

In connection with ING's first quarter 2008 results, ING's May 15, 2008 6-K disclosed

even more details and risks associated with ING's investment in RMBS, in light of rapidly

worsening economic conditions at the beginning of the year.  The 6-K disclosed that "the credit

and liquidity crisis deepened in the first quarter, extending the disruption of global financial

markets," that market prices for ING's "pressurized asset classes . . . were inevitably impacted,"

and that "[t]he adverse market environment inevitably had a negative impact on ING's capital

position."  CAC ¶ 139.

Further, in the first quarter of 2008, ING recorded €33 million of pre-tax impairments and

losses on its investment in U.S. subprime RMBS and €17 million on its investment in U.S. Alt-A

RMBS.  <u>Id.</u>  ING disclosed that the fair value of its subprime RMBS portfolio had decreased to

81.4% of its cost, and the fair value of ING Direct's Alt-A RMBS portfolio – which comprised

most of ING's Alt-A RMBS investment – had dropped to 84.3% at March 31, 2008.  <u>Id.</u> ¶¶ 139-

140; May 15, 2008 6-K, Ex. S, at 22.  In a special appendix entitled "Direct Impact of Credit and

39

Liquidity Crisis," ING disclosed that pre-tax negative revaluations on its subprime RMBS investment totaled €528 million, and pre-tax negative revaluations on its Alt-A RMBS investment totaled approximately €4.3 billion, at March 31, 2008. May 15, 2008 6-K, Ex. S, at 22.

In short, ING's public filings, quoted in the CAC and above, clearly disclosed ING's exposure to subprime and Alt-A RMBS, the criteria used by ING to classify RMBS as Alt-A, the fair value of ING's investments compared to cost, negative revaluations, and impairments taken on RMBS and the resulting impact on shareholders' equity and profit.

Plaintiffs thus cannot plausibly allege that the 6-K misled investors about the risks of ING's RMBS portfolio. Plaintiffs never allege that the disclosed amounts of RMBS, the classification of Alt-A, the fair value or the negative revaluations were false or inaccurate in any way. Rather they assert that the omission of details – relating to vintage, loan type, and geographic concentration of the underlying mortgages – left them in the dark about the risk of those investments. CAC ¶ 141. That the mortgages underlying non-prime RMBS were at greater risk of default than prime RMBS was well known in the marketplace, see, e.g., id. ¶¶ 69-70, 75, 78, 80, 82, 86-87, 96 (citing publicly available information regarding non-prime loans), and the June 2008 Offering Materials clearly showed that ING's non-prime RMBS were losing value. Investors could readily compare the €33 million subprime RMBS impairment in the first quarter of 2008 to the €64 million subprime RMBS impairment for all of 2007, and see that impairments – like the worsening economy – were dramatically increasing. Similarly, the impairments on ING's Alt-A RMBS portfolio rose from none to €17 million. Cf. LC Capital Partners, 318 F.3d at 155 (company's statements that it was taking reserves in certain areas of its business put plaintiffs on notice of losses). Plaintiffs cannot demonstrate that particular details

40

added to the "total mix" of information available to investors when the underlying risk was

clearly disclosed. See Basic, 485 U.S. at 231-32, 108 S. Ct. at 983.

Moreover, Plaintiffs fail to allege that these mortgage characteristics had any impact on

the actual RMBS in which ING invested. The information that ING did provide to investors –

the current fair value of its RMBS, for example – was a much more accurate indicator of the

performance of ING's investment. Plaintiffs therefore cannot allege facts that raise an inference

that the June 2008 Offering Materials misled investors about the risks associated with ING's

investment portfolio.[49]

Further, the omissions about which the CAC complains would not have altered the "total

mix" of information because they were already in the public domain. In ING's presentation to

analysts for the first quarter of 2008, which was available to the public in the "Investor

Relations" section of ING's website, ING provided detailed information about the mortgages

underlying its RMBS investments, including details on negative amortization, hybrid and option

mortgages, 2006 and 2007 vintages of mortgages, and mortgages originated in California and

Florida. 2008 1Q Analyst Presentation, Ex. II, at 48-52.[50]

Because this information was already disclosed by ING and in the public domain,

disclosing it elsewhere would not have altered the total mix of information available to investors.

---

[49]    The explicit discussion of specific losses and risk of future losses on ING's RMBS portfolio also highlights the insufficiency of Plaintiffs' repeated attack on general, optimistic and forward-looking statements. See, e.g., CAC ¶¶ 133, 136-137 (assailing statements such as "ING is well-insulated from the worst effects of the market turmoil"). Moreover, as discussed supra pp. 37-38, such statements are inactionable puffery and protected under the bespeaks caution doctrine.

[50]    On a Rule 12(b)(6) motion, a court may consider materials of which judicial notice may be taken, "including the fact that press coverage . . . or regulatory filings contained certain information, without regard to the truth of their contents." Staehr, 547 F.3d at 425 (internal quotation marks omitted). Here, the fact that the analyst presentation, posted on ING's website and available to the public, contained certain information is appropriate for judicial notice. Moreover, the June 2008 Offering Materials published ING's website address. See, e.g., June 2008 Prospectus, Ex. JJ, at S-14 (publishing ING's website address, albeit stating that "[t]he contents of our website are not incorporated into, and do not form part of, this prospectus supplement").

See Garber, 2009 WL 3109914, at *2 ("The total mix of information may include 'information already in the public domain and facts known or reasonably available to the shareholders.'") (quoting United Paperworkers, 985 F.2d at 1199).

> **2.    The CAC Fails To Raise An Inference That ING Should Have Taken Additional Impairments Or Increased Loan Loss Reserves Earlier**

In November 2008, in its third quarter results, ING announced a €409 million impairment charge on its Alt-A and subprime RMBS, a €416 million impairment charge on debt securities, including those issued by various unidentified Icelandic banks and WaMu, and an approximately €373 million increase in loan loss reserves,[51] amounting to total charges of approximately €1.2 billion. CAC ¶¶ 163, 190. Plaintiffs allege ING should have taken these charges at the end of the first quarter on March 31, 2008, before the June 2008 Offering. Id. ¶ 141(d).

> **(a)    Plaintiffs' Reliance On Later Events In 2008 Is Impermissible Hindsight Pleading**

At their core, Plaintiffs' allegations amount to a charge that because ING took impairments and loan losses in one quarter, it necessarily should have done so in a prior quarter, i.e., that accounting treatment implemented after the June 2008 Offering should have been implemented before that offering. This is pure hindsight, rejected as patently insufficient by a resounding chorus of courts.[52] Given the rapid deterioration of the real estate market, and the

---

[51]    The CAC at times refers to "approximately €400 million in loan loss reserve increases" for the third quarter of 2008, and at other times refers to a €373 million increase in loan loss reserves for that quarter. See, e.g., CAC ¶¶ 163, 218. The figure disclosed in ING's third quarter results is €373 million. Nov. 13, 2008 6-K, Ex. KK, at 2-4, 15.

[52]    See, e.g., Panther Partners, 538 F. Supp. 2d at 669-72 (dismissing Section 11 claims based on allegations that various disclosures should have been included in registration statement because the "allegations with regard to what [the company] knew, and when they knew it, lack the specificity and detail needed to rise above the 'speculative' level and into the realm of a 'plausible' pleading") (quoting Twombly, 550 U.S. at 555-56, 127 S. Ct. at 1965); Coronel, 2009 WL 174656, at *14 (dismissing Securities Act claims where complaint put forth no factual allegations contradicting the "veracity" of loss estimate at the time estimate was released and instead relied exclusively on subsequent disclosures); CIT Group, 349 F. Supp. 2d at 690-91 ("That defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for

value of RMBS, Plaintiffs' speculation – that ING should have taken impairments on its RMBS prior to June 2008, instead of during the quarter ended September 30, 2008 – is neither plausible nor sufficient to state a claim. Under the Twombly-Iqbal standard, the Court must consider obvious alternative explanations. Iqbal, 129 S. Ct. at 1951. By the end of the third quarter on September 30, 2008, Lehman Brothers had collapsed, AIG de facto nationalized, and the bottom had fallen out of the stock market. Ignoring the impact of these events, and just assuming (as the CAC does) that, because ING took additional impairments and reserves after them, it should have done so before these economic tsunamis, is plain speculation.

### (b)    The Amount Of Additional Impairment And Increased Loan Loss Reserve Is Immaterial

As of March 31, 2008, ING's total assets amounted to €1,303.8 billion; €1.2 billion in charges would have represented less than one-tenth of one percent (0.09%) of this amount. See May 15, 2008 6-K, Ex. S, Interim Accounts, § 4.1. The alleged misrepresentation, therefore, related to a small fraction of one percent of ING's assets, and is immaterial as a matter of law. See, e.g., JP Morgan, 553 F.3d at 204; Masters, 271 F. App'x 46.

Plaintiffs' effort to bolster the significance of this write-down is mistaken at best. They assert that the €1.2 billion in charges announced in November 2008 "forced" ING to procure capital from the Dutch government. CAC ¶ 16. But that is flatly contradicted by the Dutch government's own announcements. See id. ¶ 163. The Dutch government explained that its program to protect the Dutch financial sector was to "preserve a level playing field," in response to governmental interventions elsewhere, and that the capital was being made available only to "financial enterprise[s] in the Netherlands that [are] fundamentally sound and viable." Press

---

concluding that defendants did not think reserves were adequate at the time" the registration statement "became effective ").

Release, De Nederlandsche Bank, "Measures by the Dutch Authorities to Protect the Financial

Sector" (Oct. 9, 2008) Ex. H at 1. Furthermore, there is no connection (alleged in the CAC or

otherwise) between the Dutch government's program and ING's RMBS, and Plaintiffs allege no

facts to support the proposition that ING's issuance of securities to the Dutch government was in

any way related to impairment charges or an increase in loan reserves.

### (c)    ING's Valuation Of Its RMBS And Debt Securities And Its Related Accounting Decisions Were A Matter Of Judgment And Opinion

Decisions about impairments and loan loss reserves necessarily depend on the valuation

of assets at issue. As this Court noted in Fraternity Fund, valuation of illiquid instruments like

RMBS "was not a matter of looking up closing prices on the Wall Street Journal, but involved

the exercise of judgment." 376 F. Supp. 2d at 396. ING itself disclosed as much:

> Valuation of such instruments is a complex process involving the
> consideration of market transactions, pricing models, management
> judgment and other factors, and is also impacted by external
> factors such as underlying mortgage default rates, interest rates,
> rating agency actions and property valuations.

2007 Annual Report, Ex. R, at 10 (emphasis added); see also id. at F-10 ("The identification of

impairment and the determination on the recoverable amount are an inherently uncertain process

involving various assumptions and factors including the financial condition of the counterparty,

expected future cash flows, observable market prices and expected net selling prices.")

(emphasis added). Because "[v]aluation models depend so heavily on the discretionary choices

of the modeler . . . the resulting models and their predictions can only be fairly characterized as

subjective opinions." In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 251-52

44

(S.D.N.Y. 2005) (addressing 10(b) claim). As such, Plaintiffs' failure to plead that ING's opinions were not truly held mandates dismissal of the claim.[53]

Aside from the absence of <u>subjective</u> falsity, there is no competent allegation suggesting ING's decisions about either RMBS or the debt securities issued by Icelandic banks and WaMu were <u>objectively</u> problematic under the disclosed accounting methodology:

<u>RMBS</u>. In the May 15, 2008 6-K, ING observed that under IFRS, "impairments are only taken on RMBS if it is probable that the cash flows from interest rate or principal repayments will not be recovered." ING explained that it did not take impairments on Alt-A RMBS where "the cashflows from [those] RMBS continue to perform in line with contractual terms." CAC ¶ 139. Notably, Plaintiffs do not allege that ING misstated the IFRS standard, or that cash flows from ING's Alt-A RMBS failed to perform under their terms.[54] <u>See id.</u>

<u>Debt Securities issued by Icelandic Banks and WaMu</u>. Similarly, ING disclosed that:

> Debt securities are considered impaired if, due to a credit event, it is probable that the principle and/or interest may not be fully recovered. Declines in fair value due to market fluctuations in interest rates, credit spreads, liquidity, etc. do not result in an impairment, because future cash flows are not affected.

May 15, 2008 6-K, Ex. S, at 23. In its results for the third quarter ended September 30, 2008, ING announced that "[c]ounterparty risk was highlighted in the quarter as a number of financial

---

[53] See <u>Global Crossing</u>, 313 F. Supp. 2d at 210 (dismissing Section 11 claim where plaintiff did not adequately allege that "opinion or belief" was not "truly held"); <u>see also</u> <u>NovaGold</u>, 2009 WL 157220, at *19 (where plaintiffs disclaim fraud they necessarily fail to allege defendants made statements with knowledge of their falsity), <u>cf.</u> <u>Allied Capital</u>, 2003 WL 1964184, at *4 (dismissing Section 10(b) claim for lack of false statement where plaintiffs merely alleged disagreement with defendants' valuation of illiquid assets).

[54] In its May 15, 2008 6-K, which reported first quarter 2008 results, ING also recorded a €3 million impairment on its investment in CDOs and CLOs and €16 million in losses on those investments during the first quarter of 2008, and disclosed that €6 million of the CDOs and CLOs were backed by subprime mortgages. CAC ¶¶ 139, 189. While Plaintiffs claim that ING should have taken additional impairments on its CDO and CLO investments, Plaintiffs offer no independent factual allegations to support this claim, and plead next to no facts about these <u>de minimis</u> investments. In light of the insufficiency of those factual allegations, Plaintiffs fail to state a claim regarding ING's investments in CDOs and CLOs.

institutions were no longer able to fulfill their obligations. ING suffered €416 million of pre-tax losses (excluding loan losses) on <u>Lehman Brothers</u>, Washington Mutual and the Icelandic banks. These losses relate to fixed income and derivative exposures, as well as derivative replacement costs." Nov. 13, 2008 6-K, Ex. KK, at 5 (emphasis added). In its Condensed Consolidated Interim Accounts for the third quarter of 2008, ING added that, of the €416 million amount, there were no losses on exposures to Lehman Brothers, WaMu, or the Icelandic banks in the first or second quarters. Interim Accounts filed with Nov. 13, 2008 6-K, Ex. KK, § 4.5.9.

It is no accident that Plaintiffs fail to include in their allegation that the €416 million of impairments included impairments on debt securities issued by Lehman Brothers, which filed for Chapter 11 bankruptcy protection during the third quarter, on September 15, 2008. Plaintiffs' allegations about debt securities focus solely on the unidentified Icelandic banks and WaMu, and they fail to make any effort to quantify either. Because the Securities Act only makes material omissions actionable, Plaintiffs' failure to so allege is fatal to their claim.

The general allegations the CAC purports to rely upon also do not survive scrutiny.

<u>General market conditions</u>. Allegations of market conditions also do not raise an inference that the charges ING took prior to June 2008 were materially misleading. Plaintiffs allege, generally, that the escalating default rates on Alt-A and subprime mortgages, illiquidity in the market for Alt-A and subprime RMBS, data indicating a measurable decrease in estimated cash flows on Alt-A and subprime RMBS generally, and national economic conditions correlating to defaults on Alt-A and subprime RMBS, including a decrease in the real property prices that collateralized them, all show that ING should have taken the €1.2 billion of charges that it recorded as of September 30, 2008, months earlier. <u>See, e.g.</u>, CAC ¶ 174. However, Plaintiffs fail to allege any connection between these general economic conditions and the

46

condition of ING's RMBS at the time of the June 2008 Offering. See, e.g., Landmen Partners, 2009 WL 3029002, at \*9. The alternative – and more plausible – inference is that these market conditions, which Plaintiffs concede were rapidly changing, see, e.g., CAC ¶¶ 69-70, 182, 186-187, ultimately did affect ING's RMBS portfolio in the third quarter of 2008, but not earlier.[55] Further, Plaintiffs ignore the fact that ING did record significant impairments and negative revaluations on its RMBS portfolio during the first quarter of 2008, in reaction to the volatile market.[56]

Other Banks. No actionable inference arises from Plaintiffs' repetitive allegations that "because other institutions were taking write-downs on various assets, ING should have, too." The write-downs by other institutions described in the CAC for the most part do not even relate to the same type of assets. For example, Plaintiffs allege that during 2007 and early 2008, HSBC Securities (USA) Inc. announced impairments on its subprime loan portfolio, Merrill Lynch wrote down its ABS CDOs, UBS wrote down various "mortgage-related assets," and AIG recorded an impairment charge "primarily related to significant disruption in residential mortgage and credit markets." See, e.g., id. ¶¶ 11, 93, 95, 98, 100-101. Yet Plaintiffs never allege that these other banks had similar portfolios to ING's, and they fail to address the obvious

---

[55]    Indeed, such an inference is supported by ING's disclosure in the third quarter that its Alt-A RMBS portfolio outperformed the market. See 2008 3Q Analyst Presentation, Ex. I, at 57.

[56]    Plaintiffs also fail to state any link between comments by ING's Chief Risk Officer ("CRO") about general market illiquidity and the additional impairments ING allegedly should have taken. Plaintiffs allege that during a conference call with analysts and investors to discuss ING's first quarter 2008 results, CRO Koos Timmermans "admitted" there was considerable market illiquidity associated with ING's Alt-A RMBS, and that was "objective evidence of impairment." CAC ¶ 178. Apart from the obvious facts that such a general statement is not objective evidence of impairment, and ING did take impairments and negative revaluations on its RMBS as of March 31, 2008, Timmermans's brief allusion to market illiquidity was part of a lengthy discussion of the strengths and weaknesses of ING's Alt-A portfolio, during which he said: "If we move from the Alt-A, just a last issue on that. We have seen a considerable amount of market illiquidity. It's a bit [of] a theoretical issue to precisely decompose how much of the price move is due to illiquidity and how much is due to credit." See 2008 1Q Earnings Call, Ex. LL, at 10.

explanation that ING had no reason to take similar write-downs because its RMBS portfolio was different from these other banks.

ABX and TABX Indices. Plaintiffs further allege that the ABX and TABX indices should have prompted ING to record greater impairments on its RMBS portfolio. But (as explained, see supra p. 19), they allege no connection between these indices and ING's RMBS.

Debt Securities Issued by Icelandic Banks and WaMu. Finally, to support its claim that Plaintiffs should have taken impairments on Icelandic bank and WaMu debt securities at March 31, 2008, instead of September 30, 2008, Plaintiffs allege that during the last half of 2007 and 2008, various Icelandic banks were forced to shut down or sell their assets. CAC ¶ 191. Plaintiffs selectively cite several news articles that describe the financial troubles of several Icelandic banks, id. ¶¶ 192-199, but do not allege that ING held securities issued by any of them, or that their financial distress affected the cash flows from ING's debt securities portfolio before the third quarter of 2008.[57] Further, the rates of credit default swaps associated with a few Icelandic banks do not raise a plausible inference that ING should have taken an impairment on the debt securities in its portfolio. See id. ¶ 202.

Similarly, Plaintiffs make only conclusory statements that ING should have recorded an impairment on its WaMu debt securities at March 31, 2008. But the only facts alleged to support this claim are that WaMu announced a $1.87 billion net loss for the fourth quarter of 2007, that WaMu's credit default swap rates "surged" in the fourth quarter of 2007 and first quarter of 2008, and that various rating agencies downgraded WaMu in March 2008. Id. ¶¶ 206-207. Taken together, such facts fail to raise any inference that ING's securities were materially

---

[57]    Under IFRS, "impairments are only taken on RMBS if it is probable that the cash flows from interest rate or principal repayments will not be recovered." See CAC ¶ 139.

impaired by March 31, 2008. The only plausible scenario is that the Icelandic bank and WaMu debt securities held by ING did not warrant impairment until the third quarter of 2008.

### 3. Plaintiffs Allege No Separate Facts To Support Their Assertion That ING Violated International Accounting Standards Or Reg S-K

Finally, Plaintiffs' assertions that ING's disclosure violated Reg S-K and various IAS seem calculated to obfuscate the hollowness of Plaintiffs' allegations. For example, Plaintiffs allege that ING failed to include a discussion of the most significant factors that made the June 2008 offering risky or speculative, as required by Item 503 of Reg S-K. See CAC ¶ 157. Plaintiffs also allege ING failed to alert investors of the material adverse change in ING's capital adequacy resulting from its exposure to Alt-A and subprime RMBS and debt securities issued by various Icelandic banks and WaMu, in violation of Form S-3. Id. ¶ 160. However, ING made ample disclosure in the May 15, 2008 6-K, as described above.

Plaintiffs also contend that ING violated IAS No. 39, which required ING to determine at the end of each period whether there existed objective evidence of impairment as a result of a "loss event" that had an impact on estimated future cash flows of the financial asset that could be reliably estimated. Id. ¶ 171 (emphasis added). Plaintiffs have alleged no more than general market trends and after-the-fact events to support their conclusory statement that ING should have taken impairments six months earlier than it did. Plaintiffs do not allege that observable data indicated a measurable decrease in estimated future cash flows of ING's RMBS, at the time of the June 2008 Offering, as required by IAS No. 39 – nor do they allege that ING's decisions about impairments and loan loss reserves were contrary to the judgment of Ernst & Young, which gave unqualified opinions on ING's audited financial statements.[58]

---

[58]     See Indiana State Dist. Council of Laborers And Hod Carriers Pension and Welfare Fund v. Omnicare, Inc., ___ F.3d ___, 2009 WL 3365189, at *7 (6th Cir. Oct. 21, 2009) (rejecting GAAP violation claims noting they were "substantially undercut both by the lack of any financial restatements on [the Company's] part and by the

Finally, Plaintiffs make a number of conclusory statements that ING violated IAS Nos. 1,

7, 10, and 34, but do no more than quote those standards.  See id. ¶¶ 219-227.  Accordingly,

Plaintiffs have failed to raise a plausible inference that the June 2008 Offering Materials were

materially false or misleading.[59]

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed.

Dated: New York, New York
       November 5, 2009

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _Mitchell A. Lowenthal_

    Mitchell A. Lowenthal
    Giovanni P. Prezioso

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

Attorneys for Defendant ING Groep N.V., ING Financial
Holdings Corp., and ING Financial Markets LLC

SHEARMAN & STERLING LLP

By: _____

    Stuart J. Baskin
    Adam S. Hakki
    Herbert S. Washer

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

Attorneys for all Underwriter Defendants except ING
Financial Markets LLC

---

willingness of third-party auditors to continue to certify [the Company's] GAAP compliance.").

[59]    See, e.g., Garber, 537 F. Supp. 2d at 613 (merely citing GAAP does not state a claim); In re Duke Energy
Corp. Sec. Litig., 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2004) (dismissing conclusory Securities Act allegations of
improper accounting practices where complaint failed to allege "in any cognizable respect [whatsoever] how mark-
to-market accounting practices were improper").

Finally, Plaintiffs make a number of conclusory statements that ING violated IAS Nos. 1,

7, 10, and 34, but do no more than quote those standards.  See id. ¶¶ 219-227.  Accordingly,

Plaintiffs have failed to raise a plausible inference that the June 2008 Offering Materials were

materially false or misleading.[59]

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed.

Dated: New York, New York
      November 5, 2009

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:_____
    Mitchell A. Lowenthal
    Giovanni P. Prezioso

One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile: (212) 225-3999

Attorneys for Defendant ING Groep N.V., ING Financial
Holdings Corp., and ING Financial Markets LLC

SHEARMAN & STERLING LLP

By:_____
    Stuart J. Baskin
    Adam S. Hakki
    Herbert S. Washer

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

Attorneys for all Underwriter Defendants except ING
Financial Markets LLC

---

willingness of third-party auditors to continue to certify [the Company's] GAAP compliance.").

[59]    See, e.g., Garber, 537 F. Supp. 2d at 613 (merely citing GAAP does not state a claim); In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2004) (dismissing conclusory Securities Act allegations of improper accounting practices where complaint failed to allege "in any cognizable respect [whatsoever] how mark-to-market accounting practices were improper").