UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

|  |  |
|---|---|
| MARSHALL FREIDUS and EDWARD P. ZEMPRELLI, Individually and on Behalf of All Others Similarly Situated, | 09 Civ. 1049 (LAK) and consolidated cases |
| Plaintiffs, | 09 Civ. 1284 (LAK) 09 Civ. 1410 (LAK) |
| - against - | 09 Civ. 1820 (LAK) 09 Civ. 2667 (LAK) |
| ING GROEP N.V., et al., | 09 Civ. 3066 (LAK) |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

-------------------------------------------------------------------- X

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Mitchell A. Lowenthal, Esq.
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York  10006
Tel:  (212) 225-2000
Fax:  (212) 225-3999

Giovanni P. Prezioso, Esq.
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC  20006
Tel:  (202) 974-1500
Fax:  (202) 974-1999

Attorneys for Defendants ING Groep N.V.,
ING Financial Holdings Corp., and ING
Financial Markets LLC

Stuart J. Baskin, Esq.
Adam S. Hakki, Esq.
Herbert S. Washer, Esq.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022
Tel:  (212) 848-4000
Fax:  (212) 848-7179

Attorneys for UBS Securities LLC, Citigroup
Global Markets Inc., Merrill Lynch, Pierce,
Fenner & Smith Incorporated, Wachovia
Capital Markets, LLC, Morgan Stanley & Co.
Incorporated, Banc of America Securities LLC,
RBC Capital Markets Corporation, J.P.
Morgan Securities Inc., Credit Suisse
Securities (USA) LLC, HSBC Securities
(USA) Inc., ABN AMRO Incorporated, and
A.G. Edwards & Sons, Inc.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT........................................................................................................ 1

I.      THE JUNE 2007 OFFERING CLAIMS ARE TIME-BARRED........................... 1

II.     THE CAC FAILS TO STATE A CLAIM UNDER THE
        SECURITIES ACT.................................................................................. 4

        A.    Plaintiffs' Claims Are Subject To Rule 9(b) Because
              They Sound In Fraud ..................................................................... 4

        B.    The June 2007 Offering Allegations Fail to State a Claim........................ 6

              1.    Plaintiffs Fail to Tie General Market Condition
                    To ING's RMBS............................................................ 6

              2.    Hindsight Pleading Fails.................................................. 8

              3.    Plaintiffs Have No Claim Based On A Violation
                    Of IAS Or Reg S-K ........................................................ 9

              4.    The Alleged Misstatements And Omissions Are
                    Immaterial................................................................... 10

              5.    Plaintiffs Otherwise Challenge Puffery Or
                    Inactionable Forward-Looking Statements ..................... 11

        C.    The September 2007 Offering Allegations Fail To State A Claim ........... 13

              1.    Disclosure Of FICO Scores And LTV Ratios
                    Was Not Misleading ..................................................... 13

              2.    The Omission Of Loan-Level Details Was
                    Not Misleading ............................................................ 15

              3.    Disclosure Of Credit Ratings Was
                    Not Misleading ............................................................ 16

              4.    Plaintiffs Otherwise Challenge
                    Inactionable Opinion Or Puffery :.................................... 16

D.     The June 2008 Offering Allegations Fail To State A Claim ....................... 17

       1.     Hindsight Pleading ........................................................ 17

       2.     There Was No Material Misstatement
              Or Omission.................................................................. 18

       3.     ING Did Not Violate IAS No. 39 ................................... 19

E.     The Section 15 Claim Fails As A Matter of Law ........................................ 22

CONCLUSION ............................................................................................................ 22

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

15 U.S.C. § 77z-2(c)(1) .................................................................. 13

17 C.F.R. § 229.1100(b) ................................................................. 14

17 C.F.R. §§ 229.1101, 229.1103, 229.1105............................................. 14

17 C.F.R. § 229.1105(a)(3)(B)(iii) ....................................................... 14

17 C.F.R. § 229.1111...................................................................... 14

70 F.R. 1506-01 (Jan. 7, 2005)........................................................... 14

IAS No. 39 § 59 ........................................................................... 20

IAS No. 39 § 60 ........................................................................... 21

IAS No. 39 § 62 ........................................................................... 20

**Cases**

Acito v. IMCERA Group, Inc.,
47 F.3d 47 (2d Cir. 1995) ................................................................ 17

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009)................................................................... 4,5,6

Basic Inc. v. Levinson,
485 U.S. 224, 108 S. Ct. 978 (1988) ................................................... 15-16

Berry v. Valence Tech., Inc.,
175 F.3d 699 (9th Cir. 1999) ............................................................. 4

Caiola v. Citibank, N.A.,
295 F.3d 312 (2d Cir. 2002) ............................................................. 12, 15

Coronel v. Quanta Capital Holdings Ltd.,
No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)..................... 5, 21

ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase,
553 F.3d 187 (2d Cir. 2009) ....................................................... 10, 11, 12, 22

Farr v. Shearson Lehman Hutton Inc.,
755 F. Supp. 1219 (S.D.N.Y. 1991) .................................................... 4

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.,
376 F. Supp. 2d 385 (S.D.N.Y. 2005) ................................................................. 21

Ganino v. Citizens Utils. Co.,
228 F.3d 154 (2d Cir. 2000) ............................................................................... 10,11

Garber v. Legg Mason, Inc.,
537 F. Supp. 2d 597 (S.D.N.Y. 2008),
aff'd, No. 08-1831-cv, 2009 WL 3109914 (2d Cir. Sept. 30, 2009) .................................. passim

In re Adams Golf, Inc. Sec. Litig.,
381 F.3d 267 (3d Cir. 2004) ............................................................................... 19

In re Alliance Pharm Corp. Sec. Litig.,
279 F. Supp. 2d 171 (S.D.N.Y. 2003) ................................................................. 15

In re CIT Group, Inc. Sec. Litig.,
349 F. Supp. 2d 685 (S.D.N.Y. 2004) ................................................................. 5-6, 20

In re Duke Energy Corp. Sec. Litig.,
282 F. Supp. 2d 158 (S.D.N.Y. 2004) ................................................................. 21

In re Global Crossing, Ltd. Sec. Litig.,
313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................. 20

In re Livent, Inc. Noteholders Sec. Litig.,
151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................. 12

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................. 7

In re Mirant Corp. Sec. Litig.,
No. 02 Civ. 1467 (RWS), 2009 WL 48188 (N.D. Ga. Jan. 7, 2009) .................................... 21

In re Moody's Corp. Sec. Litig.,
599 F. Supp. 2d 493 (S.D.N.Y. 2009) ................................................................. 11

In re New Century,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................... 9, 21

In re NovaGold Res. Inc., Sec. Litig.,
629 F. Supp. 2d 272 (S.D.N.Y. 2009) ................................................................. passim

In re Oxford Health Plans, Inc. Sec. Litig.,
187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................................... 11-12

In re RAIT Fin. Trust Sec. Litig.,
No. 07 Civ. 3148 (LDD), 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ............................ 9, 21

In re Refco, Inc. Sec. Litig.,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) .............................................................................. 5

In re Salomon Analyst Level 3 Litig.,
373 F. Supp. 2d 248 (S.D.N.Y. 2005) .............................................................................. 20

In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.,
259 F.R.D. 490 (W.D. Wash. 2009) .................................................................................. 9, 21

Kowal v. MCI Commc'ns Corp.,
16 F.3d 1271 (D.C. Cir. 1994) .......................................................................................... 17

Ladmen Partners v. Globalstar, Inc.,
No. 07 Civ. 0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) ......................... 5

Landmen Partners, Inc. v. Blackstone Group, L.P.,
No. 08 Civ. 3601 (HB), 2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009) ........................... 7, 10

Lapin v. Goldman Sachs Group, Inc.,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) .............................................................................. 11,12

LC Capital Partners v. Frontier Ins. Group, Inc.,
318 F.3d 148 (2d Cir. 2003) ............................................................................................. 3,4

Lentell v. Merrill Lynch & Co.,
396 F.3d 161 (2d Cir. 2005) ............................................................................................. 2,3

Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,
No. 02 Civ. 767 (LBS), 2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003) ............................ 15

Newman v. Warnaco Group,
335 F.3d 187 (2d Cir. 2003) ............................................................................................. 3,4

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000) ............................................................................................. 12

Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,
538 F. Supp. 2d 662 (S.D.N.Y. 2008),
aff'd in part, rev'd in part on other grounds,
No. 08-3398-cv, 2009 WL 2959883 (2d Cir. Sept. 17, 2009) ........................................... 8

Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,
No. 08 Civ. 10446 (RGS), 2009 WL 3149775 (D. Mass. Sept. 30, 2009) ........................ 7, 14

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004) ............................................................................. 5, 13, 17

Rubin v. MF Global, Ltd.,
634 F. Supp. 2d 459 (S.D.N.Y. 2009) ................................................................... 12

Staehr v. Hartford Fin. Servs. Group,
547 F.3d 406 (2d Cir. 2008) ................................................................................. 2,3

United Guaranty Mortg. Indem. v. Countrywide Fin. Corp.,
_ F. Supp. 2d _, No. 09 Civ. 1888 (MRP),
2009 WL 3199844 (C.D. Cal. Oct. 5, 2009) ......................................................... 7

Defendants[1] submit this reply in further support of their motion to dismiss the CAC and in response to Plaintiffs' Opposition ("PB").

## PRELIMINARY STATEMENT

The Opposition largely repeats the legally insufficient assertions that plague the CAC. Stripped of hindsight pleading and the intentional blurring of an investment in mortgages and credit enhanced MBS – and viewed through a lens of common sense and plausibility – it is plain that the CAC's claims should be dismissed as a matter of law.

## ARGUMENT

## I.    THE JUNE 2007 OFFERING CLAIMS ARE TIME-BARRED

Plaintiffs concede that if they were on inquiry notice of their June 2007 Offering claims by February 5, 2008, those claims are time barred. They had such notice.

The foundation of the June 2007 Offering Claims is that ING "failed to disclose" that it "had more than €31 billion ($45.26 [billion]) of exposure to Alt-A and subprime RMBS." CAC ¶ 120(a). Long before February 2008, ING had disclosed exactly that. As the CAC itself alleges, "[o]n August 8, 2007," ING disclosed "that it was holding €3.2 billion ($4.6 billion) in subprime RMBS and a dramatic €28.7 billion ($41.9 billion) in its Alt-A RMBS portfolio." CAC ¶ 7. See also id. ¶ 124 (same disclosure made in September 2007). Every one of the June 2007 Offering allegations rests on ING's alleged failure to disclose these holdings, see DB at 12, a point the Opposition does not dispute. Thus, by definition, ING's disclosure of the size of its RMBS investments in August, September, and November 2007 put Plaintiffs on notice of "the facts underpinning their allegations" – the dismissal standard that Plaintiffs embrace. See PB at

---

[1]    Terms defined in Defendants' Memorandum in Support of Their Motion to Dismiss ("DB") are similarly used herein. Unless otherwise noted, citations to "Ex." are exhibits attached to the Lowenthal Declaration.

13 (citing <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 169 (2d Cir. 2005)).[2] Given the CAC's core allegation that the June 2007 Offering "failed to disclose <u>any mention whatsoever</u> of ING's massive position in" RMBS securities, CAC ¶ 7 (emphasis in original), and the undisputed disclosure of exactly that information beginning in August 2007, there can be no dispute that Plaintiffs had the requisite notice of their claims more than a year before they filed suit.[3]

Plaintiffs set up and then try to knock down a series of irrelevant straw men. <u>First</u>, they complain that when the facts were disclosed, comforting statements accompanied them. PB at 15-17. But where, as here, the actual facts Plaintiffs complain were omitted <u>are</u> disclosed, alleged characterizations of those facts do not bar Plaintiffs' inquiry notice obligations. <u>See</u> <u>In re NovaGold Res. Inc., Sec. Litig.</u>, 629 F. Supp. 2d 272, 288-89 (S.D.N.Y. 2009) ("words of comfort" did not avoid duty of inquiry where company disclosed that study was being superseded and claim was based on new study being performed).

<u>Second</u>, there were no "words of comfort" that masked the factual disclosures ING made. One of the defining characteristics of the CAC is that it contains no allegations about specific RMBS held by ING. Rather, it is the mere fact that ING owned €31 billion of such securities that is the foundation of Plaintiffs' claims. <u>See, e.g.</u>, CAC ¶¶ 7, 120(a); DB at 12. The information allegedly omitted from the June 2007 Offering Materials was disclosed to the public in black and white as of August and September 2007, and Plaintiffs have not and cannot identify any accompanying statements that change that.

---

[2]    Plaintiffs begin with an incomplete recitation of the principle that statute of limitations questions are often inappropriate for resolution on a motion to dismiss. <u>See</u> PB at 13. In the very case they cite, the Circuit went on to recognize that in many instances "[courts] can readily resolve the [statute of limitations] issue on a motion to dismiss and have done so in a vast number of cases." <u>Lentell</u>, 369 F.3d at 168 (internal quotation marks omitted); <u>see also</u> <u>Staehr v. Hartford Fin. Servs. Group</u>, 547 F.3d 406, 427 (2d Cir. 2008) (noting that "[w]hether a plaintiff was placed on inquiry notice is analyzed under an objective standard . . . [which] can be resolved as a matter of law")

[3]    Moreover, Plaintiffs do not (and cannot) deny that storm warnings "need not detail every aspect" of the alleged claim. <u>Staehr v Hartford Fin. Servs. Group</u>, 547 F.3d 406, 427 (2d Cir. 2008).

2

Third, the cases cited by Plaintiffs where statute of limitations arguments were based on disclosures from third-party sources have no application here.[4]  Defendants are not pointing to third-party sources; they are relying on ING's own disclosures about its own RMBS holdings. Plaintiffs needed to perform no investigation beyond reviewing ING's 2007 public filings to learn the information they allege to have been improperly omitted in June 2007.  In short, this "is 'company specific information' that relates directly to the misrepresentations alleged." NovaGold, 629 F. Supp. 2d at 287 (citing Staehr, 547 F.3d at 428).  Plaintiffs were "thus on inquiry notice" because (according to their own allegations) they "learn[ed] of the probability of an earlier 'untrue statement' or 'omission'" more than a year before filing suit.  Id. at 288.

Moreover, Plaintiffs' reliance on Newman v. Warnaco Group, 335 F.3d 187 (2d Cir. 2003), does not help their cause.  There, the defendant was accused of fraudulent inventory control and forecasting practices.  In the disclosure that allegedly triggered inquiry notice, the company took extensive write-downs but explained them away as a result of "the cumulative effect of a change in accounting."  Id. at 194 (emphasis in original).  This was insufficient to put an investor on inquiry notice because it consisted of an untrue and seemingly benign explanation that concealed the critical fact of inventory fraud.  Here, in contrast, Plaintiffs' claims rest on the allegation that ING did not disclose its RMBS holdings; undeniably, it did disclose them more than a year before this case was filed, and there is nothing it said or is alleged to have said that masked the magnitude of those holdings.[5]

---

[4]    See Lentell, 396 F.3d at 169 (media coverage regarding issuers was insufficient to trigger inquiry notice of a third-party wrongdoer (research analyst)); Staehr, 547 F.3d at 427-31 (media coverage on brokers' kickbacks from insurers and lawsuits against brokers did not trigger inquiry notice regarding a separate insurer).

[5]    Plaintiffs also ignore applicable Circuit precedent, which recognizes that "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on [them] " LC Capital Partners v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003) (emphasis added).  Courts must look at "how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence."  Id.  Here, all three factors weigh in favor of finding inquiry notice for the claims Plaintiffs assert:  first, Plaintiffs themselves

3

Finally, Plaintiffs argue that the disclosure of the information they allege was omitted –

ING's RMBS holdings – does not count for statute of limitations purposes because the market

did not react significantly to it. Plaintiffs cite no authority for the proposition that publicly

disclosed information somehow is not disclosed unless it moves the market in accord with

Plaintiffs' theory of the case. Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), which the Opposition

remarkably never mentions, instructs that assertions be tested on a plausibility standard. The

market's reaction does not plausibly mean that ING failed to make disclosures that it objectively

did,[6] but that (a) the market was already aware that ING held RMBS, see DB at 6, and (b) ING's

RMBS holdings were immaterial.[7] And the Court need not even bother with plausibility: either

way one interprets stock price movements, the allegedly omitted information indisputably was

disclosed more than a year before this case was filed. That ends the discussion.

    The June 2007 Offering Claims are time barred.

## II.   THE CAC FAILS TO STATE A CLAIM UNDER THE SECURITIES ACT

### A.   Plaintiffs' Claims Are Subject To Rule 9(b) Because They Sound In Fraud

Plaintiffs accuse Defendants of "parsing" the CAC for "words . . . out of context," PB at

12-13, but they ignore the reality that the CAC – in addition to using words classically associated

with fraud (that Defendants "chose not to review" and "ignored" evidence and "purportedly

---

described the exposure to RMBS that ING disclosed as "dramatic," see CAC ¶ 7; second, ING did not indicate that it would divest its RMBS, meaning that any problem caused by risky RMBS assets could continue; third, ING's statement that, "to date, this market disruption has had a limited impact on ING" does not constitute any steps to avoid recurrence. Simply put, these statements are at most "mere expressions of hope," LC Capital Partners, 318 F.3d at 156, which "do not rise to the level . . . necessary to excuse a reasonable investor from the duty of inquiry," Farr v. Shearson Lehman Hutton Inc., 755 F. Supp. 1219, 1228 (S.D.N.Y. 1991).

[6]    See Aug. 9, 2007 6-K, Ex. Q at 5; Sept. 24, 2007 6-K, Ex. D at 4; Nov. 8, 2007 6-K, Ex. T at 4.

[7]    Plaintiffs again seek refuge in Newman. But there the Court first examined the storm warning statements, found that they "did not contain any indication that fraud was being perpetrated," and merely cited to the market reaction as "further" support for that conclusion. 335 F.3d at 194. Berry v. Valence Tech., Inc., 175 F.3d 699, 705 (9th Cir. 1999), which Plaintiffs also cite, PB at 16, is to the same effect (holding that single press article did "not excite inquiry into the possibility of fraud" and looked to market reaction as support for that conclusion). In contrast, here there is no denying that the very facts Plaintiffs contend were omitted – ING's holdings in subprime and Alt-A RMBS – were disclosed by ING well prior to one year before Plaintiffs brought suit.

4

relied" on ratings "to support their unreasonable" valuations of RMBS, <u>see</u> DB at 15-16) – also

implies an overarching motive for an alleged scheme of misconduct. <u>See</u> DB at 16 (quoting in

full the CAC's allegations that Defendants were "incentivized" to "improper[ly]" understate

impairments so they could raise "precious Tier 1 capital"). These allegations plainly "sound in

fraud."[8] The Opposition itself loudly makes this point. <u>See, e.g.</u>, PB at 4 (implying that

Defendants "abused" or "gamed" accounting principles). Moreover, in attacking forward-

looking statements, disputing ING's business judgments, and arguing that they were lulled into

ignoring storm warnings by misleading statements of comfort, Plaintiffs are asserting claims on

classes of statements that could <u>only</u> be actionable if Defendants possessed actual knowledge of

the statements' falsity. <u>Rombach v. Chang</u>, 355 F.3d 164 (2d Cir. 2004), dictates that these

allegations cannot be ignored; the mere fact that Plaintiffs do not assert Exchange Act claims

does not alter the nature of the charges they do make.[9]

    In any event, the CAC fails to state a claim even under Rule 8. <u>See, e.g.</u>, DB at 17, 21,

25. Applying <u>Iqbal</u>'s "plausibility" standard is a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." <u>Iqbal</u>, 129 S. Ct. at 1950.

Critically, under Rule 8 – and Rule 9(b) – hindsight-driven allegations must be disregarded. <u>See</u>

---

[8]    <u>See, e.g.</u>, <u>Coronel v. Quanta Capital Holdings Ltd.</u>, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *15 (S.D.N.Y. Jan. 26, 2009) (applying Rule 9(b) to Securities Act claims where allegations implying defendant possessed a financial incentive to conceal information "infer an intent to defraud"); <u>In re CIT Group, Inc. Sec. Litig.</u>, 349 F Supp. 2d 685, 690 n.4 (S.D.N.Y. 2004) ("[A]n allegation that defendants reported that loan loss reserves were adequate despite 'already knowing at the time of filing . . . that the Company did not have adequate reserves,' unquestionably sounds in fraud . . . .") (citation omitted).

    For this reason, Plaintiffs' reliance on <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611 (S.D.N.Y. 2007), and <u>Garber v. Legg Mason, Inc.</u>, 537 F. Supp. 2d 597 (S.D.N.Y. 2008), <u>aff'd</u>, No. 08-1831-cv, 2009 WL 3109914, at *3 (2d Cir. Sept. 30, 2009), is misplaced. Those cases did not rest on mere disclaimers of fraud but rather on a finding that the allegations "d[id] not rely on fraudulent acts, and allege[d] no fraudulent intent." <u>Id.</u> at 612; <u>see also</u> <u>Refco</u>, 503 F. Supp. 2d at 632 ("claims [were] carefully couched in the language of negligence" and no allegation contained "even a hint of fraud").

[9]    <u>See, e.g.</u>, <u>Ladmen Partners v. Globalstar, Inc.</u>, No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008); <u>CIT Group</u>, 349 F. Supp. 2d at 690 n.4.

In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (citing Denny v. Barber, 576 F.2d 465 (2d Cir. 1978)).

### B.    The June 2007 Offering Allegations Fail To State A Claim

Refusing to acknowledge the fundamental difference between originating or investing in subprime mortgages – which ING did not do – and investing in highly rated, credit enhanced mortgage-backed securities – which ING did, the Opposition rests on inaccurate irrelevancies insufficient to state a claim about the RMBS ING actually owned.

### 1.    Plaintiffs Fail To Tie General Market Conditions To ING's RMBS

Plaintiffs begin their defense of the June 2007 Offering Claims by asserting that they did not know that ING "was holding more than €31 billion Alt-A and subprime RMBS." PB at 18. More than a year before they brought suit, ING had specifically disclosed that fact, and simple math revealed how much those RMBS constituted of ING's net assets, capital ratio, and equity.

Despite this, Plaintiffs assert that ING failed to disclose the risks presented by the RMBS in which it invested. But the litany of news stories and reports that Plaintiffs rely upon in support of that argument (most of which were published long after the June 2007 Offering) deal principally with the subprime crisis and mortgage origination – not the highly rated securities in which ING passively invested. The CAC (and the Opposition) say nothing about the actual RMBS that ING owned.[10] Instead, Plaintiffs contend they are free to make broad allegations about assets ING did not own, and nothing more, asserting that their burden does not go beyond "a short and plain statement." PB at 21 (citation omitted). Iqbal, of course, holds otherwise.

---

[10]    In one instance, Plaintiffs contend they have done so, castigating the defense for "erroneously" arguing that according to the CAC, AAA rated RMBS, like those held by ING, "were not written down until April 2008." PB at 21 n.13. The shoe is on the other foot. Defendants simply noted that the CAC states that the initial downgrades of AAA rated Alt-A RMBS did not begin until April 2008, almost a year after the June 2007 Offering. DB at 19 (citing CAC ¶ 87). In doing so, Defendants cited the article cited in the CAC, "Moody's Begins Downgrading AAA-Rated Alt-A RMBS to Junk." Id. In any case, downgrades of assets that ING did not own are beside the point. Moreover, AAA rated subprime RMBS had been downgraded earlier, and ING disclosed it had reduced the valuations of those investments at that time. Aug. 9, 2007 6-K, Ex. Q at 5; DB at 6 (citing CAC ¶ 7).

6

With no cases to support them, Plaintiffs must attack <u>Landmen Partners, Inc. v.</u>
<u>Blackstone Group, L.P.</u>, No. 08 Civ. 3601 (HB), 2009 WL 3029002 (S.D.N.Y. Sept. 22, 2009).
There, post <u>Iqbal</u>, the Court held that a plaintiff must link general allegations to the specific
assets owned by the issuer to state a securities claim.  In doing so, Judge Baer was not alone.[11]
But even if he were, <u>Landmen Partners</u> is compelling.  Plaintiffs purport to distinguish it because
the defendant largely owned commercial, and the plaintiff made allegations about residential,
real estate investments.  But the holding is not so limited: "generalized allegations that problems
brewing in the market at large made it 'foreseeable' that a particular set of unidentified
investments would sour are insufficient to 'nudge[] [the] claims across the line from conceivable
to plausible.'"  <u>Id.</u> at *8 (citation omitted) (alterations in original).  In short, the <u>Landmen</u>
<u>Partners</u> plaintiffs failed to link general problems in the subprime residential mortgage market to
<u>the defendants' specific real estate investments</u>, which included residential properties.

Similarly, Plaintiffs here rely on only general assertions about the subprime housing
market as a whole, including allegations about direct loans and assets with a different structure,
rating, or both, than the AAA rated, structurally-protected RMBS ING held at the time of the
June 2007 Offering.  <u>See, e.g.</u>, CAC ¶¶ 68-101; DB at 17-21.[12]  This distinction is no different
than the commercial/residential one in <u>Landman Partners</u>.  A central feature of a securitization is
mitigating the risk of owning the underlying mortgages, and to differentiate the risk of owning

---

[11]     Plaintiffs simply ignore other authorities the defense cited (DB at 18 n.28): <u>See Garber</u>, 537 F. Supp. 2d at
613; <u>In re Merrill Lynch & Co. Research Reports Sec. Litig.</u>, 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003).

         And they, too, have much company: <u>See United Guaranty Mortg. Indem. v. Countrywide Fin. Corp.</u>, _ F.
Supp. 2d _, No. 09 Civ. 1888 (MRP), 2009 WL 3199844, at **17-18 (C.D. Cal. Oct. 5, 2009) (dismissing complaint
where allegations "go to Countrywide's general operating procedures—not to the class of loans ('subprime') in
issue"); <u>Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.</u>, No. 08 Civ. 10446 (RGS),
2009 WL 3149775, at *6 (D. Mass. Sept. 30, 2009) ("That questionable appraisal practices were a common problem
in the industry as a whole, without more, tells nothing about [the defendant's] underlying loans.").

[12]     Plaintiffs neglect to defend the appropriateness of their treating these assets as equivalent, and ignore
Defendants' specific argument regarding the BBB assets underlying the TABX index.  The index Plaintiffs chart at
¶ 92 of the CAC that is allegedly tied to certain AAA assets is still an insufficient link to ING's RMBS.  Notably,
however, that chart shows not only no decline but an increase in the value of those assets in the summer of 2007.

7

MBS among the various securitization tranches. Defendants stressed this difference in their moving papers. With nothing to say, not even about the allegation (at CAC ¶ 68) Defendants highlighted, Plaintiffs ignore it. There, the CAC alleges that at the end of 2007, 8.5% of Alt-A <u>mortgages</u> were delinquent – which shows that over 90% of such mortgages were performing, and says nothing about the performance of AAA rated <u>RMBS</u>, underscoring why the required nexus between the allegations underlying a claim and the actual assets owned by the defendant is, as <u>Landmen Partners</u> and others hold, so critical.

## 2.    Hindsight Pleading Fails

All of the reasons the CAC offers about <u>why</u> certain vintages, loan types, or geographic concentrations of mortgages were "extremely risky" came from sources dated after the June 2007 Offering (indeed, after the September 2007 Offering).[13]  The CAC does not explain how ING would have or could have known this information in June (or September) 2007.  Instead, Plaintiffs just brand the underlying loans "extremely risky," and thereby bootstrap a hindsight argument into a conclusory label. This fails.[14]  The Opposition compounds the error by contending that events occurring as late as October 2008 and January 2009 "prove" that there were problems with ING's RMBS investments over a year earlier. <u>See</u> PB at 23 (arguing "toxic effect" of ING's RMBS was "demonstrated in October 2008"). Plaintiffs ignore the intervening effect of the credit crisis and the ten fateful days in September 2008 over which Fannie Mae and Freddie Mac were placed in conservatorship, Lehman Brothers filed for bankruptcy protection,

---

[13]    <u>See</u> DB at 21-22 (citing CAC ¶¶ 67-73 (exclusively citing statistics as "the end of 2007" and sources well into 2008)).

[14]    <u>See, e.g.</u>, <u>Panther Partners, Inc. v. Ikanos Commc'ns, Inc.</u>, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008) (holding that "craftily drafted" complaint implying "that what only became clear due to subsequent events was somehow known" is insufficient as a matter of law), <u>aff'd in part</u>, <u>rev'd in part on other grounds</u>, No. 08-3398-cv, 2009 WL 2959883 (2d Cir. Sept. 17, 2009).

and AIG was essentially nationalized. Assuming away these cataclysmic events flunks the common sense and plausibility tests demanded by Iqbal.

### 3. Plaintiffs Have No Claim Based On A Violation Of IAS Or Reg S-K

Plaintiffs maintain that the June 2007 Offering Materials violated accounting provisions by failing to disclose "significant concentrations of credit risks." PB at 29-31. But they can point to no reason why ING's structurally protected, AAA RMBS – constituting about 2% of ING's assets – could ever be considered a "significant concentration of credit risk." Nor can Plaintiffs overcome that the application of these broad guidelines requires management judgment, see DB at 23-24, or that independent auditors – with whom Plaintiffs have no quarrel – certified ING's financial statements as consistent with all applicable accounting standards.[15]

Instead, Plaintiffs strain to analogize this case to those in which "contemporaneous facts existed which contradicted the judgments made by reporting entities." PB at 31. But the very cases Plaintiffs cite underscore their inapplicability; each involved issuers of (not investors in) mortgage-related assets where the defendants had actual knowledge of specific facts that rendered their valuations false at the time they were made.[16] Here, Plaintiffs disclaim the fraud they concede would be required, and the CAC contains no allegation that management knew (much less believed) that the valuations they used were wrong. In that circumstance, courts routinely reject securities law claims. See DB at 23 n.36 (citing cases); NovaGold, 629 F. Supp. 2d at 295.

---

[15]    Plaintiffs' sole response is merely to quote the truism that the financial statements are management's responsibility. See PB at 31 n.18. That does not change the fact that independent auditors certified them.

[16]    See In re RAIT Fin. Trust Sec. Litig., No. 07 Civ. 3148 (LDD), 2008 WL 5378164, at **6-8 (E.D. Pa. Dec. 22, 2008) (company knowingly failed to value properly the assets collateralizing its CDOs); In re New Century, 588 F. Supp. 2d 1206, 1226-27 (C.D. Cal. 2008) (alleged facts gave rise to a strong inference the defendants were at least deliberately reckless in representing making misrepresentations as to loan quality); In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig., 259 F.R.D. 490, 507 (W.D. Wash. 2009) (company and officers knowingly misstated loan loss reserves).

9

### 4.    The Alleged Misstatements And Omissions Are Immaterial

Plaintiffs invent a novel – and unsupported – formula to calculate quantitative materiality by recasting the assets at issue as a percentage of shareholder equity. PB at 22-24. But the sole case they cite, Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000), confirms that "the items in issue should be compared to like items on the corporate financial statements." Id. at 165; see also id. at 163-64 (citing SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45152 (1999) (relevant benchmark for quantitative materiality is the percentage with respect to the particular line item)). Here, the "items in issue" were assets. Thus, as in JP Morgan,[17] the relevant assessment is as a percentage of assets. ING's RMBS portfolio represented only 2.25% of its total assets, and thus falls far below the relevant materiality threshold.

Comparing ING's RMBS assets to shareholders' equity also defies common sense. Under Plaintiffs' logic, virtually any asset, however small, would be material to a company with low shareholders' equity. To require dollar-and-cents disclosures would not only be an impossible standard, it would also violate other principles of the securities laws. See Landmen Partners, 2009 WL 3029002, at *6 ("Including . . . information [about every investment in a portfolio] would have obfuscated truly material information in a flood of unnecessary detail, a result that the securities laws forbid."). The comparison is untenable for a second reason: except for companies with no liabilities, assets always exceed equity. Comparing assets to equity, therefore, necessarily magnifies the materiality of assets, and therefore directly conflicts with both Ganino and JP Morgan.

Moreover, not even Plaintiffs contend (nor could they) that ING's RMBS were worthless in June 2007 (or at any time). Even if every mortgage underlying them went into default, the

---

[17]    ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase, 553 F.3d 187, 203 (2d Cir. 2009); see also DB at 24-25 and cases cited therein.

properties still had value. Thus, simply comparing the amount of those assets to equity is contrasting apples and oranges. At most, the issue is whether the RMBS were worth less than what they were carried at on ING's balance sheet. But neither the CAC nor the Opposition makes the slightest effort to quantify this alleged overstatement. Without it, there simply is no basis to find that Plaintiffs have adequately alleged materiality.

Plaintiffs also fault Defendants for supposedly failing to account for the qualitative factors that JP Morgan used to determine materiality. But the qualitative factors cited by JP Morgan and the qualitative factors that supported the materiality alleged in Ganino are concededly absent here. See Ganino, 228 F.3d at 166-67 (allegations that defendants deceptively masked a change in earnings and that there was a consequent stock price drop upon disclosure prevented dismissal as a matter of law). Nor do Plaintiffs allege adequately that the misstatement related to a significant aspect of ING's business; indeed, they concede that ING "does not originate subprime mortgages." CAC ¶ 124 (quoting Sept. 24, 2007 6-K).[18] Under these circumstances, courts do not hesitate to dismiss claims as immaterial as a matter of law. See JP Morgan, 553 F.3d at 204; Garber, 2009 WL 3109914, at *3.

### 5.    Plaintiffs Otherwise Challenge Puffery Or Inactionable Forward-Looking Statements

Puffery. Plaintiffs contend broad disclosures in the June 2007 Offering Materials that "repeatedly tout ING's strong risk management" are actionable. See PB at 25-26. Not surprisingly, all of the cases Plaintiffs cite adequately pleaded a systemic scheme of misconduct that rendered an overarching policy wholly false,[19] or concrete facts demonstrating that a specific

---

[18]    ING's disclosure about its residential mortgage lending business is wholly irrelevant to its RMBS investments, and thus could not have "independently" given rise to any disclosure duties. See PB at 19.

[19]    See Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221 (S.D.N.Y. 2006) (claims of analyst independence undercut by alleged conflict-of-interest scheme); In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (same as to claims of rating agency independence); In re Oxford Health Plans, Inc. Sec.

policy was fraudulently abandoned.[20]  Each of these cases also rests on "[t]he important

limitation on [puffery principles:] that optimistic statements may be actionable upon a showing

that the defendants did not genuinely or reasonably believe [them]." Lapin, 506 F. Supp. 2d at

239. Here, the CAC disclaims fraud, and contains no allegation showing how a firm-wide risk

management procedure could be rendered false even if there were a failure of risk management

in 2% of ING's many products or portfolios across ING's many businesses.  Further, the

statements the Opposition attacks are wholly general, quintessential puffery. See PB at 25

(portfolios were "appropriately" run).  They are no different than the risk management

statements made by JP Morgan and held inactionable by the Second Circuit. See JP Morgan,

553 F.3d 187, 205-06 (such statements "did not, and could not, amount to a guarantee that its

choices would prevent failures in its risk management practices"). See also Rubin v. MF Global,

Ltd., 634 F. Supp. 2d 459, 473 (S.D.N.Y. 2009) ("a reasonable investor could not have been

misled into thinking that the risk of a faulty risk management system did not actually exist")

(internal quotations omitted).

 Forward-looking.  The statements about ING's risk management goals are also inherently

forward-looking because they relate to future events and potential losses. See DB at 26

(discussing In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 440 (S.D.N.Y.

2001)).  That they are rooted in current conditions (ING's goals) does not change this result. See

NovaGold, 629 F. Supp. 2d at 292 ("Any projection or forward-looking statement necessarily

has its basis in current conditions.").  Hence the challenged statements are protected by the

---

Litig., 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (broad statements as to financial condition actionable where defendants
knew computer troubles yielded widespread faulty accounting and financial data).

[20] See Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000) (statements regarding inventory mark-down
actionable where inventory fraud alleged); see also Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002) (statement
that a specific hedging strategy was being followed actionable where defendant secretly stopped employing that
strategy), cited in PB at 19-20.

PSLRA safe harbor and are not actionable – regardless of the adequacy of cautionary language[21] – unless the CAC adequately pleaded that Defendants made them with "actual knowledge" that they were "false and misleading." See 15 U.S.C. § 77z-2(c)(1); Rombach, 355 F.3d at 173. Plaintiffs ignore this requirement. See PB at 28 (addressing only cautionary language).

### C.     The September 2007 Offering Allegations Fail To State A Claim

As of the September 2007 Offering, investors were told precisely how much RMBS ING owned and how that amount compared to its total assets, capital, and shareholders' equity. Plaintiffs ignore this and the additional risk warnings and cautionary disclosures ING made. See DB at 28-30. Coupled with the disclosures widely broadcast and cited in the CAC about the risks associated with RMBS, they demonstrate that ING made no material misstatements or omissions in the September 2007 Offering. Plaintiffs' arguments to the contrary are makeweight.

### 1.     Disclosure Of FICO Scores And LTV Ratios Was Not Misleading

Plaintiffs' principal challenge to the September 2007 Offering Materials is the contention that investors were led to believe that the LTV ratios and FICO scores were represented to be current when they were in fact historic. See PB at 35, 37. But no effort is made to explain how counsel understood the disclosure to be historic, but investors somehow did not. Indeed, any reasonable investor would know that this data is taken and stated as of the time the mortgages were issued: no homeowner is required to give updated FICO scores to a bank months or years after a mortgage has been issued, and issuers of RMBS – much less investors in them – do not

---

[21]     In any event, Plaintiffs' criticism that the cautionary language is too general is makeweight. It is simply a function of the general statements under attack. It is impossible to articulate every conceivable variation of a potential risk, and sound jurisprudence recognizes this reality. See, e.g., NovaGold, 629 F. Supp. 2d at 294 ("The Registration Statement need not predict all of the details . . . that came to pass. Requiring it to do so would force companies warning of capital cost risks to detail every single capital expenditure they planned to make and their expected costs. Such an approach would be impractical."). In any event, ING specifically warned investors of risks underlying its RMBS investments, such as changes in the real estate market, the volatility and strength of the capital markets, and a downturn in the equity markets. See DB at 26.

engage in the time-consuming and costly process of reappraising all of the properties securitized by the RMBS to determine updated LTV ratios.

This plain common-sense notion is confirmed by Regulation AB, the SEC's detailed set of requirements for asset-backed securities disclosures. It mandates disclosure of a broad array of information, including delinquencies and losses data, acquisition data for the underlying pool of assets, the programs under which the loans were originated, standardized credit (i.e., FICO) scores, and LTV data. See generally 17 C.F.R. §§ 229.1101, 229.1103, 229.1105. Notably, however, LTV ratios and credit scores are not among the data that must be periodically updated. See 17 C.F.R. § 229.1100(b). In fact, the SEC explicitly recognizes this type of data as comprising "summary information for the original characteristics of the prior securitized pool." 17 C.F.R. § 229.1105(a)(3)(B)(iii) (emphasis added); see also 17 C.F.R. § 229.1111. Nowhere in Regulation AB or its commentary about it does the SEC ever suggest that LTV ratios and FICO scores are anything but historic or that they must be periodically updated – even by the issuer of the MBS. See generally 70 F.R. 1506-01 (Jan. 7, 2005).

Even if the law were otherwise, the CAC contains no allegation that any borrower's FICO score or LTV ratio associated with a mortgage underlying ING's RMBS – much less a material number of them – was misstated. As, among many others, Landman Partners holds, plaintiffs must tether the allegations they make to the securities at issue. But here Plaintiffs offer nothing to show that any general decline in FICO scores or LTV ratios had any material effect on the RMBS held by ING. See also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08 Civ. 10446 (RGS), 2009 WL 3149775, at *6 (D. Mass. Sept. 30, 2009) (cited in DB at 33).[22]

---

[22]    Finally, nowhere in the CAC or in the Opposition do Plaintiffs allege that ING had access to current FICO scores or LTV ratios. Their only rebuttal is that ING had access to underwriting and payment history for each

14

## 2.    The Omission Of Loan-Level Details Was Not Misleading

Plaintiffs challenge ING's statement that it considered its RMBS exposure "to be of

limited size and relatively high quality" as false and misleading because ING failed to deluge

investors with details about the mortgages underlying its RMBS.  In doing so, Plaintiffs rely on

the unremarkable principle that a defendant "has a duty to disclose any information that is

necessary to make other statements not misleading," In re Alliance Pharm Corp. Sec. Litig., 279

F. Supp. 2d 171, 182 (S.D.N.Y. 2003) (citations omitted), and then themselves admit that ING

did disclose the factual basis for the very statements under attack, including the Alt-A/subprime

composition of the portfolio, the ratings of these securities, and the negative revaluations thereof

and their consequent effect on shareholders' equity.  See PB at 32-33.  Plaintiffs nevertheless

assert that these statements were insufficient and ING should have disclosed additional features

of the underlying mortgages, such as loan type, vintage, or geographic concentration.  Tellingly,

Plaintiffs cite no rule, regulation, or industry precedent for disclosing this level of detail on the

thousands of mortgages underlying each RMBS.  CAC ¶ 62.[23]

Simply because the normative amount of an investment is large does not make every

detail about it material to investors.  Rather, the disclosure of the omitted information must have

"significantly altered the 'total mix' of information" available, Basic Inc. v. Levinson, 485 U.S.

224, 231-32, 108 S. Ct. 978, 983 (1988), and the total mix includes "information already in the

---

mortgage pool. See PB at 36; CAC ¶¶ 63, 145. However, Plaintiffs do not and cannot allege that this information
would somehow translate into updated FICO scores for thousands of individuals or LTV ratios for thousands of
properties.

[23]    Neither of the cases Plaintiffs cite (PB at 33-34) holds that a defendant must disclose all information to
make a statement complete and accurate. See Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 329-30 (2d Cir. 2002)
(express misrepresentation to an investor regarding a hedging strategy that had in fact been abandoned actionable
where parties were aware investments were wholly dependent on the continued use of that strategy); Nanopierce
Techs , Inc. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 767 (LBS), 2003 WL 22882137, at **3-4 (S.D.N.Y.
Dec. 4, 2003) (omission from background information that President and CEO had submitted to a consent decree
following SEC allegations of securities fraud and that another company went bankrupt during his tenure was not "so
obviously unimportant" to be immaterial as a matter of law).

public domain and facts known or reasonably available to the shareholders," Garber, 2009 WL
3109914, at *2 (internal quotation marks omitted). Plaintiffs' only argument why the failure to
disclose these features constitutes a material omission is that "these types of loans were the exact
types" that worried the market generally in 2006 and 2007. PB at 34. But they do not even
address (much less rebut) Defendants' detailed demonstration that, taken separately or together,
none of these features was material to ING shareholders. See DB at 30.

### 3.    Disclosure Of Credit Ratings Was Not Misleading

Ignoring Nomura's holding (and every argument Defendants have made on the subject,
see DB at 34-36), Plaintiffs persist in contending that ING somehow knew, or should have
known, at the time of the September 2007 Offering that the credit agencies employed unreliable
methodologies. But Plaintiffs cannot plausibly allege that ING had access to those
methodologies. (Nor can they dispute that ING accurately reported the ratings the agencies gave
to the RMBS ING owned, or that ING explicitly disclosed that it was not responsible for those
ratings. See DB at 36.) Indeed, Plaintiffs are left to argue that the rating agencies employed
flawed methodologies by resorting to information obtained from those agencies long after ING
completed all of the challenged Offerings. At best, this is impermissible hindsight pleading.

### 4.    Plaintiffs Otherwise Challenge Inactionable Opinion Or Puffery

ING's statements that the financial crisis, as of the date of the Offering, had a "limited
impact" on ING, and that its RMBS portfolio was of "limited size" and of "relatively high
quality" were merely (and concededly) management's characterization of the accompanying
disclosed facts. As such, reading them in context, see DB at 39, they are opinions that could
only be actionable if not truly held. Plaintiffs do not (and cannot) so allege. Rather, with the
benefit of hindsight, Plaintiffs quarrel that Defendants should have taken a pessimistic view. But

16

neither clairvoyance nor pejorative characterizations are required by the securities laws.[24]

Moreover, as an optimistic opinion about ING's entire portfolio in one case and its wide-ranging

businesses in the other, they are precisely the type of generalized statement of puffery that no

reasonable investor would rely upon. See DB at 37.

Finally, in light of the accompanying, explicit warnings that turbulent market conditions

could continue to lead to accompanying negative revaluations, these statements are firmly within

the protections of the bespeaks caution doctrine. See id. at 37-38.[25]

### D.    The June 2008 Offering Allegations Fail To State A Claim

The gravamen of the only additional arguments made to defend the June 2008 Offering

Claims is that, although ING took €50 million of impairments and €4.8 billion of negative

revaluations on its non-prime RMBS before that Offering, it allegedly should have taken an

additional €1.2 billion of charges, which it later took in the third quarter of 2008. At most,

Plaintiffs' allegations – which rely on ING's 2008 1Q Analyst Presentation (Ex. II) and

subsequent SEC filings – are bald pleading by hindsight.

#### 1.    Hindsight Pleading

To support their claim that ING should have taken €1.2 billion of additional impairment

charges in the first quarter of 2008, Plaintiffs rely exclusively on ING's own accounting

determination half a year later. See PB at 44; DB at 42. The Opposition ignores well-settled law

explicitly rejecting such reasoning by hindsight, insufficient even under Rule 8 standards. DB at

---

[24]    See, e.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("defendants' lack of clairvoyance simply does not constitute securities fraud"); Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1277 (D.C. Cir. 1994) (rejecting allegations that "called for pejorative characterizations of disclosed factual matters"); cf. Rombach, 335 F.3d at 174 ("[Companies] are not required to take a gloomy, fearful, or defeatist view of the future.").

[25]    As Plaintiffs themselves represent, all of the cases they rely upon in arguing that ING's cautionary language was insufficient depend on a fact pattern in which defendants failed to disclose known facts that a specific risk had already materialized to the defendant's detriment. See PB at 28-29 & 40-41 and cases cited therein. The CAC is devoid of factual allegations as to the actual default rates on ING's RMBS at the time of the relevant Offerings, let alone the magnitude of any impact on ING. See supra Points II.B.1 & 2.

17

42-43 & n.52. It also ignores Iqbal's obligation to consider obvious alternative explanations. By the end of ING's 2008 third quarter, Freddie Mac and Fannie Mae had been put into conservatorship, Lehman Brothers had failed, and AIG nationalized. To equate time periods before and after these events flies in the face of common sense. Even Plaintiffs portray a rapid decline in ING's RMBS at this time, see PB at 45, underscoring the inappropriateness of the hindsight compression of this turbulent period. Particularly in the absence of any other explanation (and the CAC offers none), the most plausible explanation is that these unique market conditions caused the rapid decline in ING's RMBS and debt securities investments.

### 2.    There Was No Material Misstatement Or Omission

The €1.2 billion of impairments that ING allegedly should have taken in the first quarter of 2008, rather than the third quarter, are also quantitatively immaterial. Only one-third of this amount (€409 million) was attributed to RMBS; the balance was for loan loss reserves (irrelevant to the CAC) and all of ING's debt securities portfolio. DB at 42. Nevertheless, the full €1.2 billion charge taken in November 2008 represented less than one-tenth of one percent (0.09%) of ING's total assets at that time. A fortiori, the €409 million in RMBS charges are quantitatively and qualitatively immaterial in light of the extensive disclosures that ING made about its RBMS investments. See DB at 43-44; supra § II.B.4. Plaintiffs offer no response.[26]

Instead, Plaintiffs argue that the losses recorded by ING in November 2008 "forced" ING to "seek and receive a bail out by the Dutch Government to remain adequately capitalized and functioning." PB at 48. But this was after the economic tsunami in September 2008. The Dutch Government's own press release speaks for itself: the government said it was making capital

---

[26]    Similarly, the Opposition purports to defend the CAC's allegations about ING's ownership of WaMu and Icelandic Bank securities, but does nothing more than repeat them; no effort is made to address any argument raised by the defense. See PB at 45-46. Thus, the Opposition does not deny that the CAC never even identifies which Icelandic banks ING invested in, or the magnitude of its investment in those banks or WaMu. Further, the CAC just lumps these investments together with ING's holdings of Lehman Brothers securities. See DB at 45-46, 48-49.

"available to each financial enterprise in the Netherlands that is fundamentally sound and viable," Press Release, De Nederlandsche Bank, "Measures by the Dutch Authorities to Protect the Financial Sector" (Oct. 9, 2008), Ex. H at 1, and (Plaintiffs' assertion to the contrary notwithstanding) that it was doing so "to level the playing field" in light of public sector investment in financial companies elsewhere. Id.

Plaintiffs also argue that material details about the decline in ING's RMBS portfolio were withheld from investors in the June 2008 Offering. PB at 44-45. The Opposition contends, for example, that delinquencies doubled and market values declined. Id. at 44; CAC ¶ 182. The CAC does not identify the source of these allegations, but tellingly does not identify any witness (confidential or otherwise) or internal ING document. The reason is that, months before the June 2008 Offering, ING disclosed these facts on its website. Indeed, as shown in Defendants' opposition to Plaintiffs' belated motion to strike (Defs.' Opp. to Mot. to Strike at 8-10), the allegations come directly from this pre-Offering public disclosure by ING.[27]  Plaintiffs' assertion that the market was unaware of these facts, therefore, is inexplicable, and hardly a good faith basis for demonstrating that the total mix of information omitted these facts.[28]

### 3.    ING Did Not Violate IAS No. 39

Because ING's accounting determinations were a matter of judgment and opinion, to state a claim under Section 11 Plaintiffs must allege that they were objectively and subjectively false when made. See DB Br. 44-49. Not even Plaintiffs contend that they have done so.

---

[27]    In their motion to strike reply, Plaintiffs coyly refuse to say where their allegations come from. MTS Reply at 5.

[28]    Courts routinely consider information already in the public domain and facts known or reasonably available to the shareholders in assessing whether an alleged omission would have altered the total mix of information. See Garber, 2009 WL 3109914, at *2 (quotation marks omitted). The Third Circuit case upon which Plaintiffs rely is distinguishable. See In re Adams Golf, Inc. Sec. Litig., 381 F 3d 267, 276 n.10 (3d Cir. 2004) (rejecting defendants' argument that information disclosed in pre-IPO press release did not need to be disclosed in the offering materials because prior to the IPO, there was no indication that the information would be publicized or digested by an efficient market).

IAS No. 39 explicitly acknowledges that accounting determinations about impairments are matters of judgment. First, an impairment charge is taken "if, and only if, there is objective evidence of impairment as a result of one or more events . . . [which] has an impact on the estimated future cash flows of the financial asset or group of financial assets that can be reliably estimated."[29] Further, where observable data is

> limited or no longer fully relevant to current circumstances . . . an entity uses its experienced judgment to estimate the amount of any impairment loss. Similarly, an entity uses its experienced judgment to adjust observable data for a group of financial assets to reflect current circumstances . . . . The use of reasonable estimates is an essential part of the preparation of financial statements and does not undermine their reliability.

IAS No. 39 § 62. Thus, ING specifically disclosed that "[t]he identification of impairment and the determination of the recoverable amount are an inherently uncertain process involving various assumptions and factors." 2007 Annual Report, Ex. R, at F-10, quoted in DB at 44. In taking certain impairments and not others, and disclosing the reasons therefore – i.e., that the RMBS securities and other debt securities continued to perform in line with contractual terms, CAC ¶ 139 (quoting Ex. S at 5) – ING was exercising the judgment the IAS requires.

Plaintiffs make no allegation (and indeed disclaim) that ING's estimates were not truly believed. Nor do they allege that it was improper to consider contractual cash flow or that the decisions as a whole were contrary to ING's "experienced judgment," or to the judgment of Ernst & Young, which gave unqualified opinions on ING's audited financial statements. The absence of any such allegation mandates dismissal.[30]

---

[29]    IAS No. 39 § 59 (emphasis added), Reply Declaration of Mitchell A. Lowenthal (Jan. 8, 2010) ("Lowenthal Reply Decl.") Ex. A.

[30]    See, e.g., CIT Group, 349 F. Supp. 2d at 690-91 (rejecting Securities Act claims where plaintiffs failed to plead "any facts from which it could be inferred that defendants' belief in the adequacy of the reserves was beyond the pale of reason"); In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 210 (S.D.N.Y. 2003) (dismissing Section 11 claim in the absence of an allegation opinion was not truly held); In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 351-52 (S.D.N.Y. 2005) (mere difference of opinion as to valuation does not establish falsity);

Simply pointing to alternative factors that Plaintiffs <u>believe</u> support a different judgment – some of which are explicitly deemed insufficient under IAS No. 39 or belied by the very documents upon which Plaintiffs rely[31] – does not change this result.  Plaintiffs rest on fraudulent scheme cases in which there were specific factual allegations of knowledge of concrete facts (supported by allegations by corporate insiders) that did not so much as "contradict" management's valuations as establish that an accounting violation had occurred.[32]  Having disclaimed the only fact that could put ING's valuations at issue (<u>i.e.</u>, fraudulent intent), and having wholly relied on hindsight rather than "contemporaneous fact," Plaintiffs' claims are facially defective.[33]

---

<u>Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.</u>, 376 F. Supp. 2d 385, 396-97 (S.D.N.Y. 2005) (mere difference of opinion as to valuation does not by itself rise to the level of a misstatement or omission).

      Plaintiffs' attempt to distinguish these cases rings hollow.  PB at 47.  That the cases do not address the precise accounting standard at issue and that one dealt with a fairness opinion do not affect the application of the broader principle that valuations are opinions, and as such can only be actionable as a misstatement if not truly held.

[31]     <u>Compare</u> PB at 45 (alleging that more than 20% of ING's RMBS portfolio was downgraded from AAA to AA) <u>with</u> IAS No. 39 § 60 ("A downgrade of an entity's credit rating is not, of itself, evidence of impairment . . . ."). Further, the analyst presentation that was the apparent source of that allegation disclosed that approximately 20% of ING's small <u>subprime</u> RMBS portfolio was so downgraded – while ING's Alt-A RMBS portfolio remained 99% AAA rated. Ex. II at 46, 48-49.

      The analyst presentation also revealed that the market value of ING's NegAm RMBS investment declined from 94% to 65% of par – figures Plaintiffs allege should have caused ING to take greater impairments. PB at 45. <u>But see</u> IAS No. 39 § 60 ("A decline in the fair value of a financial asset below its cost or amortised cost is not necessarily evidence of impairment . . . ."). Plaintiffs also ignore that "cash flows continued to perform" and ING invested in "AAA NegAm RMBS because of its . . . high average credit enhancement, which covers current 3.9% estimated pipeline loss 6.7 times." <u>See</u> Ex. II at 50.

[32]     <u>See, e.g.</u>, <u>RAIT</u>, 2008 WL 5378164, at **6-8; <u>New Century</u>, 588 F. Supp. 2d at 1226-27; <u>Wash. Mut., Inc.</u>, 259 F.R.D. at 507; <u>supra</u> n.15.

[33]     <u>See, e.g.</u>, <u>Coronel</u>, 2009 WL 174656, at *14 ("The relevant inquiry under the Securities Act is not whether the estimate disclosed in the offering documents later turned out to be incorrect, but rather whether the facts alleged in the Complaint evince that the Company knew or had reason to believe, at the time the Prospectus and Registration Statement were filed, that the statement was untrue."); <u>In re Duke Energy Corp. Sec. Litig.</u>, 282 F Supp. 2d 158, 160 (S.D.N.Y. 2004) (dismissing Securities Act allegations of improper accounting practices where complaint failed to allege "in any cognizable respect [whatsoever] how mark-to-market accounting practices were improper"); <u>In re Mirant Corp. Sec Litig.</u>, No. 02 Civ. 1467 (RWS), 2009 WL 48188, at *21 (N.D. Ga. Jan. 7, 2009) (dismissing Securities Act claims where plaintiffs failed to allege facts establishing that accounting standards required the defendant to recognize the alleged impairment).

**E.    The Section 15 Claim Fails As A Matter Of Law**

The Section 15 claim is asserted only against defendants who have never been served.[34]

In any event, in the absence of a primary violation no Section 15 claim will lie.  See, e.g., JP

Morgan, 553 F.3d at 206-07.

## CONCLUSION

For the foregoing reasons, and those set forth previously, the CAC should be dismissed

with prejudice.

Dated: New York, New York
       January 8, 2010

Respectfully submitted,


CLEARY GOTTLIEB STEEN & HAMILTON          SHEARMAN & STERLING LLP
LLP

By: _Mitchell A. Lowenthal_                By: _Adam Hakki /apg_
    Mitchell A. Lowenthal                      Stuart J. Baskin
    Giovanni P. Prezioso                        Adam S. Hakki
                                               Herbert S. Washer

One Liberty Plaza
New York, New York 10006                   599 Lexington Avenue
Telephone:  (212) 225-2000                 New York, New York 10022
Facsimile: (212) 225-3999                  Telephone: (212) 848-4000
                                           Facsimile: (212) 848-7179

Attorneys for Defendants ING Groep N.V., ING
Financial Holdings Corp., and ING Financial   Attorneys for all Underwriter Defendants except
Markets LLC                                   ING Financial Markets LLC

---

[34]    As Defendants have noted, see DB 1 n.1 – and as uncontested by Plaintiffs – only the movants here have been served; Plaintiffs do not contend – because they cannot – that any other defendant has been.  Rather, they rely upon a letter referring to representation – not appearance or service.  PB at 1 n.2.  They also know, but omit, that (a) the only ING entities on whose behalf an appearance has been filed are the ING movants – the only ING entities who have been served, and (b) Plaintiffs' failure to serve the other defendants was specifically called to their attention before this motion to dismiss was filed.  See Lowenthal Reply Decl., Exs. B and C.

22